## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH DUNN, HELEN IEHL, ALBERT PIETERSON, JOHN HASTINGS, WINDIE BISHOP, LISA BARNES, ANGELA GARR, and MYESHA PRATHER individually and on behalf of a class of similarly situated individuals, | ) ) ) ) ) ) | No. 17-cv-00481 |
| *Plaintiffs*, | ) ) ) | Hon. Manish S. Shah |
| v. | ) ) | |
| WELLS FARGO BANK, N.A., | ) ) | |
| *Defendant*. | ) | |

## PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Myles McGuire
Evan M. Meyers
Eugene Y. Turin
MCGUIRE LAW, P.C.
55 W. Wacker Dr., 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
mmcguire@mcgpc.com
emeyers@mcgpc.com
eturin@mcgpc.com

Jonathan D. Selbin
Daniel M. Hutchinson
LIEFF CABRASER
HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Tel: (212) 355-9000
Fax: (212) 355-9592
jselbin@lchb.com
dhutchinson@lchb.com

Daniel C. Girard
Angelica M. Ornelas
GIRARD SHARP LLP
601 California St., Ste. 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dgirard@girardsharp.com
aornelas@girardsharp.com

*Counsel for Plaintiffs and
Class Counsel*

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................ii

TABLE OF AUTHORITIES ................................................................................... iii–v

I.     INTRODUCTION...........................................................................................1

II.    ADDITIONAL BACKGROUND ON SETTLEMENT NEGOTIATIONS ......................2

III.   ARGUMENT ................................................................................................5

    A.    The Notice Plan was Effective and Satisfied Rule 23 and Due Process .......................5

    B.    Final Approval of the Settlement Is Warranted. .........................................7

        i.     The Settlement was reached after extensive discovery, litigation, and arm's-length negotiation ...............................................................7

        ii.    The relief provided by the Settlement is exceptional in light of the costs, risks, and delay of trial and appeal ..................................................9

        iii.   The remaining Rule 23(e)(2)(C) factors weigh in favor of approval. ...................11

    C.    The Court Should Grant Final Certification of the Settlement Class ...........................13

    D.    The Court Should Strike the Hoipkemier Objection Because Mr. Hoipkemier Is Not a Member of the Class and Lacks Standing to Object ............................................13

    E.    In the Alternative to Striking the Objection, the Hoipkemier Objection Should be Overruled.................................................................................................13

        i.     The Objection is wrong about the procedural history of the Settlement and the settlement negotiations .............................................................14

        ii.    There is no reverse auction here, only a valuable settlement reached by experienced counsel after vigorous litigation ..........................................17

        iii.   The requested fees are reasonable ...........................................................20

        iv.   Fee allocation agreements are not subject to Rule 23(e)(3)....................................23

        v.    The requested Incentive Award is reasonable .........................................24

IV.   CONCLUSION ...........................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Adams v. AllianceOne Receivables Mgmt. Inc.*,
   No. 08-cv-00248 (S.D. Cal.) ...................................................................9

*Aggretti v. ANR Freight Sys., Inc.*,
   982 F.2d 242 (7th Cir. 1992) ...............................................................13

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ...........................................................................19

*Aranda v. Caribbean Cruise Line, Inc.*,
   No. 12-cv-4069, 2017 WL 1360741 (N.D. Ill. 2017) .........................21

*Arthur v. Sallie Mae, Inc.*,
   No. 10-cv-0198, 2012 WL 90101 (W.D. Wash. 2012) ....................1, 9

*Birchmeier v. Caribbean Cruise Line, Inc.*,
   896 F.3d 792 (7th Cir. 2018) ...........................................................12, 21

*Butler v. Am. Cable & Tel., LLC*,
   No. 09-cv-5336, 2011 WL 2708399 (N.D. Ill. 2011) ..........................8

*CE Design v. Beaty Const., Inc*,
   No. 07-cv-3340, 2009 WL 192481 (N.D. Ill. 2009)............................6

*Class Plaintiffs v. Jaffe & Schlesinger, P.A.*,
   19 F.3d 1306 (9th Cir. 1994) .............................................................22

*Connor v. JPMorgan Chase Bank*,
   No. 10-cv-1284 (S.D. Cal.) ...................................................................9

*Cook v. Niedert*,
   142 F.3d 1004 (7th Cir. 1998) ...........................................................24

*Creative Montessori Learning Ctrs. v. Ashford Gear LLC*,
   662 F.3d 913 (7th Cir. 2011) .............................................................17

*Cross v. Wells Fargo Bank, N.A.*,
   No. 15-cv-1270 (N.D. Ga.) ...................................................................9

*Davenport v. Discover Fin. Servs*,
   No. 15-cv-6052 (N.D. Ill. 2017)..........................................................13

*Davis v. AT&T Corp*,
   No. 15-cv-2342, 2107 WL 1155350 (S.D. Cal. 2017) .......................10

*Duke v. Bank of Am., N.A.*,
   No. 12-cv-04009 (N.D. Cal.) .................................................................9

*Fowler v. Wells Fargo Bank, N.A.*,
   No. 14-cv-02092 (N.D. Cal. 2018).....................................................21

*Gehrich v. Chase Bank USA, N.A.*,
   No. 12-cv-5510, 2016 WL 806549 (N.D. Ill. 2016)............................9

*Hartless v. Clorox Co.*,
  273 F.R.D. 630 (S.D. Cal. 2011) ....................................................................23

*High Sulfur Content Gasoline Prods. Litig.*,
  517 F.3d 220 (5th Cir. 2008) .......................................................................23

*Hughes v. Kore of Indiana Enter., Inc.*,
  731 F.3d 672 (7th Cir. 2013) .........................................................................6

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
  270 F.R.D. 330 (N.D. Ill. 2010) ....................................................................6

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
  789 F. Supp. 2d 935 (N.D. Ill. 2011)................................................ 18, 19, 22

*In re Capital One TCPA Litig.*,
  80 F. Supp. 3d 781 (N.D. Ill. 2015).................................................... 1, 9, 18

*In re Domestic Air Transp.*,
  148 F.R.D. 297 (N.D. Ga. 1993) ..................................................................24

*In re Gen. Motors Engine Interchange Litig.*,
  594 F.2d 1106 (7th Cir. 1979) .....................................................................19

*In re Hatteras Fin., Inc. Shareholder Litig.*,
  286 F. Supp. 3d 727 (M.D. N.C. 2017)........................................................22

*In re Hyundai and Kia Fuel Economy Litig.*,
  926 F.3d 539 (9th Cir. 2019) .......................................................................22

*In re Life Time Fitness, Inc. TCPA Litig.*,
  847 F.3d 619 (8th Cir. 2017) .......................................................................23

*In re NCAA Student-Athlete Concussion Injury Litig.*,
  332 F.R.D. 202 (N.D. Ill. 2019).....................................................................13

*In re Toyota Motor Corp. Unintended Acceleration Mktg. Litig.*,
  No. 10-cv-2151, 2013 U.S. Dist. LEXIS 123298 (C.D. Cal. 2013)............24

*In re Warfarin Sodium Antitrust Litig.*,
  212 F.R.D. 231 (D. Del. 2002) ....................................................................24

*James v. JPMorgan Chase Bank, N.A.*,
  No. 15-cv-02424 (M.D. Fla.) ......................................................................10

*Johnson v. Yahoo!, Inc.*,
  346 F. Supp. 3d 1159 (N.D. Ill. 2018) ....................................................11, 21

*Kramer v. Autobytel, Inc.*,
  No. 10-cv-2722 (N.D. Cal. 2012)................................................................1, 9

*Luster et al. v. Wells Fargo Bank, N.A.*,
  No. 15-cv-01058 (N.D. Ga. 2017).............................................................9, 10

*Malta v. Fed. Home Loan Mortg. Corp.*,
  No. 10-cv-1290, 2013 WL 444610 (S.D. Cal. 2013) ...................................9

*Markos v. Wells Fargo Bank, N.A.*,
No. 15-cv-1156 (N.D. Ga.) ........................................................................................... 9

*Martin v. JTH Tax, Inc.*,
No. 13-cv-6923 (N.D. Ill. 2015) ................................................................................... 12

*McCabe v. Aranda*,
139 S. Ct. 923 (2019) .................................................................................................... 12

*Reynolds v. Ben. Nat'l Bank*,
288 F.3d 277 (7th Cir. 2002) ........................................................................... 14, 17, 18

*Roark v. Credit One Bank, N.A.*,
No. 16-cv-173, 2018 WL 5921652 (D. Minn. 2018) ................................................... 10

*Rose v. Bank of Am. Corp.*,
Nos. 11-cv-02390 & 12-cv-04009, 2014 WL 4273358 (N.D. Cal. 2014) ................... 20

*Sandoe v. Bos. Sci. Corp.*,
No. 18-cv-11826, 2019 WL 5424203 (D. Mass. 2019) ........................................... 10, 21

*Schulte v. Fifth Third Bank*,
805 F. Supp. 2d 560 (N.D. Ill. 2011) ...................................................................... 11, 19

*Smith v. Premier Dermatology*,
No. 17-cv-3712, 2019 WL 4261245 (N.D. Ill. 2019) .............................................. 11, 21

*Tomeo v. CitiGroup, Inc.*,
No. 13-cv-4046, 2018 WL 4627386 (N.D. Ill. 2018) ................................................... 10

*Vergara et al v. Uber Techs, Inc.*,
No. 15-cv-6942 (N.D. Ill. 2018) ...................................................................... 10, 12, 22

*Weinstein v. The Timberland Co.*,
No. 06-cv-00484 (N.D. Ill. 2008) .................................................................................... 1

*Wilkins v. HSBC Bank Nev., N.A.*,
No. 14-cv-190 (N.D. Ill. 2015) ....................................................................................... 9

**Statutes**

Fed. R. Civ. P. 23 .................................................................................................. *passim*

47 U.S.C. § 227 ............................................................................................................. 10

**Treatises**

Conte & Newberg, *Newberg on Class Actions* (5th ed.) .................................. 13, 20, 24

*Manual for Complex Litigation* § 22.921 (4th ed. 2004) ................................................ 8

2 McLaughlin on Class Actions § 6:12 (16th ed.) .......................................................... 8

## I.  **INTRODUCTION**

Plaintiffs respectfully request that this Court grant final approval of the Parties' Class Action Settlement Agreement.[1] This Settlement is, by any measure, an excellent result for the Class. At $17.85 million in non-reversionary cash for an estimated 440,000 wrong-number call recipients, the Settlement offers more than $40 per Class Member, and more than *$400* per valid claimant, both well above the standard range for TCPA class settlements. After pro rata distribution of the Settlement Fund (with no money reverting back to Wells Fargo), each claimant is projected to receive a cash payment between $400 and $500, an exceptional amount when compared to awards achieved in similar TCPA settlements.[2]

The Settlement must be measured against the real possibility that Settlement Class Members would have received no compensation whatsoever. While Plaintiffs believe they would have secured class certification and prevailed at trial, success was not assured, particularly given the uncertainty surrounding the FCC's interpretation of "automatic telephone dialing system" ("ATDS"), and the substantial risk that Plaintiffs could lose class certification based on Wells Fargo's contention, supported by applicable case law, that difficulties in identifying wrong-number class members present substantial ascertainability challenges.

The reaction of the Class reflects this superior result—more than 22,150 claims (with four weeks still remaining in the claims period), only 45 opt-outs, and only a single objection filed by

---

[1] Unless otherwise defined herein, capitalized terms used herein have the same meaning given to them as in the Settlement Agreement, which is Exhibit A to the Motion for Preliminary Approval, Dkt. 80-1.

[2] *See, e.g.*, *Kramer v. Autobytel, Inc.*, No. 10-cv-2722, Dkt. 148 (N.D. Cal. Jan. 27, 2012) (providing for a cash payment of $100 to each class member); *Weinstein v. The Timberland Co.*, No. 06-cv-00484, Dkt. 93 (N.D. Ill. Dec. 18, 2008) (providing for a cash payment of $150 to each class member); *In re Capital One TCPA Litig.*, 80 F. Supp. 3d 781, 790 (N.D. Ill. 2015) (providing a $34.60 recovery per claiming class member); *Arthur v. Sallie Mae, Inc.*, No. 10-cv-0198, 2012 WL 90101, at *3 (W.D. Wash. Jan. 10, 2012) (approving a settlement where class members were due to receive between $20 and $40).

a misguided class action attorney whose client (and law firm partner) – evidence has shown – is not even a member of the Class. Notably absent from that Objection is any analysis of the actual result obtained for the Class, or any discussion of the reasonableness of the Settlement in light of the relevant risks. In 28 pages of hyperbole and wild accusations, the Objection never once addresses the quality of the Settlement for the Class, and never claims the Settlement itself is inadequate or offers any proposal to improve it. Instead, the Objection seems fine with the relief provided to the Class but complains that this fair and adequate outcome was somehow reached by the wrong attorneys. For the reasons explained below, those criticisms simply do not reflect the true facts. And the Objection entirely overlooks the advanced expert work and discovery conducted in the California cases against Wells Fargo and the fact that the eventual participation of California counsel in settlement negotiations further increased what was already a generous resolution. Ultimately, the adequacy of counsel is clearly demonstrated by the fact that they secured an excellent result for the Class.

Plaintiffs respectfully request that the Court grant final approval of the Settlement, approve Plaintiffs' request for attorneys' fees, expenses, and incentive awards (Dkt. 95), and strike Mr. Hoipkemier's Objection for lack of standing, or otherwise overrule the Objection on the merits.

## II.     ADDITIONAL BACKGROUND ON SETTLEMENT NEGOTIATIONS

The background of the various TCPA class actions filed, litigated, and now resolved as part of this Settlement, as well as the terms of the proposed Settlement, are set forth in detail in Plaintiffs' Motion for Preliminary Approval. (Dkt. 80, at 2–13.) To avoid burdening the Court with duplication of efforts, Plaintiffs will not repeat such discussions here, but will provide herein additional detail regarding settlement discussions to address the speculative and demonstrably untrue assertions in the Hoipkemier Objection.

This Settlement is the culmination of several separate settlement efforts by the Parties and their counsel that were at all times conducted at arms-length and strictly for the benefit of the Class. The first mediation occurred on September 13, 2018 in the *Pieterson-Hastings* matter, under the auspices of mediator Hunter Hughes. (*See Pieterson et al. v. Wells Fargo Bank, N.A.*, No. 17-cv-03633, Dkt. 34 (N.D. Cal. Sept. 7, 2018)). While that mediation was unsuccessful, the Parties agreed to resume mediation after the *Pieterson-Hastings* Plaintiffs filed their motion for class certification, which they did on November 16, 2018. (*Pieterson-Hastings*, Dkt. 153.)

Meanwhile, in *Prather*, in light of Plaintiff's discovery efforts, as well as the then-upcoming deadline for the filing of Plaintiff's motion for class certification, the Parties agreed to participate in a mediation on December 20, 2018 before the Honorable James F. Holderman (Ret.) of JAMS. (*See* Declaration of Evan M. Meyers, attached hereto as <u>Exhibit A</u>, ¶ 11.) Before that mediation, *Prather* had already taken the 30(b)(6) deposition of Wells Fargo and Wells Fargo had provided extensive information regarding the potential class size and the merits of the claims asserted in the *Pieterson-Hastings*, *Barnes*, *Bishop*, and *Garr* Actions. (*Id.*, ¶¶ 9–11.)

After a full day of negotiations, the Parties made extensive progress and reached an initial settlement to resolve wrong-number class claims asserted in the *Prather*, *Pieterson-Hastings*, *Barnes*, *Bishop*, and *Garr* Actions. (*Id.*, ¶ 12.) The terms of the settlement reached at the December 20, 2018 mediation, which was subject to confirmatory discovery, provided for a $15 million settlement based on 750,000 telephone numbers identified by Wells Fargo as "wrong numbers" that were potentially called in error—amounting to approximately $20 per telephone number. (*Id.*, ¶ 12.)

Following the *Prather* mediation, Wells Fargo moved to stay *Pieterson-Hastings*, and the California federal court granted that motion in part on February 24, 2019. (*Pieterson-Hastings*,

Dkt. 218.) Shortly thereafter, on February 26, 2019, counsel for Plaintiffs in the *Pieterson-Hastings*, *Bishop*, *Barnes*, and *Garr* Actions met with counsel for Plaintiffs Prather, Dunn, and Iehl to learn the details of the potential settlement (Meyers Decl., ¶ 13; Declaration of Jonathan Selbin, attached hereto as <u>Exhibit B</u>, ¶ 22.) After that meeting, counsel agreed to engage in joint settlement negotiations in an effort to reach an efficient final resolution of each of their respective class cases against Wells Fargo. (Meyers Decl., ¶ 14; Selbin, Decl., ¶¶ 26–30.) In the following five months, the Parties engaged in extensive and often contentious further negotiations to come to terms on the key elements of a global class settlement addressing calls by multiple Wells Fargo lines of business, including the appropriate relief to be provided to the Class Members, the scope of the release, and the plan for notice and settlement administration.

These negotiations benefited not only from the discovery conducted by *Prather* counsel prior to the December 2018 mediation, as well as the discovery and substantial expert work conducted in *Pieterson-Hastings*, but also extensive confirmatory discovery, including three *additional* 30(b)(6) depositions of Wells Fargo's corporate representatives conducted by *Prather* counsel that occurred on February 25, 2019 and March 8, 2019. (Meyers Decl., ¶ 14.) This confirmatory discovery revealed that the estimated number of telephone numbers identified by Wells Fargo as potentially being called in error was actually closer to 850,000. (Meyers Decl., ¶ 15; Selbin Decl., ¶ 26.)

To account for these additional records, Class Counsel engaged in negotiations with Wells Fargo to increase the Settlement Fund to the amount finally agreed upon, $17.85 million, which provided even more compensation per potential class member than the amount originally agreed upon. Based on expert analysis of the Class data conducted by Class Counsel, as well as by Wells Fargo, the total number of potential Class Members is no more than 440,000, because a large

4

portion of telephone numbers with a wrong-number code actually belonged to Wells Fargo customers outside the Class. As a result, the true estimated Class size, as reported to the Court in the Motion for Preliminary Approval, is approximately 440,000 or less, or less than 50% of the total number of wrong number-coded telephone numbers at issue. (Meyers Decl., ¶ 16; Selbin Decl., ¶ 27; Dkt. 80, at 10.) This Class estimate comes as no surprise given that the expert analysis of Wells Fargo's data in *Pieterson-Hastings* yielded a similar ratio—49%. (Selbin Decl., ¶ 27.) The Settlement is consequently valued at more than $40 per true Class member.[3]

## III.  **ARGUMENT**

The new Fed. R. Civ. P. 23(e) calls for front-loaded scrutiny of a proposed settlement so that any issues are identified *before* notice goes out to the class. That step has already occurred. (Dkt. 84 (Order granting preliminary approval)). With this Motion, Plaintiffs respectfully request that the Court take the second and final step in the process by granting final approval of the Settlement. Final approval is warranted because the Class Notice was effective and satisfied Rule 23 and due process, and because the Settlement is an excellent result for Class Members that was reached through arms-length, adversarial negotiations.

### A.     **The Notice Plan was Effective and Satisfied Rule 23 and Due Process.**

When a class is certified through settlement, due process and Rule 23 require that the court "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). Notice is "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P.

---

[3] After Wells Fargo's formal assembly of the Notice list after preliminary approval, the number of telephone numbers identified by Wells Fargo as potentially being called in error was determined to be approximately 931,000. (Meyers Decl., ¶ 17; Declaration of Settlement Administrator, Cameron R. Azari, attached hereto as Exhibit C, ¶ 14.) However, based on the expert analysis previously conducted by Class Counsel, as well as Wells Fargo's own analysis of its records, the estimated Class size is at most 440,000.

23(c)(2)(B). This mandate does not require that every individual class member actually receive direct notice. *See, e.g.*, *CE Design v. Beaty Const., Inc.*, No. 07-cv-3340, 2009 WL 192481, at *10 (N.D. Ill. Jan. 26, 2009) ("The Federal Rules [] require the best notice that is 'practicable' not perfect notice. The word 'practicable' implies that the plaintiff should be afforded some flexibility with respect to providing notice to unknown, potential class members"). In particular, class members who cannot be reached through reasonable effort can be notified by publication. *Hughes v. Kore of Indiana Enter., Inc.*, 731 F.3d 672, 677 (7th Cir. 2013). Class notice must clearly state in plain, easily understood language the details of the proposed settlement, including the nature of the action, the class definition(s), the claims, and the class members' rights. Fed. R. Civ. P. 23(c)(2)(B)(i)–(vii); *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 350–51 (N.D. Ill. 2010).

Here, the Notice clearly satisfied Rule 23 and due process. Consistent with the Modified Preliminary Approval Order, the Notice Plan was implemented by September 30, 2019. (Dkt. 92; Azari Decl., ¶ 17.) The Settlement Administrator sent direct notice of the Settlement via U.S. Mail to Class Members who were identified by conducting a reverse-lookup of the phone numbers from Wells Fargo's Notice Database coded as wrong-number calls. (Azari Decl., ¶¶ 15, 17.) Direct notice was further supplemented by publication notice in which the Settlement Administrator oversaw the placement of a press release, multiple online banner advertisements via various online publication networks, such as the Google Ad Network and Facebook, as well as advertisements in *USA Today*. (*Id*., ¶¶ 21–25.) Additionally, Class Members have access to the Settlement Website which contains all of the information related to the Settlement in both English and Spanish, including key dates and deadlines, relevant court documents, contact information for Class Counsel, and most importantly, an easily accessible online Claims Form that Settlement Class

Members can use to submit their claim through U.S. mail, by email, by telephone, and also directly on the Settlement Website. (Azari Decl., ¶¶ 29–32; *see* www.tcpawellsfargo.com.) Thanks to the Notice implemented there have already been over 132,000 unique visitors to the Settlement Website. (*Id.*, ¶ 30.)

As the Court has already found, the form and content of Class Notice satisfied Rule 23 and due process. (Dkt. 84, at ¶ 9.) And notice was effective, reaching hundreds of thousands of potential Class Members and resulting in more than 22,150 Claim Forms already being submitted, with 4 weeks still remaining before the Claims Deadline. (Azari Decl., ¶ 34.)

**B.      Final Approval of the Settlement Is Warranted.**

As the Court already found in its initial decision granting preliminary approval of the Settlement, application of the Rule 23(e)(2) factors demonstrate that the Settlement should be granted final approval.

**i.      The Settlement was reached after extensive discovery, litigation, and arm's-length negotiation.**

The first two factors under the amended Rule 23(e)(2) are intended to "look[] to the conduct of the litigation and of the negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23(e)(2)(A) & (B) Advisory Committee's Note. In determining whether these factors are satisfied the Court may consider "the nature and amount of discovery in this or other cases, or the actual outcomes of other cases, [which] may indicate whether counsel negotiating on behalf of the class had an adequate information base." Fed. R. Civ. P. 23(e)(2)(A) & (B) Advisory Committee's Note.

The negotiations that led to the Settlement followed extended and contentious discovery and litigation in *Prather*, *Pieterson-Hastings*, and *Bishop*. The Settlement was negotiated only after significant discovery had already been completed, after a motion for class certification had been filed in *Pieterson-Hastings*, and after discovery had concluded and class certification filings

were imminent in *Prather*. And the Settlement was finalized only after Class Counsel conducted extensive additional confirmatory discovery and negotiated the Settlement over many months. *See* 2 McLaughlin on Class Actions § 6:12 (16th ed.) ("Confirmatory discovery permits plaintiffs to verify any representations by defendants during settlement negotiations concerning what discovery would establish, and should go far towards demonstrating that the settlement is fair, adequate, and reasonable") (citing Federal Judicial Center, *Manual for Complex Litigation* § 22.921 (4th ed. 2004)).

Class Counsel collectively reviewed tens of thousands of pages of documents produced by Wells Fargo and conducted many depositions of Wells Fargo's corporate designees. (Selbin Decl., ¶ 11; Meyers Decl., ¶¶ 9–11, 14.) In addition, Class Counsel worked with their experts to conduct detailed analyses of Wells Fargo's call records to verify the accuracy of its record-keeping system and determine the size and ascertainability of the putative Class. (Selbin Decl., ¶ 11(f); Meyers Decl., ¶ 16.) Much of this discovery was obtained only after extended meet-and-confer discussions and, in several cases, contested discovery-related proceedings, including motion to compel proceedings. The collective discovery efforts in the six Actions provided Class Counsel with a comprehensive understanding of Wells Fargo's calling practices across multiple business lines. (Selbin Decl., ¶¶ 11, 25; Meyers Decl., ¶ 18.)

Settlement negotiations at all times were contentious, at arm's-length, and facilitated by experienced mediators. *See Butler v. Am. Cable & Tel., LLC*, No. 09-cv-5336, 2011 WL 2708399, at *8 (N.D. Ill. July 12, 2011) (presence of respected neutral supports finding of fairness); Fed. R. Civ. P. 23(e)(2)(A) & (B) Advisory Committee's Note ("[T]he involvement of a neutral or court-affiliated mediator or facilitator in those negotiations may bear on whether they were conducted in a manner that would protect and further the class interests"). Most importantly, the December 20, 2018 mediation that resulted in the initial settlement in principle that formed the basis for the

Settlement ultimately finalized by the Parties and preliminarily approved by the Court was conducted before Judge Holderman. (Meyers Decl., ¶ 11.)

### ii. The relief provided by the Settlement is exceptional in light of the costs, risks, and delay of trial and appeal.

The Settlement provides outstanding relief to the Settlement Class Members, especially in light of the numerous significant risks if these cases had proceeded towards ruling on class certification, dispositive motions, and trial. The Settlement is on the high end for TCPA settlements on a per-Class Member basis.[4] The Settlement is also exceptional considering what claimants will receive and is on the very high end for TCPA settlements on a per-claimant basis. Given that over 22,150 claims have been submitted to date, with four weeks remaining before the Claims Deadline, the Parties estimate that each claimant will receive over $400. This per-claimant benefit not only compares very favorably to other "wrong-number" settlements, it actually amounts to close to full statutory damages available under the TCPA per violation. *See* 47 U.S.C. § 227(b)(3)(B); *see, e.g., Vergara et al v. Uber*, No. 15-cv-6942, Dkt. Nos. 101, 111 (N.D. Ill. 2018) (granting final approval of settlement creating $20 million fund for unauthorized robocalls with 103,000 claims made,

---

[4] *See, e.g., Markos v. Wells Fargo Bank, N.A.*, No. 15-cv-1156 (N.D. Ga.) ($16.4 million for 3,296,755 class members, $4.97 per class member); *Cross v. Wells Fargo Bank, N.A.*, No. 15-cv-1270 (N.D. Ga.) ($30.4 million for 6,409,689 class members, $4.74 per class member); *Luster v. Wells Fargo Dealer Servs.*, No. 15-cv-1058 (N.D. Ga.) ($14.8 million for 3,128,914 class members, $4.73 per class member); *Gehrich v. Chase Bank USA, N.A.*, No. 12-cv-5510, 2016 WL 806549 (N.D. Ill. Mar. 3, 2016) ($34 million for more than 32 million class members, $1.06 per class member); *Arthur v. Sallie Mae Inc.*, No. 10-cv-00198 (W.D. Wash.) ($24.15 million for 7,792,256 class members, $3.10 per class member); *Malta v. Fed. Home Loan Mortg. Corp.*, No. 10-cv-1290, 2013 WL 444619 (S.D. Cal. Feb. 5, 2013) ($17.1 million for 4,546,293 class members, $3.76 per class member); *Duke v. Bank of Am., N.A.*, No. 12-cv-04009 (N.D. Cal.) ($32,083,905 for approximately 7,723,860 class members, $4.15 per class member); *Connor v. JPMorgan Chase Bank*, No. 10-cv-1284 (S.D. Cal.) ($11,665,592.09 for 2,684,518 class members, $4.35 per class member); *Wilkins v. HSBC Bank Nev., N.A.*, No. 14-cv-190 (N.D. Ill.) ($39,975,000 for 9,065,262 class members, $4.41 per class member); *In re Capital One Tel. Consumer Protection Act Litig.*, No. 12-cv-10064 (N.D. Ill.) ($75,455,098 for 16,645,221 class members, $4.53 per class member); *Kramer v. Autobytel*, No. 10-cv-02722, 2012 U.S. Dist. LEXIS 185800 (N.D. Cal. Jan. 27, 2012) ($12.2 million for 47 million class members, $0.26 per class member); *Adams v. AllianceOne Receivables Mgmt. Inc.,* No. 08-cv-00248 (S.D. Cal.) ($9 million for more than 6,079,411 class members, $1.48 per class member).

approximately $120 per claimant after deduction of attorneys' fees, costs, and awards); *Luster et al. v. Wells Fargo Bank, N.A.*, 15-cv-01058, Dkt. Nos. 72-1, 80 (N.D. Ga. 2017) (granting final approval of settlement creating a $14.8 million fund for unauthorized robocalls with 301,000 claims made, approximately $33 per claimant after deduction of attorneys' fees, costs, and awards); *James v. JPMorgan Chase Bank, N.A.*, No. 15-cv-02424 (M.D. Fla.), Dkt. Nos. 56, 58 (granting final approval of settlement creating a $3.75 million fund for unauthorized robocalls with 24,000 claims made, approximately $81 per claimant after deduction of attorneys' fees, costs, and awards).

The Parties' Settlement merits approval, particularly given the risks Plaintiffs faced in proceeding with litigation. While Plaintiffs believe their TCPA claims against Wells Fargo are strong, they also recognize that Wells Fargo's defenses, if successful, would result in Plaintiffs and the Class receiving no payment at all. Because this case involves what is often termed "misdirected" automated calls, class certification is far from certain. *See, e.g., Sandoe v. Bos. Sci. Corp.*, No. 18-cv-11826, 2019 WL 5424203 (D. Mass. Oct. 23, 2019) (denying class certification); *Tomeo v. CitiGroup, Inc.*, No. 13-cv-4046, 2018 WL 4627386 (N.D. Ill. Sept. 27, 2018) (denying class certification); *Davis v. AT&T Corp.*, No. 15-cv-2342, 2017 WL 1155350, (S.D. Cal. Mar. 28, 2017) (denying class certification). Further, with respect to the merits of Plaintiffs' claims, some courts have found that misdirected calls may not even be actionable under the TCPA and that a defendant's reasonable reliance on the consent of the customer it intended to reach may defeat the claim. *See, e.g., Roark v. Credit One Bank, N.A.*, No. 16-cv-173, 2018 WL 5921652 (D. Minn. Nov. 13, 2018). Courts also often find – as Wells Fargo would argue here – that dialer equipment that makes calls from a list of numbers does not meet the statutory definition of an ATDS. *See Smith v. Premier Dermatology*, No. 17-cv-3712, 2019 WL 4261245, at *7 (N.D. Ill. Sept. 9, 2019) (finding that a system that only "had the capacity to send text messages to client-provided phone

numbers" and not "randomly or sequentially generated numbers" was not an ATDS); *Johnson v. Yahoo!, Inc.*, 346 F. Supp. 3d 1159, 1162 (N.D. Ill. 2018) (holding the system at issue was not an ATDS as it "did not have the capacity to generate random or sequential numbers to be dialed—it dialed numbers from a stored list"). A similar holding here – that Wells Fargo's equipment is not an ATDS – would substantially reduce the value of Plaintiffs' and Class Members' claims.

Moreover, any trial in this matter – or potentially multiple trials, since this Settlement resolves multiple, separate lawsuits – would be complex and expensive, with fact and expert witnesses from across the country. "Settlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation." *See Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011) (citation omitted). In addition, trial(s) would be unlikely to take place for some time. At the time of Settlement the Parties in the Actions were actively litigating several issues, with a motion for class certification fully briefed in *Pieterson-Hastings*, and major motions in the other Actions still due to be filed. Any trial verdict would also be subject to lengthy appeals on both class certification and merits issues. With this Settlement, Plaintiffs and the Settlement Class Members will receive meaningful payments now, instead of years from now—or perhaps never. *See Id.* at 582. In short, absent settlement, the expense, duration, and complexity of protracted litigation against Wells Fargo would be substantial.

### iii. The remaining Rule 23(e)(2)(C) factors weigh in favor of approval.

**Method of distributing relief to the Class**. As detailed above, the Parties' preliminarily-approved, extensive notice plan, ensured that Class Members received effective notice informing them about the Settlement and allowed for them to easily submit claims for compensation from the Settlement Fund. (*See supra* Section III.A; Fed. R. Civ. P. 23(e)(2)(C)(ii); Azari Decl., ¶¶ 16–32.)

**Terms of attorneys' fee award**. For the reasons discussed in Class Counsel's fee petition (Dkt. 95) – and in their response to Mr. Hoipkemier's Objection below – Class Counsel's requested attorneys' fees, which amount to 33% of the $17.85 million settlement amount benefitting the Class, falls well within the range of attorneys' fees awards in other similar settlements and should be found reasonable in light of the significant recovery achieved for the Class Members and the efforts undertaken by proposed Class Counsel in pursuing these claims on behalf of the Settlement Class. Fed. R. Civ. P. 23(e)(2)(C)(iii); *see, e.g., Vergara et al. v. Uber Techs., Inc.*, No. 15-cv-06942, Dkt. 112 (N.D. Ill. Mar. 1, 2018) (awarding attorney's fees of $6.5 million in a TCPA class action settlement establishing a $20 million fund); *Martin v. JTH Tax, Inc.*, No. 13-cv-6923, Dkt. 85 (N.D. Ill. Sept. 16, 2015) (awarding attorneys' fees of one-third of $3 million settlement fund in TCPA case); *Birchmeier v. Caribbean Cruise Line, Inc.*, 896 F.3d 792, 795 (7th Cir. 2018), *cert. denied sub nom. McCabe v. Aranda*, 139 S. Ct. 923 (2019) (affirming district court's award of attorney's fees of 33% of the first $20 million of settlement fund in TCPA case).

**Any agreement required to be identified under Rule 23(e)(3)**. As further discussed below in response to the Hoipkemier Objection, there are no agreements, other than the Settlement Agreement, subject to Rule 23(e)(3).

**Equitable treatment**. Because each Settlement Class Member will receive an equal share of the Settlement Fund based on a pro rata distribution, the proposed Settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D).

## C.     The Court Should Grant Final Certification of the Settlement Class.

As explained in the Motion for Preliminary Approval, the Settlement Class meets the requirements of Rule 23(a) and Rule 23(b)(3). (Dkt. 80, at 21–29.) Nothing material has changed, and no objections to class certification have been filed. As such, the Court should conclude that

the Settlement Class meets the requirements of Rule 23(a) and Rule 23(b)(3), and the Court should finally certify the Settlement Class.

**D.    The Court Should Strike the Hoipkemier Objection Because Mr. Hoipkemier Is Not a Member of the Class and Lacks Standing to Object.**

As detailed in the November 19, 2019 Status Report filed by Wells Fargo (Dkt. 114), the evidence clearly establishes that Mr. Hoipkemier is *not* a class member and thus does *not* have standing to object. Objectors who are not class members lack standing to object. *See In re NCAA Student-Athlete Concussion Injury Litig.*, 332 F.R.D. 202 (N.D. Ill. 2019) (explaining that non-members of the class "lack standing to object") (citing *Aggretti v. ANR Freight Sys., Inc.*, 982 F.2d 242, 246 (7th Cir. 1992)); *Davenport v. Discover Fin. Servs.*, No. 15-cv-6052, Dkt. 109 (N.D. Ill. Dec. 19, 2017) (finding that objector lacked standing where "he never received any of the phone calls which form the basis of liability"); Newberg on Class Actions § 13:22 (5th ed.) ("Courts regularly find that nonclass members have no standing to object to a proposed settlement"). Given Mr. Hoipkemier's failure to show that he is a class member who received any call at issue in this Settlement, and Wells Fargo's evidence *affirming* that he did *not* in fact receive any such calls, Mr. Hoipkemier's Objection should be stricken on its face for lack of standing.

**E.    In the Alternative to Striking the Objection, the Hoipkemier Objection Should be Overruled.**

Notwithstanding the fact that Mr. Hoipkemier is not a Class member and, thus, lacks standing, Plaintiffs below address the substance of the Objection both because it is devoid of merit and because it attempts to impugn the conduct and character of Plaintiffs' counsel. In the alternative to the Court striking the Objection, the Court should overrule the Objection for lack of standing and because the Objection is baseless and without any merit.

### i.  The Objection is wrong about the procedural history of the Settlement and the settlement negotiations.

The Hoipkemier Objection makes extraordinary claims of collusion, a reverse auction, and "a paradigm sell-out of absent class members." (Obj., 2.) None of that is true.

Instead of Mr. Hoipkemier's wild allegations based on nothing but speculation, what follows is an explanation of what really happened. In late December 2018, Lieff Cabraser and Girard Sharp (together, "*Pieterson* counsel") were informed by Wells Fargo that a settlement had been reached in the *Prather* case that would resolve the litigation in California in which they had been appointed to represent the putative class under Rule 23(g). (Selbin Decl., ¶ 13.) At that time Wells Fargo's counsel refused to divulge any further information about the terms of the settlement, including the scope of the release, the relief to the class, and whether the settlement was a common fund or claims-made. (*Id.*, ¶¶ 14, 17.) Despite not knowing the actual terms of the *Prather* deal, a number of facts led *Pieterson* counsel to be concerned that Wells Fargo may have engaged in a reverse auction of the claims to the detriment of Class members within the meaning of *Reynolds v. Ben. Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002). Those facts included: (1) the timing of the mediations in the two cases; (2) the greater apparent leverage based on the pending class certification motion in *Pieterson-Hastings* (and counsel's experience in past TCPA cases with Wells Fargo); (3) the fact that Wells Fargo would divulge nothing about the proposed settlement; and (4) the fact that the TCPA claims pleaded in *Prather* involved only calls or texts regarding deposit accounts, while the settlement apparently released claims across multiple lines of business, including the credit card calls alleged in *Pieterson-Hastings*. (Selbin Decl., ¶¶ 18–19.)

After Judge Laporte granted (over counsel's objection) Wells Fargo's motion to stay *Pieterson-Hastings* pending settlement in the *Prather* Action, *Pieterson* counsel met with counsel representing the Plaintiffs in *Prather*, on the conditions that *Prather* counsel delay moving for

preliminary approval and that they and Wells Fargo disclose the terms of the potential settlement. (Selbin Decl., ¶ 21.) At that meeting in February 2019, *Pieterson* counsel were informed, for the first time, that the settlement between Wells Fargo and *Prather* provided for a $15 million settlement based on 750,000 telephone numbers identified by Wells Fargo as having potentially been called in error, or $20 per telephone number. (*Id.*, ¶ 22; Meyers Decl., ¶ 13.)

*Pieterson* counsel include attorneys with deep experience in class TCPA litigation, and in cases against Wells Fargo in particular. (Selbin Decl., ¶ 23; Declaration of Daniel Girard, attached hereto as Exhibit D, ¶ 4.) It was immediately apparent to them that the amount *Prather* counsel and Wells Fargo had agreed upon per potential class member – $20 per phone number – was in fact relatively high in comparison to similar cases. (Selbin Decl., ¶ 24; Girard Decl., ¶ 8.) Indeed, *Pieterson* counsel knew from discovery and expert analysis in *Pieterson* that the number of wrong-number records was actually much higher than the true Class size, because many numbers coded as wrong-numbers actually belonged to Wells Fargo customers. As a result, *Pieterson* counsel were aware that the settlement terms were even more generous than they appeared.

*Pieterson* counsel thus concluded that their prior concerns about a reverse auction were in fact unfounded, in that *Prather* counsel had negotiated a fair settlement for the Class, which they conceded was driven in large part by the vigorous litigation in *Pieterson*. (Selbin Decl., ¶¶ 24, 30; Meyers Decl. ¶ 11.)

After the February 2019 meeting, *Pieterson* counsel insisted in follow-up discussions both that Wells Fargo "true up" the settlement amount to account for confirmatory discovery revealing that there were 850,000 wrong-number records for the entire settlement class period – a requirement that had not been previously negotiated – and to also, in-turn, increase the size of the settlement fund. (Selbin Decl., ¶ 26.) After two more months of negotiation, on April 22, 2019,

15

Wells Fargo agreed to pay $17.85 million—$2.85 million more than the original $15 million. (Selbin Decl., ¶ 27.)[5]

Based on analysis of the wrong-number records maintained by Wells Fargo, after culling out Wells Fargo customers from the wrong-number coded calls, the "true" Class size is no more than 440,000. (*Id.*, ¶ 27.) This result is consistent with findings in the expert analysis *Pieterson* counsel and *Prather* counsel conducted for litigation purposes. (*Id.*, ¶¶ 11(f), 27; Meyers Decl. ¶ 16.) Thus, the final revised Settlement reached by the Parties is valued at more than $40 per person. In other words, *Prather* counsel independently negotiated an excellent result for the Class; *Pieterson* counsel made it only more so.

There are no secrets or side deals here, and no collusion. Based on what they knew, *Pieterson* counsel had legitimate concerns about the Settlement being the product of a reverse auction and told Judge Laporte so in written pleadings and in open court. (Selbin Decl., ¶ 20.) When *Pieterson* counsel learned that was not the case, they informed this Court they believed the Settlement to be fair, adequate, and reasonable, putting their professional judgment and reputations behind it. (Selbin Decl., ¶ 30; Girard Decl., ¶¶ 8–9.)

It is simply not true, as the Objection contends, that *Pieterson* counsel "dropped their objections to the reverse auction for a share of the fee." (Obj., 4.) Rather, counsel "dropped their objections" because the Settlement is an excellent result for the Class, particularly as improved after subsequent negotiations. The Objection's claim that counsel's change in position is "unexplained" therefore lacks merit. (Obj., 21.) Moreover, as *Prather* counsel freely admit, the

---

[5] The Objection makes much of a supposed "**third mediation**." (Obj., 10) (emphasis in original). No such "third mediation" ever occurred. The Motion for Attorneys' Fees mistakenly said that counsel participated in a "subsequent mediation in April 2019." (Dkt. 95, at 7.) The only in-person meeting between counsel occurred on February 26, 2019. (Selbin Decl., ¶ 22; Meyers Decl. ¶ 13.) Negotiations actively continued into April, as detailed here, but there was no subsequent mediation. (Selbin Decl., ¶ 27; Meyers Decl. ¶ 14.)

Settlement was driven by all of the related cases, including *Pieterson*. For this reason, *Pieterson* counsel along with the other law firms supporting this Settlement would have been entitled to seek and recover attorneys' fees regardless of their participation as Class Counsel or supporting counsel. In short, all Plaintiffs' counsel support the Settlement because they believe it to be an excellent result for the Class.[6]

>    ii.    **There is no reverse auction here, only a valuable settlement reached by experienced counsel after vigorous litigation.**

The Hoipkemier Objection contends this Settlement is akin to the one rejected in *Reynolds*, 288 F.3d 277. It is not. In *Reynolds*, the Seventh Circuit explained that where "the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant," that settlement "demand[s] closer scrutiny." *Reynolds*, 288 F.3d at 282–83. In that case, the court reversed settlement approval because the district court, faced with such circumstances, "did not give the issue of the settlement's adequacy the care that it deserved," the settlement, as proposed, provided for a reversionary fund with a low cap on any individual claim, and the parties made no showing that the amount was a reasonable return on the class claims. *Reynolds*, 288 F.3d at 280–82. This Settlement is adequate in all the ways the settlement in *Reynolds* was not.

*First*, it is not a "weak settlement." As explained in Section III.B.ii above, it compares very favorably to "the range of possible outcomes" (*Reynolds*, 288 F.3d at 285), as demonstrated by TCPA cases that have been approved in this District and around the country. The Court need not

---

[6] This case is nothing like *Creative Montessori Leaning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011), which Mr. Hoipkemier cites. There, putative class counsel had filed their case using information obtained under false pretenses and solicited a client using misleading communications. *Id.* at 917. No unethical conduct occurred here, much less a "demonstrated [] lack of integrity that cast[s] serious doubt on [counsel's] trustworthiness as representatives of the class." *Id.*

speculate as to the prospects of TCPA litigation at trial (although, for the reasons also explained in Section III.B.ii above, such cases are risky and often lose—a real possibility here), because there is a robust dataset of TCPA settlements, including against *this same Defendant*, which provided well below the per-class-member numbers achieved here. Some of those cases, like *Capital One*, conducted just the sort of "expected value" analysis Mr. Hoipkemier seeks, and approved settlements with much lower per class member recovery than the Parties' Settlement here. *See supra* note 4; *In re Capital One TCPA Litig.*, 80 F. Supp. 3d at 789–93. The Objection does not even identify any deficiencies in the actual terms of the Settlement. Rather, the Objection refers repeatedly to "indicia" of a flawed settlement, but never acknowledges – let alone addresses – that the Settlement delivers non-reversionary cash far above the norm in TCPA settlements.

*Second*, the Settlement is based on vigorous discovery and Class Counsel's years of experience with Wells Fargo's automated calling practices. The Objection asserts that *Prather* counsel did not work their case, ignoring the nearly 1,000 hours and more than $500,000 in lodestar accrued by that firm, with a significant amount of that work occurring before the issue of settlement was even broached, including written discovery, a Rule 30(b)(6) deposition, and briefing and prevailing on motions to compel and stay. (Dkt. 95-2 (McGuire Decl.), at ¶ 22.) Moreover, "[e]arly dispute resolution is salutary, and we should not encourage the unnecessary expense, delay, and uncertainty caused by lengthy litigation when the parties are prepared to compromise." *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 967 (N.D. Ill. 2011) (citation omitted). The Objection is also simply wrong that *Prather* counsel did not take any deposition before the initial December 2018 mediation. In fact, *Prather* counsel deposed Wells Fargo's corporate representative in October 2018. (Meyers Decl., ¶ 10.) And the Objection's statement that

18

"it seems McGuire Law always intended to settle prior to class certification" (Obj., 24) is baseless speculation, as *Prather* counsel were always prepared to move for class certification.

The Objection also pretends that *Pieterson* counsel had nothing to do with the Settlement, and so discounts the substantial litigation that occurred in the California actions, including extensive discovery into calling devices and identification of wrong-number class members, as well as counsel's years of experience successfully litigating against Wells Fargo for TCPA violations. (Selbin Decl., ¶¶ 3, 10–11.) Crucially, the Settlement was not finalized until *after Pieterson* counsel entered the negotiations, applied their independent judgment, and negotiated an even more generous cash payment for the Class from Wells Fargo. Further, while there was extensive discovery, an otherwise adequate settlement is not defective merely because it is not preceded by substantial formal discovery. *See, e.g.*, *Schulte*, 805 F. Supp. 2d at 587 ("[T]hat counsel conducted no formal discovery prior to settlement does not necessarily preclude final approval"); *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d at 967 ("Indeed, it is not clear how formal discovery would have produced appreciable benefits to the Court and to the parties that the informal discovery conducted by the parties did not bestow").[7]

*Third*, the Settlement is not inadequate just because it comprises multiple Wells Fargo business lines. Managing the case for trial is not relevant at settlement approval, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997), and the Objection offers no factual arguments or evidence that there are any relevant or material distinctions between Wells Fargo's robocalling practices across business lines. While it was Wells Fargo's practice in the past to litigate and settle

---

[7] The Objection cites *In re Gen. Motors Engine Interchange Litig.*, 594 F.2d 1106, 1126 (7th Cir. 1979), for the proposition that the Court must determine "who negotiated the agreement." But in that case, a settlement was negotiated without the permission of class counsel. Here, *Prather* counsel at all times had the full authority to settle their case. In any event, this brief and the supporting declarations make clear that both *Prather* and *Pieterson* counsel "negotiated the agreement" before the Court.

TCPA claims on a business-line-by-business-line basis, there is no argument – and Mr. Hoipkemier provides none – that anything in Rule 23 precludes joining multiple lines of business into one robocall settlement. Indeed, that is generally *the norm* in TCPA cases. *See, e.g.*, *Rose v. Bank of Am. Corp.*, Nos. 11-cv-02390 & 12-cv-04009, 2014 WL 4273358, at *9 (N.D. Cal Aug 29, 2014) (settlement class included recipients of mortgage or credit card calls). Rather, an adequacy challenge based upon intra-class differences lacks merit absent a showing of conflicts that are "fundamental to the suit and go to the heart of the litigation." Newberg on Class Actions § 3:58 (5th ed.). The Objection alleges no such conflicts, because there are none. Every Class Member challenges the same course of conduct—account servicing calls and texts from Wells Fargo in violation of the TCPA. And even if there were material distinctions between one business line and another, here there are Class Representatives from various business lines, ensuring adequate representation.

At bottom, the Objection is essentially a copy-and-paste of arguments made by *Pieterson* counsel in California—arguments *Pieterson* counsel made without full knowledge of the facts surrounding the Settlement. While *Pieterson* counsel *did* have reason to suspect the adequacy of the proposed Settlement, once they learned of its terms – and used their leverage to improve it further – they recognized it as a sound, reasonable, and adequate settlement that they fully support. Counsel (both *Prather* and *Pieterson*) proved their adequacy by securing for the Class a generous, all cash, non-reversionary settlement.

### iii. The requested fees are reasonable.

The Objection makes several perfunctory arguments for why the requested fees should be reduced. First, the Objection argues that an unstated amount of fees must be "forfeited" due to a "serious breach of fiduciary duty." (Obj., 23.) As explained above, there is no evidence to

substantiate this inflammatory accusation, and it is refuted by the declarations submitted with this brief.

*Second*, the Objection argues, without elaboration, that no risk adjustment is warranted. The Objection does not address – and as discussed above in Section III.E.ii – completely ignores the analysis of the risk in this case discussed in the Motion for Attorneys' Fees (Dkt. 95, at 16–19) and supporting declarations. (*See, e.g.*, Dkt. 95-3 (Hutchinson Decl.), at ¶ 58 (detailing lost TCPA class cases); Girard Decl., ¶ 6 (discussing lost consumer class cases)). As explained in the Motion for Attorneys' Fees, and further elaborated on in this brief, class certification is often denied in wrong-number cases, leaving plaintiffs and counsel empty handed. *See, e.g., Sandoe v. Bos. Sci. Corp.*, 2019 WL 5424203 (D. Mass. Oct. 23, 2019) (denying class certification). Mr. Hoipkemier should be keenly aware of the risk that proceeding with class certification brings given his *own* experience in litigating a class action against Wells Fargo and ultimately settling in another forum after having class certification denied. *See Fowler v. Wells Fargo Bank, N.A.*, No. 14-cv-02092, Dkt. 80, at 2–3 (N.D. Cal. June 28, 2018) (attached hereto as Exhibit E). Indeed, in the only case Mr. Hoipkemier cites in support of this argument, *Birchmeier*, 896 F.3d at 797, the district court awarded a risk adjustment based in part on "the difficulty of identifying class members," a serious risk to class certification in this case. *Aranda v. Carribean Cruise Line, Inc.*, No. 12-cv-4069, 2017 WL 1360741, at *7 (N.D. Ill. Apr. 10, 2017). And the legal landscape for TCPA claims is constantly in flux, including with respect to the definition of an ATDS. If courts adopt defendant-friendly interpretations – and they often do, *see, e.g., Johnson v. Yahoo!, Inc.*, 346 F. Supp. 3d at 1162 (N.D. Ill. 2018), and *Smith v. Premier Dermatology*, No. 17-cv-3712, 2019 WL 4261245, at *7 (N.D. Ill. 2019) – a TCPA case is lost entirely. The risk adjustment requested by Class Counsel in their fee petition is more than justified given the difficult nature of this case and the favorable

recovery achieved in the face of significant risk.

*Third*, the Objection contends that counsel's lodestar is overstated. As an initial matter, and as explained in the fee petition, the requested fee is fully justified under the preferred percentage-of-the-fund method, and so the Court need not assess the lodestar at all. Dkt. 95, at 12–21; *See, e.g.*, *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d at 1033 (discussing empirical study that showed courts have awarded percentage-based fees "without conducting a lodestar cross-check"). But regardless, Mr. Hoipkemier's arguments are off the mark. The "other litigation" (Obj., 24) from which lodestar is submitted are cases alleging the same unlawful conduct—automated account servicing calls and texts to wrong-numbers, by the same party, Wells Fargo, and by the same Class Representatives here. That is, the California and other litigation that drove this Settlement are now encompassed within it. It is thus entirely proper to include this time, and it is routine for multiple class action cases to be combined and settled together in one. *See, e.g., In re Hyundai and Kia Fuel Economy Litig.*, 926 F.3d 539, 565 (9th Cir. 2019) (en banc) (explaining that "multiple class actions were filed and then consolidated in California"); *In re Hatteras Fin., Inc. Shareholder Litig.*, 286 F. Supp. 3d 727, 734 (M.D.N.C. 2017) (awarding fees for work in overlapping class actions pending in other jurisdictions and settled as part of the global settlement); *Vergara v. Uber*, No. 15-cv-6942, Dkt. No. 111 (N.D. Ill. 2018) (same).

As illustrated by the history of Wells Fargo TCPA litigation, reaching a fair settlement with Wells Fargo can be an iterative process that takes multi-jurisdictional steps before defenses are overcome and reasonable terms agreed upon. (Selbin Decl., ¶¶ 3, 11–12.)[8] And it is simply not

---

[8] The Objection cites *Class Plaintiffs v. Jaffe & Schlesinger, P.A.*, 19 F.3d 1306, 1308 (9th Cir. 1994), but in that case counsel seeking fees for a parallel state-court action were never appointed class counsel. Here, not only were *Pieterson* counsel appointed under Rule 23(g) in California, but every firm requesting fees has been preliminarily appointed Class Counsel or Additional Class Counsel in this case.

true that the lodestar includes "substantial time from . . . post-settlement work." (Obj., 24.) To take just one example, of the 1,073.70 hours of time reported by Lieff Cabraser, 1,032.30 were incurred through April 22, 2019, the date the settlement amount was finalized. (Selbin Decl., ¶ 31(e)). Once again, as with his other arguments, Mr. Hoipkemier's objection to Class Counsel's fee request is based on conjecture and straw-man arguments with no evidentiary support.

### iv. Fee allocation agreements are not subject to Rule 23(e)(3).

Mr. Hoipkemier's Objection also contends that any attorneys' fee allocation agreement between Plaintiffs' counsel must be identified under Rule 23(e)(3). This is not so.

*First*, Rule 23(e)(3) provides that "[t]he parties seeking approval must file a statement identifying any agreement made in connection with the proposal." This provision applies by its terms to agreements *between the parties* – i.e. plaintiffs and defendants – not to agreements among and between plaintiffs and their counsel. Mr. Hoipkemier cites no case or authority to the contrary because there is none. The one case to expressly consider the question held that such agreements are *not* subject to Rule 23(e)(3). *See Hartless v. Clorox Co.*, 273 F.R.D. 630, 646 (S.D. Cal. 2011), *aff'd*, 473 F. App'x 716 (9th Cir. 2012). There, the court explained that the Rule was satisfied because the parties had identified the relevant agreement between class counsel and the defendant, and their "agreement as to the amount of attorneys' fees could affect the class members." *Id.* Conversely, any fee allocation agreement did not need to be disclosed because "[t]he allocation of [aggregate] fees amongst class counsel does not affect the monetary benefit to class members." *Id.*

*Second*, fee allocation agreements among plaintiffs' counsel are generally not disclosed.[9]

---

[9] It is usually only in circumstances when there is a dispute among counsel party to the fee allocation agreement that courts become involved. *See, e.g., High Sulfur Content Gasoline Prods. Litig.*, 517 F.3d 220, 227 (5th Cir. 2008) (noting a "district court's duty to scrutinize the allocation of a fee award when an attorney objects to his co-counsel's fee recommendations"); *In re Life Time Fitness, Inc. TCPA Litig.*, 847 F.3d 619, 624 (8th Cir. 2017) ("[T]here is no dispute among class counsel over how to allocate the award

The leading treatise explains that "[i]t is typical in such cases that the lawyers can decide among themselves how to split the aggregate fee. If so, courts will tend to defer to that self-allocation and there is no need for formal judicial involvement." Newberg § 15:23; *see also, e.g., In re Domestic Air Transp.*, 148 F.R.D. 297, 356 (N.D. Ga. 1993) ("Ideally, allocation is a private matter to be handled among class counsel"); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 262 (D. Del. 2002); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 10-cv-2151, 2013 U.S. Dist. LEXIS 123298, at *316 (C.D. Cal. July 24, 2013).

### v. The requested Incentive Award is reasonable.

Finally, the Objection contends that the requested Incentive Award is excessive. As an initial matter, this argument rests on the false premise that Class Counsel have requested $15,000 awards for each Class Representative. In reality, Class Counsel request an Incentive Award of $70,000 *total* for the eight Class Representatives. (Dkt. 95, at 28–30.) If divided equally, this amounts to $8,750 per Class Representative; the Class Representatives are not *each* receiving a $15,000 Incentive Award.

As set forth in more detail in the fee petition, the requested Incentive Award is reasonable. In the one case cited in the Objection, *Cook v. Niedert*, 142 F.3d 1004 (7th Cir. 1998), the Seventh Circuit affirmed a service award of $25,000 based in part upon the fact that the named plaintiff "brought a suit that resulted in . . . a cash recovery of more than $13 million." 142 F.3d at 1016. Here, the Class Representatives brought suits that resulted in a cash recovery of nearly $18 million. To be sure, *Cook* also detailed the "amount of time and effort the plaintiff expended in pursuing the litigation," but three of the Class Representatives here (Pieterson, Hastings, and Prather)

---

of attorney's fees and expenses, and the district court did not abuse its discretion by leaving the matter to class counsel to resolve among themselves").

responded to discovery and sat for depositions (one, Bishop, only responded to discovery). And the remainder were fully prepared to do so. (Selbin Decl., ¶ 31(f) (Barnes); Girard Decl., ¶ 13 (Garr); Meyers Decl., ¶ 22 (Iehl and Dunn)).

More to the point, as noted in *Cook*, incentive awards are "appropriate if [] necessary to induce an individual to participate in the suit." 142 F.3d at 1016. That is certainly the case here, where each Class Representative's small individual claim alone would not create sufficient incentive to litigate on behalf of a class. And, as explained in the fee petition, the amount requested is consistent with awards approved in similar class action settlements. (Dkt. 95, at 29–30.)

## IV.    CONCLUSION

For the foregoing reasons, and for the reasons stated in Plaintiffs' Unopposed Motion for Approval of Attorneys' Fees, Expenses, and Incentive Award (Dkt. 95), Plaintiffs respectfully request that the Court enter an Order: (1) finding that the Settlement is fair, reasonable, and adequate; (2) granting final approval of the Settlement; (3) approving Plaintiffs' request for attorneys' fees, reimbursement of litigation expenses, and incentive awards; and (4) striking the objection of Adam L. Hoipkemier for lack of standing, or otherwise overruling the objection.

Dated: November 26, 2019              Respectfully submitted,

JOSEPH DUNN, HELEN IEHL, ALBERT PIETERSON, JOHN HASTINGS, WINDIE BISHOP, LISA BARNES, ANGELA GARR, MYESHA PRATHER individually and on behalf of a class of similarly situated individuals

By: /s/ Eugene Y. Turin
     One of Plaintiffs' Attorneys

Myles McGuire
Evan M. Meyers
Eugene Y. Turin
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
mmcguire@mcgpc.com
emeyers@mcgpc.com
eturin@mcgpc.com

Jonathan D. Selbin
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Fl.
New York, NY 10013
Tel: (212) 355-9000
jselbin@lchb.com
Daniel M. Hutchinson
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Fl.
San Francisco, CA 94111
Tel: (415) 956-1000
dhutchinson@lchb.com

Daniel C. Girard
Angelica M. Ornelas
GIRARD SHARP LLP
601 California Street, Ste. 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dgirard@girardgibbs.com
aornelas@girardsharp.com

*Counsel for Plaintiffs and
Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 26, 2019, I electronically filed the foregoing *Plaintiffs' Motion for Final Approval of Class Action Settlement* with the Clerk of the Court using the CM/ECF system. A copy of said document will be electronically transmitted to all counsel of record.

/s/ Eugene Y. Turin