# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| JOSEPH DUNN, HELEN IEHL, ALBERT PIETERSON, JOHN HASTINGS, WINDIE BISHOP, LISA BARNES, ANGELA GARR, and MYESHA PRATHER individually and on behalf of a class of similarly situated individuals, | ) ) ) ) ) | No. 17-cv-00481 |
| | ) | |
| *Plaintiffs*, | ) ) | |
| | ) | Hon. Manish S. Shah |
| v. | ) | |
| | ) | |
| WELLS FARGO BANK, N.A., | ) | |
| | ) | |
| *Defendant*. | ) | |

**DECLARATION OF JONATHAN D. SELBIN IN SUPPORT
OF PLAINTIFFS' MOTION FOR FINAL APPROVAL**

I, Jonathan D. Selbin, declare as follows:

1.      I am a partner in of the law firm of Lieff, Cabraser, Heimann & Bernstein, LLP ("LCHB"), co-counsel of record for Plaintiffs in this matter, and, along with my partner Daniel M. Hutchinson and co-counsel, Court-appointed preliminary Class Counsel.  I respectfully submit this declaration in support of Plaintiffs' Motion for Final Approval, and in response to the objection filed by Adam Hoipkemier (Dkt. 113).

2.      Along with Daniel Girard of Girard Sharp LLP, on September 26, 2017, I was appointed by Magistrate Judge Elizabeth Laporte to serve as Rule 23(g) interim co-lead counsel in *Pieterson v. Wells Fargo Bank, N.A.*, No. 17-2306 (N.D. Cal.), a case involving Class Representatives Albert Pieterson and John Hastings.   I am also co-counsel in *Barnes v. Wells Fargo Bank, N.A.*, No. 18-6520 (N.D. Cal.), which involves Class Representative Lisa Barnes, and was co-counsel in *Bishop v. Wells Fargo Bank, N.A.*, No. 17-1505 (N.D. Ga.) (formerly captioned *Bacon v. Wells Fargo Bank*),

involving Class Representative Windie Bishop.

**My Firm's Experience in TCPA Litigation Against Wells Fargo**

3.      Since 2012, my firm and co-counsel (several of the firms appointed Additional Class Counsel here) have pursued a global litigation strategy against Wells Fargo for its TCPA violations.  In addition to the cases at issue in the Settlement in this case (*Pieterson*, *Bishop*, and *Barnes*), we have been involved in seventeen TCPA cases against Wells Fargo:

a.      *Federal Home Loan Mortgage Corp. et al.*, No. 10-01290 (S.D. Cal. June 10, 2010);

b.      *Allen v. Wells Fargo Auto Finance Inc.*, No. 10-02657 (S.D. Cal. Oct. 23, 2010);

c.      *Masters v. Wells Fargo Bank, N.A.*, No. 12-00376-SS (W.D. Tex. Mar. 29, 2012);

d.      *Mortezapour v. Wells Fargo Bank, N.A.*, No. 12-01520-L-BLM (S.D. Cal. Jun. 20, 2012);

e.      *Martin v. Wells Fargo Bank, N.A.*, No. 12-06030-SI (N.D. Cal Nov. 28, 2012);

f.      *Heinrichs v. Wells Fargo Bank N.A.*, No. 13-05434 (N.D. Cal. Nov. 22, 2013);

g.      *Shehan v. Wells Fargo Bank, N.A.*, No. 14-00900-JHE (N.D. Ala. May 14, 2014);

h.      *Franklin v. Wells Fargo Bank N.A.*, No. 14-2349 (S.D. Cal. Oct. 3, 2014);

        i.      *Markos v. Wells Fargo Bank, N.A.*, No. 15-1156 (N.D. Ga. Apr. 14, 2015);

        j.      *Page v. Wells Fargo Bank N.A.*, Case No. 15-06511 (N.D. Ill. Jul. 27, 2015);

        k.      *Davis v. Wells Fargo Bank, N.A.*,  filed as a class action in the State Court of Cobb County, Georgia, No. 15-1891-1 (Cobb County, Georgia Aug. 5, 2015), No. 15-3140 (N.D. Ga.);

        l.      *Cross v. Wells Fargo Bank, N.A.*, No. 15-1270 (N.D. Ga. Apr. 21, 2015);

        m.      *Luster v. Wells Fargo Dealer Services*, No. 15-1058 (N.D. Ga. Apr. 8, 2015);

        n.      *Prather v. Wells Fargo Bank, N.A.*, No. 15-01296 (S.D. Cal. June 11, 2015);

        o.      *Nixon v. Wells Fargo Bank, N.A.*, filed as a class action in the State Court of Cobb County, Georgia, No. 15-2187-1 on Sept. 1, 2015, No. 15-04231 (N.D. Ga.);

        p.      *Shadid v. Wells Fargo Bank, N.A.*, No. 17-01079 (N.D. Cal. Mar. 1, 2017); and

        q.      *Perez v. Wells Fargo Bank, N.A.*, Case No. 17-424 (S.D. Cal. Mar. 1, 2017).

    4.      After settling early-generation cases in *Malta* and *Allen*, members of the LCHB team filed a series of cases against Wells Fargo challenging calls arising from the credit card line of business.

5.      In *Masters*, we obtained and analyzed extensive written discovery concerning Wells Fargo's methodology for making collection calls and using prerecorded voice messages. That case ended when the court ruled Wells Fargo's Rule 68 offer of judgment mooted the plaintiff's claims.

6.      In *Martin*, we obtained a key victory in defeating Wells Fargo's motion to compel arbitration, a difficult and rare win. No. 12-06030, Dkt. 73 (N.D. Cal. Dec. 2, 2013). We also conducted extensive arbitration-related discovery, including reviewing 2,577 pages of documents, taking the depositions of Wells Fargo representatives, and reviewing a series of written discovery responses. *Martin* ended when discovery revealed that the alleged calls came from a scammer impersonating Wells Fargo.

7.      In *Heinrichs*, we successfully opposed Wells Fargo's motion to dismiss, which argued that both Heinrichs and class members did not meet the statutory definition of a "called party" under the TCPA. And in both *Heinrichs* and *Shehan*, we successfully opposed Wells Fargo's motion to stay under the primary jurisdiction doctrine. *Heinrichs* ended when the named plaintiff decided he no longer wished to represent the class.

8.      All of that work culminated in a nationwide settlement of $13.89 million in *Franklin*.

9.      Using knowledge of Wells Fargo's calling practices obtained through discovery, as well as research and experience regarding TCPA class actions, we filed a series of class actions alleging calls across other of Wells Fargo's lines of business. In each of those cases, we defeated Wells Fargo's attempt to moot the cases through Rule 68 offers of judgment, interviewed scores of potential class members, reviewed written discovery, and took depositions regarding Wells Fargo's calling practices. Throughout,

we navigated a challenging landscape for TCPA class actions, including three then-pending Supreme Court cases *Spokeo v. Robins*, 126 S. Ct 1540 (2016), *Tyson Foods v. Bouaphakeo*, 136 S. Ct. 103 (2016), and *Campbell-Ewald v. Gomez*, 136 S. Ct. 663 (2016)) that could have ended the litigation at any time, as well as a then-pending petition for review in the D.C. Circuit (*ACC Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018)) that threatened to—and eventually did—overturn plaintiff-friendly interpretations of the TCPA.

10.     Those efforts, in total, resulted in several all-cash, non-reversionary settlements, recovering more than $77 million for class members:

          a.     *Franklin v. Wells Fargo Bank, N.A.*, No. 14-2349 (S.D. Cal.) ($13.89 million settlement for credit card calls, final approval granted in 2016);

          b.     *Markos v. Wells Fargo Bank, N.A.*, No. 15-1156 (N.D. Ga.) ($16.4 million for mortgage calls, final approval granted in 2017);

          c.     *Cross v. Wells Fargo Bank, N.A.*, No. 15-1270 (N.D. Ga.) ($30.4 million for deposit account calls, final approval granted in 2017);

          d.     *Luster v. Wells Fargo Dealer Services*, No. 15-1058 (N.D. Ga.) ($14.8 million for auto loan calls, final approval granted in 2017); and

          e.     *Prather v. Wells Fargo Bank, N.A.*, No. 15-04231 (N.D. Ga.) ($2.1 million for student loan calls, final approval granted in 2017).[1]

**<u>Work in *Pieterson*</u>**

11.     LCHB, along with Girard Sharp and additional co-counsel (collectively, "*Pieterson* Counsel") actively litigated the *Pieterson* case over the course of many

---

[1] Not the same Prather as the Class Representative in this case.

months.  That work included:

a.      Opposing Wells Fargo's motion to stay the case for the Federal

Communications Commission and the Ninth Circuit's opinion in *Marks v. Crunch San*

*Diego*, No. 14-56834 (9th Cir.).  *Pieterson* Dkts. 90, 94.  Judge Laporte denied the

motion to stay on July 2, 2018.  *Pieterson* Dkt. 109.

b.      Repeatedly moving to compel production of relevant discovery

from Wells Fargo.  On May 24 and July 27, 2018, we moved to compel production of call

data showing the calls made to members of the proposed *Pieterson* class.  *Pieterson* Dkts.

92, 117.  On July 27, 2018, we also moved to compel production of documents relevant

to whether the TCPA violations alleged in *Pieterson* were knowing or willful. *Pieterson*

Dkt. 118.   On August 8, 2018, Judge Laporte ordered Wells to produce responsive

documents and a sample of its call records, including dialer logs, account applications,

and account notes.  *Pieterson* Dkt. 123.  We then moved to compel compliance with the

court's August 8 discovery order.  *Pieterson* Dkt. 157.  On December 6, 2018, Judge

Laporte ordered Wells Fargo to produced unredacted versions of documents from which

Wells had improperly redacted information.  *Pieterson* Dkt. 160.

c.       Receiving and reviewing over 4,000 pages of documents produced

by Wells Fargo in response to discovery requests, and engaging and working with experts

to review data and technical documents.

d.      Deposing three Wells Fargo employees, including Mike Nunn, a

Vice President & Collections Manager, on November 3, 2017, Jacob Mou, an Analytics

Manager, on July 2, 2018, Ravi Abraham, a Senior Vice President and Analytics

Manager, on August 31, 2018, and Mike Burrows, a Technology Manager overseeing

Wells Fargo's outbound dialing equipment, on August 24, 2018. Topics covered included the specifications and functionality of Wells Fargo's dialing equipment, the policies and procedures governing the use of that equipment, the number of calls placed to members of the proposed *Pieterson* class, the factual bases for Wells Fargo's affirmative defenses, and the call data Wells Fargo produced in the case.

      e.     Responding to Wells Fargo's written discovery requests, including requests for admission, document requests, and interrogatories Wells served on Plaintiffs Pieterson and Hastings, and defending each plaintiff's deposition in August 2018.

      f.     Conducting extensive expert work. On October 15, 2018, the parties exchanged initial expert reports. Each side disclosed an autodialer expert and a data analysis expert. Each side subpoenaed the other's experts, and Interim Co-Lead Counsel successfully defended their data analysis expert against an early attempt by Wells Fargo to strike that expert's report. Dkts. 133, 148. We reviewed nearly 10,000 pages of documents produced by Wells Fargo's experts and deposed them on November 9 and 12, 2018. On November 2 and December 4, we defended the depositions of Plaintiffs' experts.

      g.     Fully briefing a motion for class certification, including supporting expert reports.

      12.     The *Pieterson* parties attended mediation in September 2018 at my firm's New York offices. That mediation broke down quickly as the parties were far apart. The parties jointly agreed to set a second mediation date for January 2019 after class certification briefing was complete in *Pieterson*.

1858346.3

**The Settlement in this Case**

13.     On or about December 20, 2018, Mr. Lonergan suggested to me that *Pieterson* Counsel should speak with counsel for Plaintiff Prather in this case.  In subsequent conversations between myself and Mr. Lonergan, I learned that a settlement had been reached in this matter that purported to resolve, among other things, the claims pending in *Pieterson*.

14.     Mr. Lonergan refused to tell *Pieterson* Counsel any information about the terms of the settlement.

15.     On January 7, 2019, at *Pieterson* plaintiffs' request and over Wells Fargo's objection, Judge Laporte held a hearing to discuss the implications of a potential settlement in this matter for the pending class certification motion in *Pieterson*.  At that hearing, Mr. Lonergan again refused to provide any information about the terms of the settlement here, other than that it would resolve the claims pending in *Pieterson*.

16.     On January 14, 2019, *Pieterson* plaintiffs moved to coordinate the *Pieterson* proceedings with the proceedings in this matter, a motion Wells Fargo opposed.  On February 8, Judge Laporte granted that motion in part.  On February 13, after conferring with the Court in this case, Judge Laporte granted Wells Fargo's motion to stay *Pieterson* for 90 days.

17.     At that point and throughout the proceedings in front of Judge Laporte, *Pieterson* Counsel did not know any of the terms of the proposed settlement in this case, including the scope of the release, the business lines or claims involved, the size of the class, the amount to be paid by Wells Fargo, the amount class members would receive, and whether the settlement was common fund or claims-made.

18.     A number of facts led us to be concerned that Wells Fargo had engaged in

a reverse auction of the case to the detriment of Class members within the meaning of

*Reynolds v. Ben. Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002), as we set forth in our papers

and in open court in the Northern District of California. *See Pieterson* Dkts. 172, 182,

189, 200, 201, 211.

19.     Those facts included: (1) the timing of the mediations in the two cases

(with *Prather* reaching resolution after the failed *Pietersen* mediation and just weeks

before the second *Pieterson* mediation was set to occur), (2) the greater leverage we

believed we had based upon the pending class certification motion in *Pieterson* and our

prior TCPA cases generally and against Wells Fargo specifically, (3) the fact that neither

Wells Fargo nor *Prather* counsel would tell us anything about the proposed settlement;

and (4) the fact that the TCPA claims pleaded in this case at that time involved only calls

or texts made regarding deposit accounts while the settlement apparently released claims

across multiple lines of business including the credit card calls alleged in *Pieterson*.

20.     Based on this concern, my firm and Girard Sharp acted to fulfill our duties

as Interim Class Counsel. We asked Judge Laporte to coordinate proceedings with this

Court and opposed Wells Fargo's motion to stay class certification proceedings in

*Pieterson*. We entered an appearance in this case and were fully prepared to move to

intervene to protect the interests of the class we were appointed to represent.

21.     After Judge Laporte granted the stay in *Pieterson* (over our objection), we

agreed to meet with *Prather* counsel on the condition that they delay moving for

preliminary approval in this Court (and so ensure our potential motion to intervene would

be timely) and that they and Wells Fargo disclose to us the terms of the potential

settlement.

22.     On February 26, 2019, I, Daniel Girard, and Angelica Ornelas met with Myles McGuire, Eugene Turin, and Evan Meyers at JAMS in Chicago.  At that meeting, we were informed—for the first time—that the proposed settlement between Wells Fargo and *Prather* counsel provided for a $15 million settlement for then-estimated 750,000 unique telephone numbers with a "wrong number" code, or $20 per phone number.

23.     We knew from our own prior cases against Wells Fargo and others that the amount *Prather* counsel and Wells Fargo had agreed upon—$20 per person—compares favorably to other settlements including our own with Wells Fargo in other cases.  *See, e.g., Markos v. Wells Fargo Bank, N.A.*, No. 15-1156 (N.D. Ga.) ($16.4 million for 3,296,755 class members, $4.97 per class member); *Cross v. Wells Fargo Bank, N.A.*, No. 15-cv-1270 (N.D. Ga.) ($30.4 million for 6,409,689 class members, $4.74 per class member); *Luster v. Wells Fargo Dealer Services*, No. 15-1058 (N.D. Ga.) ($14.8 million for 3,128,914 class members, $4.73 per class member); *Prather v. Wells Fargo Bank, N.A.*, No. 15-4231 (N.D. Ga.) ($2.1 million for 440,000 class members, $4.77 per class member); *Gehrich v. Chase Bank USA, N.A.*, No. 12-5510, 2016 WL 806549 (N.D. Ill. Mar. 3, 2016) ($34 million for more than 32 million class members, $1.06 per class member); *Arthur v. Sallie Mae Inc.*, No. 10-00198 (W.D. Wash.) ($24.15 million for 7,792,256 class members, $3.10 per class member); *Malta v. Fed. Home Loan Mortg. Corp.*, No. 10-1290, 2013 WL 444619 (S.D. Cal. Feb. 5, 2013) ($17.1 million for 4,546,293 class members, $3.76 per class member); *Duke v. Bank of Am., N.A.*, No. 12-04009 (N.D. Cal.) ($32,083,905 for approximately 7,723,860 class members, $4.15 per class member); *Connor v. JPMorgan Chase Bank*, No. 10-1284 (S.D. Cal.)

($11,665,592.09 for 2,684,518 class members, $4.35); *Wilkins v. HSBC Bank Nev., N.A.*, No. 14-190 (N.D. Ill.) ($39,975,000 for 9,065,262 class members, $4.41 per class member); *In re Capital One Tel. Consumer Protection Act Litig.*, No. 12-10064 (N.D. Ill.) ($75,455,098 for 16,645,221 class members, $4.53 per class member); *Kramer v. Autobytel*, No. 10-02722, 2012 U.S. Dist. LEXIS 185800 (N.D. Cal. Jan. 27, 2012) ($12.2 million for 47 million class members, $0.26 per class member); *Adams v. AllianceOne Receivables Mgmt. Inc.,* No. 08-00248 (S.D. Cal.) ($9 million for more than 6,079,411 class members, $1.48 per class member).

24.    I have been personally involved in dozens of TCPA class actions that have recovered hundreds of millions of dollars in non-reversionary cash relief to date.  In my professional experience, a non-reversionary settlement of $20 per telephone number on these facts and claims is fair, reasonable, and adequate, and would—and should—be approved by this Court.  That fact convinced me that our prior concerns about a reverse auction were unfounded, in that *Prather* counsel had negotiated a fair settlement for the Class, which they conceded was driven in large part by our (*Pieterson* counsel's) work.

25.    We also knew—based on our expert work in *Pieterson*—that the class size was far smaller than the 750,000 the proposed settlement assumed, because a large portion of numbers coded by Wells Fargo as wrong numbers in fact belong to Wells Fargo customers.  Our expert in *Pieterson* found that approximately 49% of wrong-number coded numbers actually were associated with non-customers.

26.    After the meeting with *Prather* counsel, we insisted in follow-on discussions both that Wells Fargo "true up" the settlement amount to account for confirmatory discovery revealing the set of telephone numbers with wrong-number codes

to be approximately 850,000 and pay more money on top of that.

27. After two more months of negotiations, on April 22, 2019, Wells Fargo agreed to increase the settlement to $17.85 million—$2.85 million more than the original $15 million deal and $850,000 more than the "true up" number. Based on expert discovery conducted in *Pieterson*, as well as Wells Fargo's own analysis, it was evident that that, after culling out Wells Fargo customers from the wrong-number coded calls, the "true" class size was around 440,000. Which meant that the revised settlement is valued at more than $40 per person.

28. We also had concerns that the proposed settlement was vulnerable to an adequacy challenge given that *Prather* itself concerned only deposit account calls. But those concerns, even if valid in the abstract, were vitiated by inclusion of additional class representatives from our other cases who alleged calls from other lines of business, all of whom reviewed the revised deal and signed off on it.

29. In every meaningful way, *Pieterson* counsel was involved in the final settlement as presented to the Court. Our fulsome discovery and preparation for class certification in *Pieterson* informed Wells Fargo's and *Prather* counsel's initial negotiations, our assessment of the preliminary deal reached in *Prather*, as well as our demands for an improvement on that settlement. And, in addition to negotiating with Wells Fargo to improve the settlement, we actively participated in drafting the settlement agreement and supporting papers.

30. There are no secrets or side deals here, and no collusion. While it is true that we had legitimate concerns that the proposed settlement was the result of a reverse auction, and told Judge Laporte so in written pleadings and in open court, once we

learned that was not the case, we informed this Court we believed the settlement to be fair, adequate, and reasonable, and put our professional judgment and reputations behind it. We still do.

**Objection to the Settlement**

31.     The Hoipkemier objection makes several incorrect assertions.

a.     ***Pieterson* counsel "dropped their objections to the reverse auction for a share of the fee." Obj. at 4.** This is not true. As explained above, there was not a reverse auction here. The Seventh Circuit in *Reynolds* explained that where "the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant," that settlement "demand[s] closer scrutiny." *Reynolds*, 288 F.3d at 282-83. That is simply not what occurred here. The settlement, which *Prather* counsel freely acknowledged was driven by the litigation in *Pieterson*, is not "weak" and withstands any "scrutiny." There is no risk of the situation in *Reynolds*, where the district court failed to rigorously analyze the proposed settlement. *Id.* at 283. Here, the Court will determine whether the proposed settlement is fair, adequate, and reasonable under Rule 23(e). We submit that it is.

b.     Nor did *Pieterson* counsel take any action or inaction "for a share of the fee." Even if we had never been involved in *Prather*, we would have sought to intervene here to ask for—and been entitled to—a share of the fee because of the substantial efforts we invested on behalf of the portion of the class at issue in the California litigation, litigation that indisputably drove the resolution here. We signed onto the settlement as Class Counsel, and submitted our lodestar as support for the fee

request, because we believe it to be an excellent result for the class.  It is true that we
have reached an agreement on allocation of fees with *Prather* counsel, but such
agreements are routine and the one here was negotiated only after we first were fully
informed of the terms of the proposed settlement, evaluated it, improved it, and our
clients told us they supported it.

   c. **Counsel participated in a secret "third mediation."  Obj. at 10.**
That is not true.  The motion for fees mistakenly said that counsel participated in a
"subsequent mediation in April 2019."  Dkt. 95 at 7.  Nothing in the cited declarations
states that such a mediation occurred, because it did not.  Negotiations actively continued
into April, as detailed above, but there was no formal mediation.

   d. **Lodestar from other TCPA cases against Wells Fargo should
not be considered.  Obj. at 24.**  As an initial matter, and as explained in the fee motion,
the requested fee is justified by and warranted under the percentage-of-the-fund analysis
that best reflects the market rate.  The lodestar is offered only as a cross-check.  But
regardless, the efforts in *Bishop*, *Pieterson*, *Barnes*, and *Garr* were tremendously
valuable—indeed, critical—to the outcome here because, as explained in Mr.
Hutchinson's fee declaration, they provided the factual basis for the Settlement Class,
which includes both ATDS and prerecorded voice calls, and claims related to calls
originating from lines business represented only by Class Representatives in those
actions.  *See* Dkt. 95-3 at ¶ 44.

   e. **Plaintiffs' counsel "built much of their lodestar after the case
was settled."  Obj. At 24-25.**  That is untrue.  For example, of the 1073.70 hours of
attorney and staff time reported by my firm (see Dkt. 95-3 at ¶ 49 & Ex. B), 1032.30

hours were incurred through April 22, 2019, the date the amount of the settlement was finalized.

f.    **Class Representatives Barnes and Bishop do not deserve service awards.  Obj. at 25-26.**  The Objection challenges the requested service awards, including those intended for my firm's clients Barnes and Bishop.  Both deserve service awards because they put themselves forward as TCPA class representatives and were willing to do what was necessary to represent their classes.  Ms. Barnes, the only Class Representative who received calls related to auto loans, was fully prepared to respond to discovery.  Absent her participation, the class would have no representative who received calls related to auto loans, making it vulnerable to an objection on that basis.  And Ms. Bishop responded to discovery before her case was voluntarily dismissed for strategic purposes and without her receiving any compensation.  Both reviewed the proposed settlement terms and signed off on it.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on November 26, 2019 in New York, New York.

/s/ *Jonathan D. Selbin*
Jonathan D. Selbin

1858346.3