**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| JOSEPH DUNN, HELEN IEHL, ALBERT PIETERSON, JOHN HASTINGS, WINDIE BISHOP, LISA BARNES, ANGELA GARR, and MYESHA PRATHER, individually and on behalf of a class of similarly situated individuals,<br><br>*Plaintiff*,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>*Defendant*. | Case No. 1:17-cv-00481<br><br>Hon. Manish S. Shah |

**WELLS FARGO'S JOINDER IN PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, AND RESPONSE TO OBJECTION OF ADAM HOIPKEMIER**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ....................................................................................................1

II. FACTUAL BACKGROUND......................................................................................2

A. The TCPA Class Actions and Accompanying Discovery and Motion Practice..........................................................................................2

1. *Prather v. Wells Fargo* ..................................................................2

2. The California Litigation ..................................................................3

3. The Georgia Litigation.......................................................................3

4. Extensive Discovery Was Taken Across Five Suits ...........................4

B. The Parties' Extensive Settlement and Mediation Efforts. ..........................4

C. Post-Settlement Challenge By the California Plaintiffs, Followed by Their Joining the Settlement...............................................................5

III. THE SETTLEMENT MEETS RULE 23(e)(2)'S CRITERIA FOR APPROVAL ............7

A. The Settlement Was Negotiated at Arm's Length. .......................................7

B. In Light of Wells Fargo's Strong Defenses, the Relief Is Adequate and the Costs, Risks, and Delay of Trial and Appeal Heavily Favor Approving the Settlement ............................................................................8

1. Plaintiffs Face a Grave Risk that No Class Could Ever Be Certified in this "Wrong Number" Class Action. ........................................8

2. Whether These Calls Are Even Subject to the TCPA Is In Serious Doubt.......................................................................................11

3. Wells Fargo's Liability for Calls to Reassigned Cell Numbers Is In Serious Doubt.................................................................................13

4. The Amount Paid in Settlement Is Adequate if Not Generous Compared to Similar Settlements and the Amounts Class Members Might Hope to Receive if Plaintiffs Were to Prevail. ..................14

IV. WELLS FARGO'S RESPONSE TO OBJECTION OF ADAM HOIPKEMIER............16

A. Hoipkemier Is Not a Class Member and Has No Standing To Object ..................16

B. In the Alternative, the Objection Should Be Stricken....18

C. Hoipkemier's Attack on the Settlement is Non-Substantive and Lacks Merit....19

V. CONCLUSION....22

## TABLE OF AUTHORITIES

Page(s)

***Cases***

*ACA Int'l v. FCC*,
885 F.3d 687 (D.C. Cir. 2018) ....................11, 12, 13

*In re Advanced Methods to Target & Eliminate Unlawful Robocalls*,
CG Dkt. No. 17-59, 2018 WL 1452721 (FCC Mar. 23, 2018) ....................13

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
789 F. Supp. 2d 935 (N.D. Ill. 2011) ....................5

*Cellco P'ship v. Plaza Resorts, Inc.*,
No. 12-81238, 2013 WL 5436553 (S.D. Fla. Sept. 27, 2013) ....................9

*Columbus Drywall & Insulation, Inc. v. Masco Corp.*,
258 F.R.D. 545 (N.D. Ga. 2007) ....................22

*Custom LED, LLC v. eBay, Inc.*,
No. 12-350, 2014 U.S. Dist. LEXIS 87180 (N.D. Cal. June 24, 2014) ....................17, 18

*Davis v. AT&T*,
2017 WL 1155350 (S.D. Cal. Mar. 28, 2017) ....................10

*Denova v. Ocwen Loan Serv.*,
No. 17-2204, 2019 U.S. Dist. LEXIS 164402 (M.D. Fla. July 26, 2019) ....................12

*In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*,
33 F.3d 29 (9th Cir. 1994) ....................18

*In re GSE Bonds Antitrust Litig.*,
No. 19-1704, 2019 U.S. Dist. LEXIS 194736 (S.D.N.Y. Nov. 7, 2019) ....................1

*Gutierrez v. Barclays Grp.*,
No. 10-1012, 2011 U.S. Dist. LEXIS 12546 (S.D. Cal. Feb. 9, 2011) ....................9

*Horn v. Bank of Am., N.A.*,
No. 12-1718, 2014 U.S. Dist. LEXIS 51972 (S.D. Cal. Apr. 14, 2014) ....................18

*In re Hydroxycut Mktg. & Sales Practices Litig.*,
No. 09-md-2087, 2013 U.S. Dist. LEXIS 133413 (S.D. Cal. Sep. 17, 2013) ....................17, 18

*Johnson v. Yahoo!, Inc.*,
346 F. Supp. 3d 1159 (N.D. Ill. 2018) ....................12

*Johnson v. Yahoo!, Inc.*,
No. 14-2028, 2014 WL 7005102 (N.D. Ill. Dec. 11, 2014)....................................................12

*Jordan v. Nationstar Mortg. Ltd. Liab. Co.*,
No. 14-175, 2019 U.S. Dist. LEXIS 74833 (E.D. Wash. May 2, 2019)...............................1, 7

*Keyes v. Ocwen Loan Serv., LLC,*
335 F. Supp. 3d 951 (E.D. Mich. 2018) (E.D. Mich. Aug. 16, 2018) ....................................12

*Marks v. Crunch San Diego, LLC*,
904 F.3d 1041 (9th Cir. 2018) ..........................................................................................12

*Matlock v. United Healthcare Servs.*,
No. 13-2206, 2019 U.S. Dist. LEXIS 65149 (E.D. Cal. Apr. 15, 2019) ................................13

*McBean v. City of New York*,
233 F.R.D. 377 (S.D.N.Y. 2006) .........................................................................................5

*Miller v. Ghirardelli Chocolate Co.*,
No. 12-4936, 2015 U.S. Dist. LEXIS 20725 (N.D. Cal. Feb. 20, 2015) ................................18

*Morlan v. Universal Guar. Life Ins. Co.*,
No. 99-274, 2003 U.S. Dist. LEXIS 20961 (S.D. Ill. Nov. 20, 2003)....................................18

*In re Omnivision Techs., Inc.*,
559 F. Supp. 2d 1036 (N.D. Cal. 2008)...............................................................................18

*Revitch v. Citibank, N.A.*,
No. 17-6907, 2019 U.S. Dist. LEXIS 72026 (N.D. Cal. Apr. 28, 2019)...........................10, 11

*Ritchie v. Van Ru Credit Corp.*,
No. 12-1714, 2014 U.S. Dist. LEXIS 115399 (D. Ariz. July 30, 2014).................................14

*Roark v. Credit One Bank, N.A.*,
No. 16-173, 2018 U.S. Dist. LEXIS 193252 (D. Minn. Nov. 13, 2018)................................13

*Sandoe v. Bos. Sci. Corp.*,
No. 18-11826, 2019 U.S. Dist. LEXIS 183886 (D. Mass. Oct. 23, 2019) ..............................10

*Schulte v. Fifth Third Bank*,
805 F. Supp. 2d 560 (N.D. Ill. 2011) ....................................................................................5

*Sliwa v. Bright House Networks, LLC*,
No. 16-235, 2019 U.S. Dist. LEXIS 167805 (M.D. Fla. Sep. 27, 2019).................................10

*Soulliere v. Central Florida Invests.*,
No. 13-2860, 2015 WL 1311046 (M.D. Fla. Mar, 24, 2015) ..................................................9

*Steel Co. v. Citizens for a Better Environment*,
523 U.S. 83 (1998)....................17

*Thompson-Harbach v. USAA Fed. Sav. Bank*,
359 F. Supp. 3d 606 (N.D. Iowa Jan. 9, 2019)....................12

*West v. California Servs. Bureau, Inc.*,
323 F.R.D. 295 (N.D. Cal. 2017)....................10

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
No. 08-65000, 2016 U.S. Dist. LEXIS 130467 (N.D. Ohio Sep. 23, 2016)....................22

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
No. 02-921, 2004 U.S. Dist. LEXIS 23342 (W.D. Mo. Apr. 20, 2004)....................12

*Wong v. Accretive Health, Inc.*,
773 F.3d 859 (7th Cir. 2014)....................1, 22

***Statutes; Rules***

United States Code
Title 28, § 2342....................12
Title 47, § 227....................12

Federal Rules of Civil Procedure
Rule 23.................... *passim*

## I. INTRODUCTION

Defendant Wells Fargo Bank, N.A. ("Wells Fargo") submits this brief joining in Plaintiffs' Motion for Final Approval of Class Action Settlement ("Motion"), Dkt 121.

The settlement meets each of the criteria for approval set forth in amended Rule 23(e), including that (A) the class has been adequately represented, (B) the settlement was negotiated at arm's length, (C) the relief is adequate, taking into account (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of the proposed method of distributing relief and processing class-member claims; and (iii) any agreement required to be identified under Rule 23(e)(3); and, (D) the proposal treats class members equitably relative to each other. *See* Fed. R. Civ. Proc. 23(e)(2).

The settlement also meets all of the similar criteria for approval previously articulated by the Seventh Circuit.[1] *See Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014) (setting forth factors for class settlement approval in the Seventh Circuit, including "(1) the strength of the case for plaintiffs on the merits, balanced against the extent of settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of

[1] As the Advisory Committee notes to the Rule 23(e) amendments point out, "[t]he central concern in reviewing a proposed class-action settlement is that it be fair, reasonable, and adequate. . . . The goal of this amendment is not to displace any factor [previously articulated by circuit authority], but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. Proc. 23(e)(2) advisory committee's note to 2018 amendment. "Under Rule 23(e), both its prior version and as amended, fairness, reasonableness, and adequacy are the touchstones for approval of a class-action settlement." *Jordan v. Nationstar Mortg. Ltd. Liab. Co.*, No. 14-175, 2019 U.S. Dist. LEXIS 74833, at *5-6 (E.D. Wash. May 2, 2019); *see also In re GSE Bonds Antitrust Litig.*, No. 19-1704, 2019 U.S. Dist. LEXIS 194736, at *11 (S.D.N.Y. Nov. 7, 2019) (same).

competent counsel; and (6) stage of the proceedings and the amount of discovery completed.") (citations omitted)).

Plaintiffs' Motion addresses each of the factors to be considered by the Court. Wells Fargo will not address each factor, so as not to burden the Court with duplicative argument. However, Wells Fargo does address certain factors that it believes are especially important, or regarding which it believes the defendant's perspective might be helpful to the Court.

This brief also includes Wells Fargo's response to the sole objection received,[2] from Adam Hoipkemier. (Dkt. 113.) A response to that objection requires a discussion of the history and procedural background of this case and the other TCPA class actions against Wells Fargo, including a description of the parties' formal and informal discovery, their respective experts' analysis of the data, and the settlement negotiations. The "Factual Background" below not only shows that Hoipkemier's objections are without merit, but that the factors for approval of class action settlements are satisfied.

## II. FACTUAL BACKGROUND

### A. The TCPA Class Actions and Accompanying Discovery and Motion Practice

#### 1. *Prather v. Wells Fargo*

Plaintiff Myesha Prather filed this putative class action lawsuit in January 2017 alleging that Wells Fargo used an automated telephone dialing system ("ATDS," "autodialer" or simply "dialer") or prerecorded or artificial voice to call and text her and others on their cellular phones without their consent, in violation of the TCPA. (Dkt. 1.)

[2] Although not explicitly mentioned in Rule 23, the third and fourth Seventh Circuit factors (class member reaction) militate in favor of approval. Not a single class member has objected to the settlement. The sole objector, Adam Hoipkemier, is not a class member. As of the date this joinder is filed only 45 individuals have requested exclusion and more than 22,000 claims have been filed seeking to share in the recovery provided under the settlement.

It is not true, as Hoipkemier contends, that "the [proposed] class did not include customers that were contacted through use of an auto-dialer[.]" (*See* Dkt. 113 at 5.) To the contrary, in addition to seeking to represent a class of persons contacted via prerecorded voice message, Prather sought to represent a class of persons contacted via text message, on the premise that the texts were sent using equipment that constitutes an alleged automatic telephone dialing system, or "ATDS." (Dkt. 1, ¶ 10 (alleging " Defendant's calling operation uses an automated telephone dialing system to send text messages for such purposes and places calls featuring a prerecorded or artificial voice."); *id*., ¶ 20 (seeking to represent voice and text classes).)

**2. The California Litigation**

In April and June 2017, respectively, two additional putative TCPA class action cases against Wells Fargo were filed in the Northern District of California: *Pieterson* (No. 17-2306) and *Hastings* (No. 17-3633). *Pieterson* and *Hastings* were later consolidated, and the proposed class definitions amended to encompass only non-customers who received autodialed or prerecorded or artificial voice calls in connection with collection on credit card accounts. (*Pieterson*, Dkt. Nos. 65 & 153; *Hastings*, Dkt. No. 26, ¶ 21.)

In October and November 2018, *Barnes* (No. 18-6520) and *Garr* (No. 18-6997) were filed. Collectively, the four California cases sought to recover for calls that reached non-customers in connection with Wells Fargo credit card accounts (*Pieterson/Hastings*), auto loans (*Barnes*), and mortgages (*Garr*).

**3. The Georgia Litigation**

In April 2017, additional plaintiffs filed suit in the Northern District of Georgia, likewise seeking to represent a putative class of persons called by Wells Fargo in alleged violation of the TCPA: *Bishop* (No. 17-1505). The Georgia plaintiffs sought to recover for calls across all

business lines, without limiting their proposed class to persons who received calls related to a particular loan or account type. Wells Fargo's motion to compel two of those plaintiffs to arbitrate their claims was granted. (*Bishop*, Dkt. 46.)

### 4. Extensive Discovery Was Taken Across Five Suits

As set forth in plaintiffs' motion, Wells Fargo engaged in extensive motion practice and discovery to combat each of the putative class cases pending in Illinois, California, and Georgia. Wells Fargo will not repeat that background here.

## B. The Parties' Extensive Settlement and Mediation Efforts.

In September 2018, the *Pieterson/Hastings* parties participated in a mediation with Hunter Hughes, a private mediator in Atlanta who had successfully mediated and settled four prior TCPA class actions against Wells Fargo. No settlement was reached, and the parties in those actions continued with active expert discovery and briefing class certification, through December 2018. (*Pieterson*, Dkts. 153 & 167.)

On December 20, 2018, a settlement was reached in *Prather* with the assistance of the Honorable James F. Holderman, an experienced mediator and the former Chief Judge of the Northern District of Illinois. The settlement provided relief to non-customers called in connection with Wells Fargo's collection on various types of consumer accounts, including calls to the putative class members in the *Prather*, *Pieterson*, *Hastings*, *Barnes*, and *Garr* cases.

As set forth in his attached declaration regarding the mediation and settlement, Judge Holderman has extensive experience with TCPA litigation and presided over numerous individual and class action TCPA cases. (Declaration of Hon. James F. Holderman (Ret.) ("Holderman Decl."), a true and correct copy of which is attached hereto as Exhibit 1, at ¶ 6.)

Of course, Judge Holderman has not opined on the fairness of the settlement, since it is the province of this Court to make that determination. (*Id.*, ¶ 10.) However, far from the

"reverse auction" with "disarmed" class counsel which Hoipkemier contends occurred, Judge Holderman "confidently express[ed]" his view that "the mediation process was robust and adversarial[.]" (*Id.*)

Notwithstanding Hoipkemier's assertion that the parties did not exchange sufficient information prior to the settlement, as part of the mediation, Wells Fargo provided Prather's counsel data regarding the number of phone numbers associated with "wrong number" codes called by Wells Fargo across multiple lines of business.[3] (*See* Declaration of Rebecca S. Saelao ("Saelao Decl."), filed herewith, ¶ 2.) The settlement was also conditioned on confirmatory discovery, at plaintiff's insistence. (*See id.*, ¶ 3.) Such discovery is appropriate and supports approval of the settlement.[4] *See, e.g., Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 588 (N.D. Ill. 2011).

### C. Post-Settlement Challenge By the California Plaintiffs, Followed by Their Joining the Settlement

It is true that the California plaintiffs immediately questioned the settlement and whether it was adequate, raising various concerns that form the basis for Hoipkemier's current objection. (*See Pieterson*, Dkt. 189.) However, they did so without knowing the terms of the settlement, including the amount made available to class members, or the potential size and recovery by the

[3] Hoipkemier takes inconsistent positions, arguing both that the settlement was reached without sufficient pre-settlement discovery regarding calls placed by each line of business and that fees should be disallowed for work performed in the various cases that challenged calls by those lines of business. (*See* Dkt. 113 at p. 24.) Regardless, the parties' extensive exchange of information pre- and post-settlement supports approval here.

[4] In deciding whether a class settlement is fair and adequate, "the question that th[e] Court must answer is not how much or how little discovery was completed by the parties before they agreed to the settlement, but rather whether the discovery that was completed was sufficient for 'effective representation.' " *See In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 966-67 (N.D. Ill. 2011) (quoting *McBean v. City of New York*, 233 F.R.D. 377, 384-85 (S.D.N.Y. 2006)). "Indeed, the label of 'discovery' is not what matters. Instead, the pertinent inquiry is what facts and information have been provided." *See id*.

class, since they did not know how many phone numbers associated with wrong number codes had been called across the various lines of business. (*See id.* at 6.)

The California plaintiffs could have chosen to push forward with their objections and criticisms of that settlement. As described in their Motion, however, they instead took various steps to learn about the settlement terms and scope of the case, to decide whether to support or oppose the settlement. Those efforts necessarily led to three way settlement discussions among the parties. As part of those discussions, the amount of the settlement was disclosed to California counsel. So was the available information regarding the scope of the settlement and potential recovery by the proposed class. This allowed those attorneys to compare the settlement amount with their own valuations of the case, based on the independent analysis they had conducted.

Global discussions continued, and the parties continued to exchange views about the valuation of the claims given divergent views over both the number of class members and the proper valuation of the claims. During this time, the parties conducted confirmatory discovery and Wells Fargo obtained additional, updated information about the scope of the potential settlement class, which was provided to plaintiffs' counsel. Eventually, Wells Fargo agreed to pay $17,850,000 to resolve the claims of the settlement class, which was estimated to consist of no more than 440,000 non-customers who received calls. (Settlement Agreement, Dkt. 80-1, at ¶ 29.) The settlement resolved the claims of Prather and the California plaintiffs, along with an additional plaintiff, Windie Bishop, from the Georgia litigation, and additional plaintiffs—Joseph Dunn and Helen Iehl—all of whom were then added to this action, by way of an amended complaint. (*See* Dkts. 77 & 80-1.) This amount represented an increase to the amount agreed to at the December 2018 mediation, in exchange for a global resolution of the pending putative

class action cases, and in light of the extended class period, which encompasses calls and texts through July 10, 2019.

The settlement is more than fair and adequate for class members, as set forth below.

## III. THE SETTLEMENT MEETS RULE 23(e)(2)'S CRITERIA FOR APPROVAL

### A. The Settlement Was Negotiated at Arm's Length.

To say that this settlement was the product of adversarial, arms' length negotiations would be putting it mildly. As detailed in plaintiffs' Motion, even after the parties reached agreement at the *Prather* mediation in December 2018, that was not the end of the matter. The various firms prosecuting the other TCPA class actions against Wells Fargo became involved, raising questions about the settlement terms and pressing for information about the settlement amount and scope. Adversarial negotiations continued for months, involving both Wells Fargo and the plaintiffs' firms that had been prosecuting the various lawsuits on separate tracks. Based on the involvement of the various firms and the presumed sharing of information developed through the different lawsuits, and to achieve global peace, the settlement agreement ultimately signed in July 2019 provided for an increased recovery for the class as compared to the initially agreed-upon terms.

These extensive settlement discussions represent the sort of "adversarial, non-collusive, and arms-length negotiation" that satisfies amended Rule 23, supporting approval here. *See Jordan*, 2019 U.S. Dist. LEXIS 74833, at *8 (approving class action settlement that "was achieved under the supervision of a trusted third-party mediator following extensive settlement negotiations, which assures the Court that the negotiations were conduct at arm's-length and without collusion among the parties."); *see also* Holderman Decl., ¶¶ 6, 10 (negotiations were arm's length and adversarial). This factor is thus met and supports approval of the settlement.

### B. In Light of Wells Fargo's Strong Defenses, the Relief Is Adequate and the Costs, Risks, and Delay of Trial and Appeal Heavily Favor Approving the Settlement

Remarkably, Hoipkemier's objection never discusses the benefits provided under the settlement or the risks of plaintiffs continuing to litigate these cases. Nor does it compare the recovery provided under the settlement with other settlements or what class members could reasonably expect to receive if the these claims were litigated to conclusion. Such comparisons strongly militate in favor of approval of the proposed settlement, as discussed below.

#### 1. Plaintiffs Face a Grave Risk that No Class Could Ever Be Certified in this "Wrong Number" Class Action.

To begin with, the plaintiffs in each case face an uphill battle certifying any class. On a contested motion for class certification, Wells Fargo would demonstrate that there is no way to identify the person who actually received each call, without conducting an individualized forensic investigation of each phone number called and each call placed. Further, if plaintiffs cannot determine from class-wide evidence which calls were answered by non-customers, determination of consent would likewise present a predominant, non-common issue, precluding class certification.

Wells Fargo's expert in these cases conducted extensive analyses of Wells Fargo's calling data, including analysis of calls placed to phone numbers with so-called "wrong number" codes. This analysis of calling data was performed in both the *Prather* and *Pieterson/Hastings* cases. Because the case schedule was slightly more advanced in *Pieterson*, and class certification was partially briefed in that case at the time the cases settled, the class certification briefing in *Pieterson* provides the best illustration of the flaws in plaintiffs' proposed methodology for identifying "non-customer" call recipients and proving class-wide liability.

Plaintiffs' expert in *Pieterson* concluded that approximately half of the phone numbers with "wrong number" codes called by Wells Fargo (504 out of a 1,000 phone number sample) belonged to Wells Fargo's customers. (*See* Saelao Decl. Ex. 1 (Declaration of Anya Verkhovskaya, *Pieterson*, Dkt. No. 150-3), at ¶ 61).) Wells Fargo's expert put that percentage at closer to 2.5%. (*See* Saelao Decl. Ex. 2 (Declaration of Margaret Daley, *Pieterson*, Dkt. 167-7), at ¶ 53.) Clearly, identification of call recipients and the ability to identify class members using class-wide evidence would be a hotly contested issue if the litigation proceeded.

Further, plaintiffs and their experts would be unable to use "wrong number" codes to eliminate the issue of consent that is so often fatal to class certification in TCPA cases. Even where it appears a call may have been answered by a non-customer, the evidence in the sample account records analyzed by the parties showed that Wells Fargo had consent to call that number. The sample data included many examples of calls answered by the customer's mother, spouse, or other family member in which the call recipient provided Wells Fargo with a "better" number to reach the customer. (Saelao Decl. Ex. 2, ¶¶ 64-77).) Wells Fargo is not liable for calls answered by family members or associates where the customer was a user, subscriber or otherwise had authorization to give consent for Wells Fargo to dial that number (on family or employer calling plans, for example).[5] As the FCC has decreed and courts have held, a phone's permissive user has the authority to provide consent to call that number.[6] Thus, individual mini-trials would be

[5] Family or business calling plans are commonplace. (*See* Saelao Decl. Ex. 3 (Daley Decl. Ex. B, *Pieterson*, Dkt. 167-9), at ¶¶ 59, 65); *see also Soulliere v. Central Florida Invests.*, No. 13-2860, 2015 WL 1311046, at *4 (M.D. Fla. Mar, 24, 2015) (business calling plan; employee-user gave consent); *Cellco P'ship v. Plaza Resorts, Inc.*, No. 12-81238, 2013 WL 5436553, *5 (S.D. Fla. Sept. 27, 2013) (same).

[6] Even persons who use the phone without asking for permission from the user or subscriber may give effective consent to call the phone. *Gutierrez v. Barclays Grp.*, No. 10-1012, 2011 U.S. Dist. LEXIS 12546, at *9 (S.D. Cal. Feb. 9, 2011).

required to determine consent and liability, notwithstanding the application of a “wrong number” code to a particular number.

For these reasons, numerous courts around the country have refused to certify “wrong number” TCPA class action cases similar to this one. *See, e.g., Sandoe v. Bos. Sci. Corp.*, No. 18-11826, 2019 U.S. Dist. LEXIS 183886, at *9 (D. Mass. Oct. 23, 2019); *see also Davis v. AT&T*, 2017 WL 1155350 (S.D. Cal. Mar. 28, 2017) (holding “‘[w]rong number’ notations would not absolutely resolve [consent] issue” because evidence would still be needed on “whether those call recipients were, in fact, customers.”); *Sliwa v. Bright House Networks, LLC*, No. 16-235, 2019 U.S. Dist. LEXIS 167805, at *14 (M.D. Fla. Sep. 27, 2019) (declining to certify “wrong number” class action, despite plaintiff’s “assert[ion] that he simplified the [proposed class] definitions to include only non-customers who, by definition, did not consent.”); *but see West v. California Servs. Bureau, Inc.*, 323 F.R.D. 295, 302 (N.D. Cal. 2017).

The *Pieterson* plaintiffs strenuously argued that they would be able to obtain class certification in their case. However, after they filed their motion to certify in that case, another judge in the Northern District of California denied class certification of a wrong number case on grounds identical to those urged by Wells Fargo in opposing class certification. *See Revitch v. Citibank, N.A.*, No. 17-6907, 2019 U.S. Dist. LEXIS 72026, at *6 (N.D. Cal. Apr. 28, 2019). In *Revitch*, the court was persuaded by the defendant’s showing of “an evidentiary basis from which to conclude that adjudicating whether or not members of the class consented to its calls lacks a common method of proof.” *Id.* In particular, the court credited the expert analysis of Margaret Daley—the same expert Wells Fargo engaged in these cases—who “identified several fatal flaws in plaintiff’s methodology” for identifying class members. *See id.* at *7. Daley’s analysis showed, among other things, that (1) many of the numbers plaintiff’s expert identified as

belonging to non-customers were in fact associated with the defendant's customers; (2) family members provided shared telephone numbers to the defendant and answered each other's calls; and (3) numbers flagged as "wrong" were later re-provided to the defendant by customers as good numbers to call. *Id.* at *6-8.

Daley reached similar conclusions after analyzing Wells Fargo's wrong number data. Those conclusions were presented to the *Pieterson* court. (*See, e.g.*, Saelao Decl. Ex. 4 (Wells Fargo's Opposition to Plaintiffs' Motion for Class Certification, *Pieterson*, Dkt. 167) at 25-26; Saelao Decl. Ex. 2 (Declaration of Margaret Daley, *Pieterson*, Dkt. 167-7) at ¶¶ 51-78).) The same or a closely similar analysis would have been presented to this Court at the class certification stage, had this litigation not been resolved in the interim. If this settlement is not approved, class members face a grave risk that no class will ever be certified, in any of these cases, and that they will receive nothing.

### 2. Whether These Calls Are Even Subject to the TCPA Is In Serious Doubt.

Even more fundamental questions loom regarding the viability of plaintiffs' claims. The Federal Communications Commission is presently re-considering what equipment even qualifies as an "ATDS" under the TCPA. *See ACA Int'l v. FCC*, 885 F.3d 687, 692 (D.C. Cir. 2018). In March of last year, the D.C. Circuit Court of Appeal, on direct review of a 2015 FCC order, "set aside . . . the Commission's effort to clarify the types of calling equipment that fall within the TCPA's restrictions," as arbitrary and capricious, given that the 2015 order set forth "an unreasonably expansive interpretation of the statute" that "would appear to subject ordinary calls from any conventional smartphone to the Act's coverage." *Id.*

Pending this determination, courts around the country are left to parse the statute, and have reached dramatically different conclusions regarding what constitutes an ATDS. This

Court is of course familiar with the issue. *See Johnson v. Yahoo!, Inc.*, 346 F. Supp. 3d 1159, 1162 (N.D. Ill. 2018) ("Some courts think the statutory language is ambiguous enough to include a device that dials numbers from a stored list (without random or sequential number generation). . . . But I read the statute differently, and it is not ambiguous.") (disagreeing with *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1051-52 (9th Cir. 2018)) (additional citations omitted).

In the wake of *ACA Int'l*, courts around the country have also held that equipment—such as the very same Aspect Unified IP System used by Wells Fargo to contact its customers—which does not use random or sequential number generation is not an "ATDS" under the TCPA. *See, e.g., Keyes v. Ocwen Loan Serv., LLC*, 335 F. Supp. 3d 951, 963 (E.D. Mich. 2018) (E.D. Mich. Aug. 16, 2018) (granting defendant summary judgment on a TCPA claim as "the Aspect System is not an ATDS as a matter of law."); *Thompson-Harbach v. USAA Fed. Sav. Bank*, 359 F. Supp. 3d 606, 612, 626 (N.D. Iowa Jan. 9, 2019) (holding on summary judgment that the Aspect Unified IP, Model 7.3 is not an ATDS). Other courts disagree. *See, e.g., Denova v. Ocwen Loan Serv.*, No. 17-2204, 2019 U.S. Dist. LEXIS 164402, at *10 (M.D. Fla. July 26, 2019).

Notwithstanding this split, the FCC could issue its ruling at any time, wiping out any liability here. The FCC's guidance, once issued, will be binding on circuit and district courts alike, under the Hobbs Act. *See Johnson v. Yahoo!, Inc.*, No. 14-2028, 2014 WL 7005102, at *3 (N.D. Ill. Dec. 11, 2014) (citing 47 U.S.C. § 227(b)(2); 28 U.S.C. § 2342(1)). The unsettled law on this threshold issue underscores that any result short of settlement will lead to protracted litigation and appeal, heavily favoring approval of the settlement. *See, e.g., In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, MDL 1559, No. 02-921, 2004 U.S. Dist. LEXIS 23342, at *55 (W.D. Mo. Apr. 20, 2004) ("In contrast to the delay and uncertainty attendant with [complex] litigation, the Settlement Agreement provides substantial and immediate benefits.").

### 3. Wells Fargo's Liability for Calls to Reassigned Cell Numbers Is In Serious Doubt.

The FCC is also actively reconsidering its treatment of "reassigned" cellular telephone numbers—i.e. numbers that may have at one time belonged to Wells Fargo's customers, but now belong to third parties whom plaintiffs contend Wells Fargo contacted in an effort to reach its customers. *See ACA Int'l*, 885 F.3d at 709. The FCC's forthcoming binding guidance on this issue will directly impact this litigation, and could substantially undercut—or eliminate entirely—any liability for calls to so called "reassigned" numbers. *See, e.g., Matlock v. United Healthcare Servs*., No. 13-2206, 2019 U.S. Dist. LEXIS 65149, at *8 (E.D. Cal. Apr. 15, 2019) (staying putative class action TCPA case pending the FCC's guidance regarding reassigned numbers, and holding "[g]iven the high number of both reassigned numbers and TCPA lawsuits, it is equally important that these matters be treated uniformly, and the FCC is the best party to do that in the first instance," and "*waiting for the FCC's ruling may dispense with all or part of the issues confronted with this case*[.]") (emphasis added). Among other things, the FCC is considering whether and to what extent callers are liable for good faith calls to reassigned numbers. *See In re Advanced Methods to Target & Eliminate Unlawful Robocalls*, CG Dkt. No. 17-59, 2018 WL 1452721, at *7 (FCC Mar. 23, 2018)); *see also Roark v. Credit One Bank, N.A.*, No. 16-173, 2018 U.S. Dist. LEXIS 193252, at *9 (D. Minn. Nov. 13, 2018) (granting defendant summary judgment on TCPA claim where it reasonably relied on its customer's prior express consent to contact an alleged wrong number).

In light of Wells Fargo's strong defenses and the uncertainty created by the forthcoming FCC rulings—including the risks and costs of protracted litigation and appeal—the settlement is more than adequate, and should be approved.

**4. The Amount Paid in Settlement Is Adequate if Not Generous Compared to Similar Settlements and the Amounts Class Members Might Hope to Receive if Plaintiffs Were to Prevail.**

Because of the serious risks that plaintiffs face in obtaining class certification and prevailing on the merits, courts have consistently approved TCPA settlements that pay class members a fraction of the $500 penalty provided under the statute. This is true of settlements throughout the country, including within the Northern District of Illinois. *See, e.g., Martinez v. Medicredit, Inc*., No. 16-1138 (E.D. Mo.), Dkt. No. 93, Dec. 5, 2017 (motion for preliminary approval) and Dkt. No. 105, May 15, 2018 (approving settlement that provided $5,000,000 for 627,642 unique cellular numbers, or $7.79 per number); *Gutierrez-Rodriguez v. Progressive Mgmt. Sys*., No. 16-182 (S.D. Cal.), Dkt. No. 67, Mar. 26, 2018 (approving settlement that provided $1,500,000 for approximately 61,939 unique cellular telephone numbers, or $24.21 per number); *James v. JPMorgan Chase Bank, N.A.*, No. 15-2424 (M.D. Fla.), Dkt. No. 51 (motion for preliminary approval) and Dkt. No. 58, June 5, 2017 (approving settlement that provided $3,750,000 for approximately 675,000 unique cellular numbers, or $5.56 per number); *Lofton v. Verizon Wireless,* No. 13-5665 (N.D. Cal.), Dkt. No. 207-1, Apr. 14, 2016 (motion for final approval of class settlement that provided $4,000,000 for approximately 242,666 potential class members, or $16.48 per member), and Dkt. No. 217, May 27, 2017 (approving settlement); *cf. Douglas v. The Western Union Co*., No. 14-1741 (N.D. Ill.), Dkt. No. 52, Oct. 28, 2015 (motion for preliminary approval, collecting cases showing even lower-value approved TCPA settlements), Aug. 31, 2018 (approving $8.5 million TCPA settlement for unsolicited text messages sent on behalf of Western Union to 823,472 numbers, or $10.32 per number).[7]

---

[7] Of course, there are outliers. Some TCPA settlements have resulted in payments of hundreds of dollars to class members, whether because of the unusual facts of the case or a relatively low number of claimants. *See, e.g., Ritchie v. Van Ru Credit Corp*., No. 12-1714, 2014 (footnote continued)

Based on the claims submitted to date, it appears that claimants in this case are likely to receive an especially generous payout. A little over 22,000 claims have been received as of November 25, 2019, suggesting that the eventual number of claimants is likely to be in the range of 25,000. (*See* Dkt. 121-3 (Declaration of Cameron Azari, Eq. on Implementation and Adequacy of Settlement Notice Plan ("Azari Decl."), ¶ 34.) If this Court were to award all of the fees, costs and service awards sought by plaintiffs and their counsel, individual claimants would receive an amount approaching the $500 statutory penalty.[8] This is an excellent recovery, especially since analysis of the calling data shows that, for more than 90% of numbers with wrong number codes called by Wells Fargo, no further calls were made following the application of that code. (*See* Saelao Decl. Ex. 3 (*Pieterson*, Dkt. 167-9), ¶ 54).)

This outcome is also consistent with Wells Fargo's assessment of the amounts at issue and theoretically available to class members if plaintiffs were able to prevail on the merits. The class notice database consists of approximately 930,000 telephone numbers with "wrong number" codes called by Wells Fargo's various lines of business during the relevant periods. (*See* Azari Decl., ¶ 14.) Based on their extensive analysis, Wells Fargo's experts believe that only 2.5% of these numbers belonged to non-customers, or an estimated 23,250 individuals. Even if Wells Fargo lacked consent to call a substantial percentage of these individuals—which

---

U.S. Dist. LEXIS 115399, at *4 (D. Ariz. July 30, 2014) (approving $2.3 million TCPA settlement for calls to 9,042 class members, or $254.36 per class member).

[8] This is calculated as $11,612,739.40 (i.e. $17.85 million, less plaintiffs' counsel's $5.875 million fee request, and less the requested settlement administration costs of $291,785.63 and $70,000 in incentive awards), distributed to an estimated 25,000 claimants.

Wells Fargo strongly disputes—the amount being paid out in settlement is approaching an estimate of the amount plaintiffs could hope to recover if they were to prevail at trial.[9]

## IV. WELLS FARGO'S RESPONSE TO OBJECTION OF ADAM HOIPKEMIER

As set forth below, Hoipkemier's concerns are misplaced, and his objection should be overruled on the merits. In addition, Hoipkemier is not a class member. His objection should also be overruled on that independent ground.

Where an objector is not a class member and has no standing, some courts have stricken the objection in lieu of overruling it on the merits. Though Wells Fargo believes the objection should be overruled, Wells Fargo also requests that the Court strike Hoipkemier's objection, as an alternative form of relief.

### A. Hoipkemier Is Not a Class Member and Has No Standing To Object

The facts relating to Hoipkemier's class membership and standing are known to the Court by virtue of the parties' prior submissions on the subject. (*See* Dkts. 114 & 115.) Accordingly, the relevant facts will only be briefly summarized here, to avoid redundant briefing.

Hoipkemier was a Wells Fargo credit card customer from July 30, 2007 through June 8, 2015. (Dkt. 114-3, ¶ 3.) In response to Wells Fargo's motion to require a threshold showing that he is a class member (Dkt. 107), he initially contended that he had received calls from Wells Fargo, after he was no longer a customer, on two different cell numbers, one with a (706) area code and one with a (404) area code. (Dkt. 114-1 at 7:17-22, 14:21-22.) On November 7, 2019, however, he submitted a declaration admitting that he does *not* remember ever receiving a call

[9] 23,250 estimated class members x $500 = a potential recovery of $11,625,000. This is approximately the same amount plaintiffs propose to distribute to class members after the payment of fees, costs, and service awards, and after the payment of settlement administration costs.

from Wells Fargo on the (706) telephone number at a time when he was not a Wells Fargo customer. (Dkt. 114-2, ¶ 4.) He continues to assert that he remembers receiving such calls on the (404) number. (*Id.*, ¶ 6.) However, he has never provided any evidence to establish this fact (other than his declaration), nor has he identified the dates of any such calls received, nor has he even established his ownership of the single remaining phone number at issue.

Wells Fargo has conducted research to identify any calls that may have been placed to the (404) telephone number using the automated technologies at issue in this lawsuit. Wells Fargo never made such a call to the (404) number at any time, including from January 1, 2015 to the present. (*See* Dkt. 114-3 (Declaration of Ravi Abraham), ¶ 8-9.) Thus, Hoipkemier's declaration is insufficient to establish that he is a class member[10]—and the Abraham declaration affirmatively negates class membership.

Where an individual seeks to object to a class action settlement, it is the objector's burden to establish that he is in fact a member of the class. *See In re Hydroxycut Mktg. & Sales Practices Litig.*, No. 09-md-2087, 2013 U.S. Dist. LEXIS 133413, at *61 (S.D. Cal. Sep. 17, 2013) ("The party seeking to invoke the Court's jurisdiction—in this case, the Objectors— has the burden of establishing standing.") (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103-04 (1998)). Where the objector fails to come forward with evidence sufficient to prove class membership, the objection should be overruled on that basis alone. *See Custom*

[10] Hoipkemier's declaration only asserts that he remembers receiving "calls," generically. He never claims or establishes that such calls were made using the automated technologies at issue (autodialer, prerecorded message, artificial voice, or text). His declaration also does not establish *when* he received any such calls, which is critical to establish class membership. At best, he suggests that he received calls sometime after June 8, 2015, when he ceased being a Wells Fargo credit card customer. But the class period at issue only goes back to March or April of 2016, for some Wells Fargo lines of business. So even if he received a call after June 8, 2015 that would not establish that he received a call during the class period at issue in *Prather*.

*LED, LLC v. eBay, Inc*., No. 12-350, 2014 U.S. Dist. LEXIS 87180, at *19 (N.D. Cal. June 24, 2014) ("[B]ecause Hicks has failed to show that he is an aggrieved class member, his objection must be overruled for lack of standing.").

Thus, the court should overrule Hoipkemier's objection to this settlement and need not reach the arguments he has made against final approval.

**B. In the Alternative, the Objection Should Be Stricken**

When an objector fails to provide evidence establishing that he or she is in fact a member of the class, many courts have stricken the objection, either *sua sponte* or in response to a motion by one or more parties. *See, e.g., Horn v. Bank of Am., N.A.*, No. 12-1718, 2014 U.S. Dist. LEXIS 51972, at *13 (S.D. Cal. Apr. 14, 2014) (striking objection where "putative objector "ha[d] not demonstrated she is a member of either of the Classes," as she "fail[ed] to demonstrate that she paid deferred interest on an option ARM."); *In re Hydroxycut Mktg. & Sales Practices Litig.*, 2013 U.S. Dist. LEXIS 133413, at *63 (striking objection because objector had not "carried his burden of proving standing as a class member"); *Morlan v. Universal Guar. Life Ins. Co.*, No. 99-274, 2003 U.S. Dist. LEXIS 20961, at *8 (S.D. Ill. Nov. 20, 2003); *Miller v. Ghirardelli Chocolate Co.*, No. 12-4936, 2015 U.S. Dist. LEXIS 20725, at *29-30 (N.D. Cal. Feb. 20, 2015) (collecting cases).

An unsupported assertion of class membership is insufficient to establish standing to object. "One must be an aggrieved class member to object to a class action settlement; to be an aggrieved class member, an individual must fall within the class definition and also must have been injured by the defendant's conduct." *See Custom LED, LLC*, 2014 U.S. Dist. LEXIS 87180, at *18-19 (citing *In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*, 33 F.3d 29, 30 (9th Cir. 1994)); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1044 (N.D. Cal. 2008).

Here, Hoipkemier is not a class member, as Wells Fargo has no record of placing automated calls or texts to his (404) number. (*See* Dkt. 114-3, ¶ 9.) And, Hoipkemier's bare assertion that he is a class member, without making any showing that he is in fact the user or subscriber to the telephone number, and without showing that Wells Fargo ever called or texted him via automated means, is insufficient to establish he is an aggrieved class member with standing to object.

**C. Hoipkemier's Attack on the Settlement is Non-Substantive and Lacks Merit**

Tellingly, Hoipkemier barely addresses the settlement's substance in his lengthy objection. Nor does he assert that any of the named plaintiffs are inadequate. He also does not question the adequacy of McGuire Law or any other class counsel, other than to make unsupported allegations regarding collusion. Despite attempting to adopt all of the California plaintiffs' initial arguments against the settlement, Hoipkemier ignores the fact that those same plaintiffs (who, unlike Hoipkemier are represented by counsel with voluminous experience resolving TCPA class cases), fully supported the settlement once they learned its terms.

At most, Hoipkemier asserts that the parties purportedly failed to quantify the "net expected value" of the case versus the value of the settlement. This is untrue.

The parties conducted extensive analysis regarding the estimated class size. Wells Fargo's experts concluded that a mere 2.5% of numbers associated with a wrong number code may have actually belonged to non-customers.[11] Plaintiffs' experts contended that up to 50% of such numbers belonged to non-customers.

Contrary to Hoipkemier's contentions, the settlement amount was also not impacted by

[11] For its part, Wells Fargo has always maintained and continues to maintain that "wrong number" cases are not appropriate for class treatment due to individual issues and manageability problems.

McGuire Law's purported lack of preparation to pursue class certification. As set forth in plaintiffs' Motion, McGuire Law has extensive experience litigating TCPA class cases, and was prepared to do so here. And, the mediator, Judge Holderman, found the settlement "was robust and adversarial, and that the settlement reached was the product of skilled and ethical attorneys zealously advocating for the interests of their respective clients, including, in the case of McGuire Law, both the plaintiff and class members." (Holderman Decl., ¶ 10.)

There is nothing suspicious about the fact that the case was mediated and settled prior to class certification, which is a very common occurrence in class litigation. Class certification is a significant motion, with high levels of risk and reward for both sides, as indicated by the cases both granting and denying motions to certify "wrong number" TCPA cases.

At the time of the December 20, 2018 mediation, the deadline for Prather to move for class certification was May 1, 2019. (*See* Dkt. 62.) Briefing on class certification was thus still over four months away. In the *Pieterson/Hastings* cases, on the other hand, the deadline for moving for class certification was November 16, 2018. (*See* Dkt. 89 at 2.) Accordingly, at the time a settlement in principle was reached in *Prather*, class certification had already been partially briefed in *Pieterson*/*Hastings*. (*See Pieterson* Dkts. 153 and 167.) The issues briefed in *Pieterson/Hastings* turned largely on the parties' analysis of the sample data produced by Wells Fargo and analyzed by the parties' experts. The *Prather* attorneys had very similar information and data sets, and certainly had worked with their experts to prepare a comparable analysis.

Nor is there anything to Hoipkemier's suggestion that the proposed settlement "includes customers contacted by auto-dialer," while—according to Hoipkemier—Prather's complaint did not "include customers that were contacted through the use of an auto-dialer and McGuire Law did not take discovery on Wells Fargo's use of automated technology." (Dkt. 113 at 5.) First,

the settlement simply does not apply to *customers* like Hoipkemier. Second, Prather both alleged a class of persons contacted by alleged ATDS technology (text message recipients) and took discovery on that claim. (*See* Dkt. 1, ¶ 10 (alleging " Defendant's calling operation uses an automated telephone dialing system to send text messages for such purposes and places calls featuring a prerecorded or artificial voice."); *id*., ¶ 20 (seeking to represent voice and text classes); Declaration of Evan Myers, Dkt. 121-1, at ¶¶ 9-10.) This is true despite Hoipkemier's quotation of a hearing transcript from June 2018, at which time such discovery had not yet been conducted. (*See* Dkt 113 at 5 n. 5 (citing a June 2018 hearing transcript).)

Hoipkemier is also incorrect that Wells Fargo has a "policy" against TCPA settlements involving multiple lines of business. Wells Fargo has previously settled class action TCPA claims involving more than one line of business or loan product, including in court approved settlements in 2012 and 2016. *Malta v. Wells Fargo Bank, N.A.*, No. 10-1290 (S.D. Cal.) (TCPA class action settlement relating to calls placed regarding residential mortgage loans and auto loans); *Markos v. Wells Fargo Bank, N.A.*, No. 15-1156 (N.D. Ga.) (TCPA class action settlement relating to calls placed regarding residential mortgage loans and home equity loans).

And even if this had never occurred previously, Hoipkemier offers no explanation as to why a settlement involving multiple lines of business is indicative of a "sell-out" of class members or otherwise problematic. Given the multiplicity of lawsuits Wells Fargo was facing, involving all lines of business, such a settlement was reasonable from Wells Fargo's perspective, as it bought peace and eliminated the ongoing burden and expense of litigation.

Further, a single settlement involving multiple lines of business makes sense given the relatively modest size of the case. The parties estimated the class size here to be no more than 440,000 persons. (Dkt. 80-1, ¶ 29.) And, as Wells Fargo expected based on its analysis of the

data, a significantly smaller population of persons are claiming to be actual non-customers who received calls without consent. Resolving the various putative class cases in one action, rather than through five or more separate settlements, provides the most efficient and economical result for all involved, including class members whose recovery would otherwise be reduced by the fees and costs required to obtain court approval for and administer multiple settlements.

Finally, leaving aside the factual inaccuracies advanced by Hoipkemier, it is not inappropriate for the parties to resolve the claims of a broader class of persons via settlement than what was originally alleged in plaintiffs' complaint. Courts routinely approve settlement classes broader in scope than classes previously sought, or even previously certified, in the same litigation. *See In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, No. 08-65000, 2016 U.S. Dist. LEXIS 130467, at *23 (N.D. Ohio Sep. 23, 2016) (approving settlement class broader than that previously certified); *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 258 F.R.D. 545, 558 (N.D. Ga. 2007) ("The Court finds that the settling defendants' desire to attain a full and complete settlement lends further support for certifying a broader settlement class.").

## V. CONCLUSION

For the reasons set forth above, Hoipkemier's objection should be overruled on the merits and for lack of standing. Alternatively, the objection should be stricken.

In addition, as set forth above and in plaintiffs' Motion, the settlement meets all criteria for approval, both as articulated in the recent amendments to Rule 23 and by the Seventh Circuit. *See Wong*, 773 F.3d at 863 (setting forth factors for class settlement approval in the Seventh Circuit). Wells Fargo therefore joins plaintiffs' Motion for final approval of the settlement.

Dated: November 26, 2019

Respectfully submitted,

WELLS FARGO BANK, N.A.

By: */s/ Mark D. Lonergan*

Mark D. Lonergan, *pro hac vice*
Rebecca S. Saelao, *admitted to the General Bar*
SEVERSON & WERSON
One Embarcadero Center, Suite 2600
San Francisco, California 94111
Telephone: (415) 398-3344
Facsimile: (415) 956-0439
mdl@severson.com
rss@severson.com

Lucia Nale
Michael Bornhorst
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Tel: (312) 782-0600
Fax: (312) 706-8169
lnale@mayerbrown.com
mbornhorst@mayerbrown.com

Attorneys for Defendant
Wells Fargo BANK, N.A.

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on the date set forth above the undersigned caused a true and correct copy of the foregoing to be filed and served electronically via the court's CM/ECF system.

*/s/ Mark D. Lonergan*