# Exhibit 2

# REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

# Declaration of Margaret Daley in Support of Wells Fargo Bank, N.A.'s Opposition to Plaintiffs' Motion for Class Certification

1  MARK D. LONERGAN (State Bar No. 143622)
   mdl@severson.com
2  REBECCA S. SAELAO (State Bar No. 222731)
   rss@severson.com
3  SEVERSON & WERSON
   A Professional Corporation
4  One Embarcadero Center, Suite 2600
   San Francisco, California 94111
5  Telephone: (415) 398-3344
   Facsimile: (415) 956-0439
6
   Attorneys for Defendant
7  WELLS FARGO BANK, N.A.

8
                    **UNITED STATES DISTRICT COURT**
9                   **NORTHERN DISTRICT OF CALIFORNIA**
                    **SAN FRANCISCO DIVISION**
10

11 ALBERT PIETERSON, *on behalf of himself*        Case No. 3:17-cv-02306-EDL
   *and all others similarly situated,*
12                                                 **DECLARATION OF MARGARET**
            Plaintiff,                             **DALEY IN SUPPORT OF WELLS**
13                                                 **FARGO BANK, N.A.'S OPPOSITION**
        vs.                                        **TO PLAINTIFFS' MOTION FOR CLASS**
14                                                 **CERTIFICATION**
   WELLS FARGO BANK, N.A.,
15
            Defendant.
16  ─────────────────────────────────────
17 JOHN HASTINGS, *on behalf of himself and*       Case No. 3:17-cv-03633-EDL
   *all others similarly situated,*
18
            Plaintiff,
19
        vs.
20
   WELLS FARGO BANK, N.A.,
21
            Defendant.
22  ─────────────────────────────────────
23

24      I , Margaret A. Daley, declare:

25                           *__Background__*

26      1.      I am a Managing Director of Berkeley Research Group ("BRG") and a leader in its

27 Global Investigations + Strategic Intelligence practice group. BRG is a leading global strategic

28 advisory and expert services firm that provides independent expert testimony, litigation and

─────────────────────────────────────────────────────────────────
07685.1850/13626585.1                          3:17-cv-02306-EDL & 3:17-CV-03663-EDL
       DALEY DECLARATION ISO WFB'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1    regulatory support, authoritative studies, strategic advice, and data analytics to major law firms,

2    Fortune 500 corporations, government agencies, and regulatory bodies around the world. I joined

3    BRG in 2015. I previously worked for Duff & Phelps and Navigant, both of which are

4    international consulting firms.

5    　　　2.　　　Among those aspects of my background that are relevant to this matter are the

6    following:  I am a licensed attorney and have been a member of the Illinois bar since 1987. I am a

7    Certified Fraud Examiner. I have been retained by Fortune 500 corporations, large public

8    universities, global financial institutions, healthcare providers and the American Bar Association

9    (among others) to conduct independent investigations and report my findings and

10   recommendations on matters ranging from whistleblower claims to law school accreditation. I

11   currently serve as the Chairman of the Cook County (Illinois) Board of Ethics. I have served on

12   the Board of Directors and as a past President of the Illinois Equal Justice Foundation. The

13   National Law Journal has named my investigative team as "Best of Chicago for Global Risk &

14   Investigations." Annually, since 2014, Who's Who Legal has named me as one of a select group

15   of Forensic Investigations Experts, and in 2018 as one of its five "Thought Leaders" nationally in

16   the field of Digital and Data Forensics and in Investigations.

17   　　　3.　　　I have previously been retained in approximately 15 lawsuits alleging violations of

18   the Telephone Consumer Protection Act or "TCPA." I was retained in those cases, among other

19   things, to investigate whether data sources—dialer records, account records and publicly available

20   data—could be used to identify the persons who received dialer calls and/or to determine whether

21   there was consent to call the number at issue. I have been engaged in certain lawsuits brought

22   under the TCPA to assist in the identification of potential class members so that class

23   administrators can provide notice in connection with the settlement of such lawsuits. A more

24   complete description of my qualifications, background and experience is set forth in my CV which

25   is attached as Exhibit A to this declaration.

26   　　　　　　　　　　　　　　　　***Analysis Conducted***

27   　　　4.　　　The work that I have done in connection with this matter includes the following:

28   　　　　　　a.　　　I conducted an extensive analysis of two sets of sample data provided by

Wells Fargo, each of which included 1,000 randomly selected cell numbers. It is my understanding that Wells Fargo's Card Services division placed dialer calls or sent pre-recorded messages to these cellular numbers during the relevant class period, which I understand to be September 18, 2014 to the present. These data sets which I analyzed included dialer data and records of Wells Fargo's calls to these numbers, as well as account applications and account notes for the credit card accounts on which the calls at issue were placed.

        b.     I also obtained and analyzed data from two data vendors, LexisNexis and TransUnion or "TLO,"[1] for each of the cell numbers included in the sample data. I also obtained and reviewed data from data vendor Microbilt for a subset of the cell numbers, as discussed below.

        c.     I have also conducted an extensive analysis of the work performed by plaintiffs' proposed expert, Anya Verkhovskaya ("Verkhovskaya"), on the sample data. I understand that Verkhovskaya's analysis was limited to the second set of 1,000 cell numbers provided by Wells Fargo. In order to study Verkhovskaya's analysis and the conclusions she has drawn, I reviewed her October 15, 2018 report in this matter ("Verkhovskaya Report"). I have also reviewed all of the tables, spreadsheets and work papers associated with the Verkhovskaya Report. I also attended her November 2, 2018 deposition in which she testified about her methodology. I "reverse engineered" her findings in an effort to understand and validate her methodology and the formulas she used in certain aspects of her work. I replicated her calculations, where it was possible to do so. I re-ran certain portions of her analysis in order to test the validity of her conclusions. Finally, I tested her analysis by using data from the same two vendors Verkhovskaya used, LexisNexis and TransUnion.

        d.     I have previously produced two reports in this matter. My initial report was produced on October 15 and my rebuttal report on November 14, 2018. True and correct copies of those reports, without exhibits, are attached as Exhibits B and C and will be referred to as "October 15 Report" and "November 14 Report," respectively.

---

[1] Plaintiffs' expert Anya Verkhovskaya refers to this vendor as TransUnion, while I commonly refer to it by the name of its database, which is "The Last One" or "TLO." TransUnion and TLO refer to the same vendor.

DALEY DECLARATION ISO WFB'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1        e.     I have also reviewed Plaintiffs' motion for class certification, which relies

2   on Verkhovskaya's report and analysis.

3        5.     As of the date of this declaration, I personally have spent approximately 160 hours

4   working on this matter, including the time spent preparing my initial and rebuttal reports, and

5   providing deposition testimony. As of this date, my staff members have spent in excess of another

6   700 hours working on this analysis under my direction.

7        6.     At her November 2, 2018 deposition, which I attended, ▮▮▮▮▮▮▮▮▮

8   ▮▮▮▮▮▮▮▮▮▮▮▮ on this matter, inclusive of the time spent preparing her report.

9        7.     The transcript of Verkhovskaya's deposition testimony is attached as Exhibit D and

10   is referred to below as "Verkhovskaya Depo."

11                                    ***Opinion***

12        8.     Plaintiffs' motion for class certification states that "Plaintiff's expert, Anya

13   Verkhovskaya will use her expertise to compare Wells Fargo's wrong number coded call records

14   with information available through [a] 'reverse-append' procedure to eliminate from the proposed

15   class those individuals who are identifiable as Wells Fargo customers." Plaintiffs' Motion for

16   Class Certification at p. 13, citing Verkhovskaya Report., ¶¶ 31-48.

17        9.     Verkhovskaya has not demonstrated that she can do what plaintiffs say she can do.

18   That is, she has not shown that she can identify (and thus "eliminate from the proposed class")

19   those cellular telephone numbers that were called by Wells Fargo that belonged to Wells Fargo

20   customers. My opinion, after careful study of Verkhovskaya's work, is that she does not and

21   cannot accomplish this task. Further, it is my opinion that it is impossible to identify which phone

22   calls were received by non-customers without conducting an individualized analysis of each phone

23   number and each call at issue.

24        10.    The bases for my opinion are summarized below and set forth in greater detail in

25   my October 15 and November 14 reports, which I incorporate herein by reference.

26                        ***Wrong Number Codes***
                    ***Are Not Dispositive Or Even Helpful for***

27                ***Identifying Calls Received by Non-Customers***

28        11.    I understand that plaintiffs previously took the position that class members (non-

1  customers who received calls from Wells Fargo) can be identified by so-called "wrong number"

2  codes or dispositions ("WNDs") that are contained in Wells Fargo's call records. Dkt No. 92, at 1

3  (statement that plaintiffs' expert will analyze the "call data associated with wrong number codes"

4  and "compile an objective list of persons who meet the class definition").

5        12.    One of the points on which Verkhovskaya and I agree is that WNDs cannot be used

6  to identify calls received by non-customers. In her analysis of 1,000 cell numbers included in the

7  data sample provided by Wells Fargo, Verkhovskaya eliminated 504 of those phone numbers with

8  WNDs—more than half of the sample population—based on her analysis and her conclusion that

9  the phone number belonged to Wells Fargo's customer, or at least could not be identified as

10  belonging to a non-customer. Verkhovskaya Report at ¶ 48.

11        13.    In this regard I agree with Verkhovskaya. A WND does not establish that the call

12  was received by a non-customer. As explained in paragraphs 28–37 of my October 15 Report,

13  WNDs are noted in the calling data for a variety of reasons, such as where the customer answers

14  and provides a different number to Wells Fargo, or asks that calls stop altogether; or where a

15  relative whose phone number was provided by the customer suggests an alternative number for

16  contacting the accountholder; or where the customer falsely asserts that he is not the customer in

17  order to stop receiving collection calls.

18        14.    My analysis in this case confirms what was stated in the February 2, 2018

19  Declaration of Jacob Mou (Dkt. #92-8): Wells Fargo enters WNDs in its records to stop dialer

20  calls to the number for a variety of reasons, not just because the call recipient is a non-customer.

21             ***Verkhovskaya's "Class List" Consists of 496 Phone Numbers***

22        15.    After eliminating more than half of the phone numbers with WNDs from the

23  sample, Verkhovskaya opines that the remaining 496 phone numbers called by Wells Fargo

24  belonged to non-customers. Verkhovskaya Depo., pp. 161:18-162:1. This list was produced as

25  "Verkhovskaya_000047 (Output File, Report 2) - HIGHLY CONFIDENTIAL- AEO" and is

26  attached as Exhibit E. I will refer to this list of remaining phone numbers as Verkhovskaya's

27  "Class List," though it is a list of phone numbers rather than persons.

28        16.    Verkhovskaya admitted on pages 55, 56, 76, and 189 of her deposition that she

cannot identify the persons who received the calls placed to these 496 phone numbers. Her "Class List" includes 919 different names associated with these 496 phone numbers; she identified as many as twelve names as associated with some of these numbers. She expressed no opinion as to which of the individuals received the call from Wells Fargo and, in fact, she acknowledged that

███████████████████████████████████████████████████

███ Verkhovskaya Depo., pp. 77-80; and 229-230.

17.     I express no opinion on whether it is appropriate to have a class action where class members cannot be identified, as I understand that is a legal issue for the Court to decide. I note, however, that neither of the named plaintiffs, Albert Pieterson and John Hastings, would be identified as class members using the methodology employed by Verkhovskaya. See ¶ 27 of my November 14 Report, and ¶¶ 80-83 of my October 15 Report. Thus, if Pieterson and Hastings were absent class members rather than the named plaintiffs, they would never receive notice of this case as a class action, if Verkhovskaya's methodology were followed.

18.     The remainder of this declaration addresses the question of whether I agree with Verkhovskaya's conclusion that the 496 phone numbers remaining on her "Class List" belonged to non-customers. I do not. I dispute Verkhovskaya's conclusion for the reasons explained below, and I believe she has ignored substantial evidence that these 496 phone numbers were in fact associated with Wells Fargo's customer.

**On Its Face, Verkhovskaya's Class List Includes**
**135 Persons Who Are Wells Fargo Accountholders**

19.     Verkhovskaya's methodology for determining who "owned" or used a particular phone number is described in detail in my reports. See November 14 Report, ¶¶ 13-15, 20-24, 32-33, 39-45, and 50-58. That explanation will not be repeated here so as to keep this declaration to a manageable length. In part, Verkhovskaya's methodology includes purchasing data from data vendors LexisNexis and TLO, then comparing the name(s) a vendor reported as "associated" with the phone number to see if the name(s) matched the name of Wells Fargo's customer. If the names do not match, she concludes, by process of elimination, that the phone number was not used by Wells Fargo's customer.

20.     As set forth in my reports, Verkhovskaya's name-matching methodology suffers from several serious errors which render her analysis unreliable and unusable for the purpose of identifying class members or determining which calls placed by Wells Fargo violated the TCPA.

a.     Among these errors, Verkhovskaya matched names by using a program or formula she referred to as "fuzzy matching," which she obtained from an unknown source, a program which she has not validated as an appropriate method for determining the similarities between two names. Verkhovskaya Depo., 117-120. My own investigation strongly suggests that Verkhovskaya downloaded and used a formula an anonymous user posted to a website called "Superuser" in 2015. November 14 Report, ¶ 41. When posting that formula, its anonymous author warned that the formula was "rough" and imprecise. November 14 Report ¶ 43.

b.     Compounding this error, Verkhovskaya then overrode or modified the results generated by this "fuzzy match" program. In many cases she concluded that two names the program determined were an "EXACT MATCH" were in fact different names belonging to two different people. Verkhovskaya changed the results of this name matching exercise subjectively, without application of any particular criteria. November 14 Report, ¶ 45-57; Verkhovskaya Depo., 146-149.

c.     Verkhovskaya did not maintain records of which name matches she had changed, or why. Verkhovskaya Depo., 130-131. As a result, it is impossible to replicate Verkhovskaya's analysis and validate its accuracy.

21.     However, by looking at the results of her name matching analysis for the 496 phone numbers remaining in her "Class List," it can be determined that her analysis is inconsistent and produces erroneous results.

22.     Most glaringly, 135 of the phone numbers she has identified as belonging to non-customers can easily be determined as belonging to Wells Fargo's customer based solely on a comparison of the customer's name with the name returned by the data vendor. Set forth below is a table showing 135 phone numbers that Verkhovskaya identified as class members in her "Class List," and in each instance the name returned by LexisNexis can be seen to match the name of the

DALEY DECLARATION ISO WFB'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1  Wells Fargo customer.[2]



DALEY DECLARATION ISO WFB'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

---

[2] This chart is excerpted from Verkhovskaya_000065 (Analysis File, Report 2) – HIGHLY
CONFIDENTIAL- AEO

Case 1:17-cv-00481 Document #: 123-4 Filed: 11/26/19 Page 11 of 29 PageID #:1987



DALEY DECLARATION ISO WFB'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

Case 1:17-cv-00481 Document #: 123-4 Filed: 11/26/19 Page 12 of 29 PageID #:1988



DALEY DECLARATION ISO WFB'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

23.     Verkhovskaya's work papers Verkhovskaya_000065 (Analysis File, Report 2) -
HIGHLY CONFIDENTIAL- AEO show that, in each of the 135 instances identified above, the
formula that Verkhovskaya relied on identified these numbers as matching to the Wells Fargo
customer names. Thus, it is my opinion that following her methodology, these 135 phone numbers
would have to be removed from the class.

*Verkhovskaya's Failure to Consider the
Dates of Calls Resulted in the Erroneous Inclusion
of 294 Phone Numbers in Her "Class List"*

24.     As described in my November 14 Report, it is critically important to consider the
dates of the particular call at issue, since phone numbers are reassigned, ownership or use of the
phone changes, and the same phone number can be used by different persons at different times.

25.     Verkhovskaya ignores the dates of the telephone calls at issue in determining which
telephone numbers to include on her "Class List."  The only thing she considered is whether
LexisNexis or TLO only identified non-customer(s) as having been associated with the phone
number at any point during the class period which began in September, 2014. If LexisNexis
returned the name of only non-customer(s) as having been associated with the phone number at
any point during the 4-year class period, Verkhovskaya concluded that the phone number
belonged to someone other than Wells Fargo's customer at the time of the calls at issue, and she
included that phone number on her Class List.

26.     However, this reasoning is flawed and has resulted in the inclusion of phone
numbers on the "Class List" even where there is no evidence that non-customers received calls at
those numbers during the time periods in which dialer calls were actually placed to those numbers.

27.     For example, Verkhovskaya included phone number ████████9394 on her class
list because LexisNexis reported that this phone number was associated with Lori Joyce rather
than Wells Fargo's customer, ████████ However, ████████ was associated with that phone

DALEY DECLARATION ISO WFB'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1    number by LexisNexis *only between August 1 and December 1, 2017*. The calls at issue to

2    customer ▮▮▮▮ occurred *between October 23, 2014 and February 15, 2016*. The fact that this

3    phone number was associated with ▮▮▮▮ one and a half years *after* the calls to customer

4    ▮▮▮▮ provides no useful information as to whether the earlier calls were received by

5    ▮▮▮▮ or someone else. November 14 Report, ¶¶ 59-60.

6          28.    This is not an isolated example. As described in paragraphs 50 through 61 of my

7    November 14 Report, Verkhovskaya included in her "Class List" many phone numbers where

8    LexisNexis did not return any name as being associated with the corresponding phone number *at*

9    *the time of the dialer calls at issue.* In fact, 59.3% of the numbers in Verkhovskaya's "Class List"

10    are ones where LexisNexis provides no information as to who might have been using the phone at

11    the time of the relevant calls.[3]  Even under her own stated methodology, Verkhovskaya should

12    have excluded all such results from her analysis, since she had no information to determine class

13    membership.

14          29.    Had Verkhovskaya required a match between the dates of the calls and the dates of

15    the reported association with a non-customer, 294 of the 496 phone numbers would have been

16    eliminated from her "Class List."

17               ***Reversing The Order In Which Databases Are Referenced***

18         ***Would Eliminate Additional Phone Numbers From The Class List***

19          30.    As described in paragraph 32 of my November 14 Report, Verkhovskaya first ran

20    the phone numbers from the data sample through the LexisNexis database. If LexisNexis returned

21    a name or names other than Wells Fargo's customer, she concluded that the phone number must

22    have belonged to a non-customer and conducted no further analysis. Verkhovskaya Depo., 85-87.

23          31.    However, her choice of which database to access first was arbitrary. Verkhovskaya

24    might have chosen to run these phone numbers through the TLO database first. There is no reason

25    to conclude that either of these two data vendors sells more reliable data than the other, and

26    Verkhovskaya herself testified at her deposition that neither database was superior to the other.

27

28    
---
[3] For approximately 45% of the population, there was more than a year's difference between the date of the calls at issue and the dates of the association between the phone number and the non-customer.

DALEY DECLARATION ISO WFB'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

Verkhovskaya Depo., 44-46.

32.     Had Verkhovskaya first run the phone numbers through the TLO database, TLO would have returned Wells Fargo's customer's name for 122 phone numbers which were **not** reported by LexisNexis as being associated with the customer (i.e., the data vendors returned conflicting results). Due to the errors in her matching process described above, only 86 of these numbers were included on Verkhovskaya's "Class List." However, because TLO reported the number as associated with Wells Fargo's customers, these 86 phone numbers should have been removed from her "Class List" following the logic of her "elimination" methodology.

*LexisNexis and TLO Databases Report Other Relevant Information, Not Considered By Verkhovskaya, Associating The Phone Number With Wells Fargo's Customer*

33.     Verkhovskaya testified at her deposition ███████████████████████ ████████████████████████████████████████████████ however, she did not use that information in her analysis. Verkhovskaya Depo., 229:17-21.

34.     The addresses and other data (other than names) reported by these data vendors contain information associating the phone numbers with Wells Fargo's customer. For example, the telephone numbers ██████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████ are reported by both the LexisNexis and TLO reverse append data as matching the address of Wells Fargo's customers as reflected in the account documentation.

35.     For the entire population of 496 phone numbers Verkhovskaya includes in her "Class List," 229 of those numbers can be removed because LexisNexis or TLO returned the same address as that of the Wells Fargo account holder.

36.     Thus, for a significant number of the phone numbers included on Verkhovskaya's "Class List," the data vendors she used had other information associating that phone number with Wells Fargo's customer, but Verkhovskaya chose not to use or consider that information in her analysis.

37.     Nor are LexisNexis and TLO the only companies that sell data. There are many other vendors that sell data, including a number of vendors Verkhovskaya has used in the past, including "MicroBilt, Experian" and "many others." Verkhovskaya Depo., 43. She testified that ████████████████████████████████████████████████████ but has not opined that data from other vendors is less reliable than data from the vendors that she did use. Yet, Verkhovskaya did not obtain data from these other sources to see if the phone numbers at issue were associated with Wells Fargo's customer in other databases.

38.     To test the impact of this omission, we took the 496 phone numbers in Verkhovskaya's "Class List" and ran them through the database offered by Microbilt. Microbilt's records reported 16 additional phone numbers as matching to the names of Wells Fargo's customers that were not reported by LexisNexis or TLO. These 16 phone numbers should also have been removed from her "Class List" following the logic of her "elimination" methodology.

39.     Thus, evidence associating these phone numbers with Wells Fargo customers exists in other databases, but Verkhovskaya chose not to obtain or use that information in her analysis.

<em><strong>Additional Information Obtained From LexisNexis Identifies<br>Additional Matches to Wells Fargo's Customers</strong></em>

40.     Additional data in LexisNexis' databases that was available to Verkhovskaya shows that some of the phone numbers that she considered as "wrong party" contact and included in her "Class List" are in fact associated with the Wells Fargo customers in LexisNexis' records even though the names returned were not automatically identified as matches with the customer.[4]

a.     For example, LexisNexis returned the name ████████████ for phone number ██████████ Wells Fargo's records associate that phone number with ████████ Manual searches in LexisNexis' records for ██████████████ revealed that ████████████ is an alternate name or alias used by the same person.

[4] The name alias and household member identification described in paragraphs 40-42 of this declaration are supported by LexisNexis reports that can be produced upon request.

1    b.    LexisNexis returned the names ██████ and "██████ for

2  phone number ██████ Wells Fargo's records associate that phone number with ██████

3  ██████" Further manual investigation in LexisNexis' records for "Samantha Gaddis" shows that

4  she is a former household member of "██████ and ██████

5    41.    Although this evidence showing the association between these phone numbers and

6  Wells Fargo customers was available from the data vendor that Verkhovskaya selected as her

7  primary resource, she chose not to obtain or use that information in her analysis.

8    42.    This additional evidence identified 4 phone numbers that also should have been

9  removed from her "Class List" because the names returned by LexisNexis are alternate names for

10 the Wells Fargo customer, and one additional number where the Wells Fargo customer was a

11 household member of the names returned by LexisNexis.

12    ***851 Of The 1,000 Phone Numbers Included in the Sample***
       ***Are Contained in the Customer's Account Application***

13

14    43.    Although Verkhovskaya relies exclusively on data purchased from third party

15 vendors, there are other data sources that contain evidence indicating that the phone number at

16 issue belonged to Wells Fargo's account holder.

17    44.    Along with the phone numbers included in the data sample, Wells Fargo produced

18 the account applications for the account on which the call was made to that phone number. I

19 reviewed those account applications as part of my work in this case. Verkhovskaya testified at her

20 deposition ████████████████████████████████ Verkhovskaya Depo.,

21 218-220.

22    45.    Of the 1,000 phone numbers in the sample, 851 (85.1%) of those numbers were

23 found in the application which the customer had submitted to Wells Fargo to open his or her credit

24 card account. 433 of the 496 phone numbers (87.3%) in Verkhovskaya's "Class List" were

25 provided by customers in Wells Fargo account applications.

26    46.    The account application is a contemporary written record, submitted to Wells Fargo

27 at the time the credit card account is opened, and the applicant certifies that the information

28 contained in the application "is true, correct, and complete." While not dispositive—it is possible

1   the customer fraudulently submitted a phone number other than her own, or that the cell number

2   was reassigned—this application information which directly associates the phone number at issue

3   with Wells Fargo's customer is certainly strong evidence that the phone number belonged to Wells

4   Fargo's customer. At a minimum, further investigation would be required before including the

5   phone number on a list of phone numbers supposedly belonging to non-customers.

6          47.    Verkhovskaya has provided no explanation or justification for her decision to

7   ignore this evidence and rely exclusively upon data purchased from third party vendors.

8   LexisNexis, TLO, and other vendors obtain data from similar sources, that is, account applications

9   submitted to financial institutions, utility companies, and other businesses. Thus, it is illogical to

10  exclude from consideration one source of such information—Wells Fargo's account application—

11  while relying upon other sources of unknown origin that are maintained by third party data

12  aggregators.

### *Wells Fargo's Account Notes Contain Evidence That*
### *Many Of The 496 Phone Numbers Included On The*
### *"Class List" Belonged To Or Were Used By Wells Fargo's Customer*

15         48.    Wells Fargo also produced the account notes for the credit card account on which

16  calls were placed to the cell number at issue. The account notes document all communications that

17  take place on the account, including a description of what is said during telephone conversations

18  occurring on the account.

19         49.    I reviewed the account notes for the data sample to look for evidence indicating

20  whether the calls at issue reached Wells Fargo's customer or some third party. Verkhovskaya

21  testified at deposition that she never reviewed the account notes and had not been asked to do so in

22  this case. She also testified that she has reviewed account notes in other TCPA cases but provided

23  no explanation for why she did not do so in this case. Verkhovskaya Depo., 184:23-25, 210:22-

24  211, 214.

25         50.    For many of the phone numbers included in the data sample, Wells Fargo's account

26  notes contain strong evidence that, despite a wrong number code having been associated with the

27  cell phone number, the call was received by the customer. Such evidence includes the following:

28                a.     For at least 20 of the phone numbers in the sample, the recipient of the call

made a payment or promise to pay his or her Wells Fargo credit card account *in the very same conversation that resulted in a wrong number code*. This includes the following phone numbers:

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ The most likely explanation for a payment/promise to pay is that the phone call reached the customer herself, not a third party.

        b.      In many other instances, there was a subsequent call (i.e., after the wrong number code was applied) to or from the same phone number and, in that later call, a payment was made, a promise to pay was made, or the caller/call recipient identified herself as Wells Fargo's customer. In on our review of the second data sample, we identified 56 telephone numbers where the content of the subsequent communication unambiguously indicates that the phone number belonged to Wells Fargo's customer. Of these 56 telephone numbers, 12 of those numbers were included on Verkhovskaya's "Class List."  Verkhovskaya included these telephone numbers on her Class List despite the evidence in the account notes that these numbers belonged to customers.

        c.      There are other instances in which the communications documented in the account notes suggest that the call was received by Wells Fargo's customer, but the notes are less than conclusive. It is difficult to state how many phone numbers in this category should be removed from the "Class List," because this requires interpretation of the conversation documented in the account notes and application of judgment as to how clearly the notes indicate that the conversation was with the customer.

        d.      Examples of these include the following:

           i.      WF_Pieterson 4065, Notes tab line 69823 – "3p initially identified herself as ███████████████ while discussing acct- 3p then said it was a prank and she wasn't the ch- she was the mother/ adv - we cnt disclose further info- 3p then adv she wasn't the mother- adv 3p we cnt proceed with the conversation anymore- disconnected call."

           ii.      WF_Pieterson 4065, Notes tab line 63040 – "started out confirmed as ch, then said not ch -- was a male; said he gets numerous calls and paper mail for a number of

unknown people . . . ."

**For At Least 975 Of The 1,000 Phone Numbers In The Data Sample,**
**_There Is Evidence Suggesting They Belonged to Wells Fargo's Customers_**

51.     For the reasons summarized above, for the vast majority of the 1,000 phone numbers marked with a wrong number code and included in the data sample, there is evidence associating the phone number with Wells Fargo's accountholder. In many instances, there are multiple records indicating that the phone number belonged to Wells Fargo's customer. For example, the phone number may have been contained in Wells Fargo's account application, and it may be associated with Wells Fargo's customer in other public databases, and the account notes may indicate that the customer was reached at that phone number.

52.     BRG has identified many factual circumstances that indicate that the numbers that Verkhovskaya includes in her class list are likely customers of Wells Fargo and thus not members of the proposed class. These circumstances include:

    a.     Phone numbers Verkhovskaya identified as class members despite her own work papers showing that they matched Well Fargo customer names.[5]

    b.     Phone numbers that, when searched first using other data vendors Verkhovskaya considers reliable, return the account holder's name using Verkhovskaya's own methodology.[6]

    c.     Phone numbers that are associated by the data vendors with the account holder's address.[7]

    d.     The phone number was provided by account holders on customer application forms.[8]

    e.     Wells Fargo records show that there was a "right party contact"—i.e. that

---

[5] See paragraphs 22 – 23 of this declaration.
[6] Results from Lexis Nexis and TLO were date restricted to ensure they matched the relevant time period. Microbilt returns such little historical information that the results from it were not date restricted.
[7] See paragraphs 33 – 36 of this declaration.
[8] See paragraph of 43 – 47 of this declaration.

1 Wells Fargo spoke with a customer on a call to or from the phone number at issue—**after** that

2 number had been coded—for whatever reason—as "Wrong Number."[9]

3         f.      Manual review of additional data in LexisNexis' databases shows that the

4 phone number is associated with the Wells Fargo customer even though the names do not

5 automatically identify it as a match.[10]

6         53.      The majority of phone numbers in Verkhovskaya's "Class List" are subject to more

7 than one of these circumstances. The chart below tallies the number of these circumstances that

8 are associated with each phone number. *Only 25 of the 1,000 phone numbers* (2.5%) do not

9 indicate that they are subject to the factual circumstances our analysis has identified to date,

10 though additional research can be conducted. However, we note that for 5 of these 25 numbers,

11 LexisNexis and TransUnion returned *no names of* anyone associated with these numbers for the

12 dates that calls were placed to these number.

| 1,000 Phone Number Sample | |
|---|---|
| Total Phone Numbers in Sample | 1,000 |
| Count of Phone Numbers Removed by Verkhovskaya | 504 |
| Count of Phone Numbers Removed by BRG for Five Circumstances | 1 |
| Count of Phone Numbers Removed by BRG for Four Circumstances | 68 |
| Count of Phone Numbers Removed by BRG for Three Circumstances | 112 |
| Count of Phone Numbers Removed by for BRG Two Circumstances | 107 |
| Count of Phone Numbers Removed by BRG for a Single Circumstances | 183 |
| Remaining Phone Numbers | 25 |

20         54.      The graph below illustrates that 471 of the 496 numbers in Verkhovskaya's "Class

21 List" appear to be associated with the Wells Fargo account holder and thus are not part of the

22 proposed class.

---

[9] See paragraph 50 of this declaration.

[10] The manual review revealed an alias match to the account holder, an address match with the account holder, or both. See paragraphs 40 – 42 of this declaration.

DALEY DECLARATION ISO WFB'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION



DALEY DECLARATION ISO WFB'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

55.     To the extent there are conflicts in the various records, one would have to determine whether the weight of the evidence suggests that the number did (or did not) belong to Wells Fargo's customer. But it would be unreasonable and scientifically unacceptable to consider only a single data source and conclude that a phone number belonged to a non-customer based on the absence of Wells Fargo's customer's name in that single data source. This is particularly true here where plaintiffs suggest relying exclusively on a data source that has been proven to be unreliable. See Daley October 15 Report, ¶ 96, Daley November 14 Report, ¶¶19, 25-27. That is what Verkhovskaya has done here. She has considered only the absence of the customer's name from one data source and ignored all of the other records which would demonstrate or suggest that the phone number in fact belong to Wells Fargo's customer.

### *The Absence Of Wells Fargo's Customer's Name In A Data Vendor's Records Does Not Establish That The Phone Number Did Not Belong To And Was Not Used By The Customer*

56.     The premise of Verkhovskaya's methodology is that, if Wells Fargo's customer's name is not associated with a phone number in the particular database she chooses to access, that fact alone establishes that Wells Fargo's call to that number was received by a non-customer. That premise is incorrect.

57.     As explained in both my October 15 and November 14 reports, the data relied upon by Verkhovskaya are not reliable for the purpose for which they are being used in this case. Neither LexisNexis nor TLO includes the names of all subscribers or users of a particular phone number in its records. Nor do these vendors make such a representation to persons purchasing data. In fact, both vendors issue explicit disclaimers as to the reliability of the data they sell. November 14 Report, ¶ 17. Through my investigation in this and other cases, I have confirmed that the data sold by these vendors is not complete, and that there are often inconsistencies in the data provided by different vendors. See November Report, ¶¶ 19, 25-27, and 34-36.

58.     The point is illustrated by the fact that neither plaintiff Albert Pieterson nor plaintiff John Hastings are associated with their own phone numbers in the data sources used by Verkhovskaya.

59.     For these reasons, the fact that Wells Fargo's customer's name is not reported as

1    being associated with a phone number in a particular vendor's records does not establish that the

2    customer did not own or use the number at issue. This is especially true where such a conclusion is

3    drawn from a single data source without determining whether there are other sources indicating

4    the customer was in fact associated with that number.

5         60.    The most that one can reasonably conclude from the absence of Wells Fargo's

6    customer in a database is that further research would have to be conducted to determine whether

7    Wells Fargo's customer owned or was using a particular cell number at the time of a particular

8    call.

9                    ***Individual Analysis Is Also Required to Determine Consent***

10        61.    Verkhovskaya testified at her deposition that she has not analyzed or attempted to

11    analyze whether Wells Fargo had consent to call the cell numbers at issue. Verkhovskaya Depo.,

12    217:6-10. I understand from reading plaintiffs' motion for class certification that plaintiffs contend

13    consent is not an issue because the class is limited to non-customers. Class Cert. Motion, 11:10-12

14    ("the proposed class is limited to non-Wells Fargo customers who, by definition, could *not* have

15    consented to Wells Fargo's automated calls").

16        62.    Wells Fargo has asked my opinion on whether consent can be determined in an

17    automated fashion based upon the records that are available. My opinion is that consent cannot be

18    determined in an automated fashion, based upon class-wide evidence. An individualized

19    determination of consent would be necessary for each of the phone numbers called by Wells Fargo

20    during the relevant period.

21        63.    If the call was received by a customer, there is a high degree of likelihood that

22    Wells Fargo had consent. My analysis indicated that 85.1% of the phone numbers included in the

23    sample data were provided in the customer's application. I also reviewed many instances of

24    customers consenting later, by providing their cellular telephone numbers to Wells Fargo. I did not

25    attempt to quantify how frequently that occurred in the sample data, because customers are

26    excluded from the class definition.

27        64.    Even where it appears the call may have been answered by a non-customer, there is

28    ample evidence suggesting Wells Fargo still had consent to call the number at issue. The

DALEY DECLARATION ISO WFB'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

following examples are taken from the data sample Wells Fargo produced in this case.

65. One of the phone numbers included in the data sample was ███████ Wells Fargo called that number on March 17, 2016 and spoke with a person who identified herself as the customer's mother and indicated that the number was "no longer" the customer's. See WF_Pieterson 004065 Notes tab at line 15092. Accordingly, the agent marked the number with a "wrong number" code on that date and no further dialer calls were made to the number. Verkhovskaya included this number on her "Class List." The application data produced by Wells Fargo reveals that this phone number was provided on the account application on February 1, 2013 by the customer, ███████ See WF_Pieterson 004065 Application Data, at line 284. An individual investigation would be necessary to determine whether Areli Palacios was the user or subscriber to the phone number at the time it was provided in the application, and whether Wells Fargo had consent to call the number.

66. Verkhovskaya's "Class List" includes other phone numbers that were marked as wrong numbers when the person answering the call identified herself as the customer's mother and indicated the phone number was not the best method for contacting the customer. These include phone number ███████, on which the customer's mother provided an alternative phone number for the customer. See Notes tab at lines 6519-6522. Other examples include phone numbers ███████ See id. at lines 16685, 53015-16, and 64547. All four of these phone numbers were included on Verkhovskaya's list of 496 "class member" phone numbers. Significantly, all four of these phone numbers were provided to Wells Fargo on the account application or at the time the credit card account was opened. See Notes tab at line 6506 and Application Data at lines 188, 902 and 982. For the above phone numbers, individual evidence would have to be analyzed to determine whether the customers were users or subscribers of the phone numbers at the time they were provided to Wells Fargo, and whether Wells Fargo had consent to call the number notwithstanding the suggestion that the phone number was no longer the best method for contacting the customer.

67. The sample data include many examples of phone numbers that were reportedly answered by the customer's mother. These include ███████ (mother said can't "reach ch

DALEY DECLARATION ISO WFB'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

[card holder] at this #"); ███████████ ("ch mother stated not her daughter's number"); ███████

███████████ ("not a good number to reach him at"); ███████████████████

███████████████████ ("ch isn't available at this number [the mother] said").

See WF_Pieterson 4065, Notes tab at lines 9325, 11313, 20935, 30227, 33003, 38800, 51555,

60972, and 62611; *See also* WF_Pieterson 3416 at lines 25601, 29660, 35751 (as to telephone

numbers ██████████████████████████ respectively). For each of these

numbers, an individual analysis would be required to determine whether the customer was

authorized to provide Wells Fargo with consent to call a number that was later answered by his or

her mother.

      68.     The sample data include examples of other relatives answering calls made to

numbers that were provided by the customer, including the following:

      a.     Phone number ███████████ where a person indicating he was the

customer's father answered the phone and stated that the number was his daughter's. Notes tab at

11378. This number was included on Verkhovskaya's Class List.

      b.     Phone number ███████████ where the person answering stated "he is ch's

father; not ch; sd ch dsnt have a phone right now but will give him mssg." WF_Pieterson 4065

Notes tab, at line 30573.

      c.     Phone number ███████████ where an unidentified person answering the

call stated that the number "belongs to cardholders family." *Id*. Note tab, at line 29417.

      d.     Phone number ███████████, where the person answering the call stated

that "she was spouse of the ch, but this was not a good number to reach him at." WF_Pieterson

3416, Notes tab, at line 24578.

      e.     Phone number ███████████ where a person identifying himself as the

customer's father called Wells Fargo to say that the number was "no longer a good number to

reach ch at" but provided a different number at which the customer could be reached. *Id*, Notes

tab, at line 5556.

     For all of these numbers, the number called by Wells Fargo was provided by the customer

on the account opening application. *See* WF_Pieterson 4065 at lines 496, 565. and 583 (as to

1   numbers ████████████████████████); *see* WF_Pieterson 4007 at lines 531

2   and 261 and (as to numbers █████████████. Thus, an individual investigation

3   would be required to determine whether the customer was the user or subscriber of the phone

4   number or otherwise had authority to provide valid consent to call the number.

5         69.    In some cases, a family member apparently answered Wells Fargo's call to the

6   customer's cell number because the customer was in jail.

7         70.    For example, on October 27, 2017, Wells Fargo called phone number ████

8   ████ and reached a person who stated that she was the customer's mother. The call resulted in the

9   following account note: "sw [spoke with] CH's mother and verified CH is not at this number and

10  is no longer able to make payments due to a life changing event." The note went on to explain that

11  "CH is incarcerated and no timeframe of getting out." WF_Pieterson 4065 Notes tab, at lines

12  67911-12. The customer provided this phone number to Wells Fargo on the account application.

13  *Id*, Application Data tab, line 215. Verkhovskaya included this phone number on her Class List.

14  See Verkhovskaya_000065, Sorting tab at line 237. However, the fact that a customer's mother

15  answered a call to his cell phone because he was incarcerated and unable to take the call would not

16  mean that Wells Fargo lacked consent to call the number; rather, an individual investigation of the

17  circumstances would be required.

18        71.    Similarly, Wells Fargo's August 7, 2018 call to phone number ████████

19  resulted in the follow entry in the account notes: "3P MOM SD CH IS INCARCERATED."

20  WF_Pieterson 4065 Notes tab, line 8750. Verkhovskaya also included this number on her Class

21  List. See Verkhovskaya_000065, Sorting tab at line 16.

22        72.    Another example is phone number ██████████ An unidentified person answered

23  Wells Fargo's call on June 27, 2018, resulting in the following account note: "3p stated that ch is

24  incarcerated. will not be back until november." WF_Pieterson 4065 Notes tab, at line 65696.

25        73.    The sample data produced in this case includes other examples where a third party

26  apparently answered a call and stated that the customer was unavailable to take the call for reasons

27  other than incarceration. For example, Wells Fargo called phone number ███████████ on April

28  21, 2015 and the person answering (who claimed it was the customer's mother's phone) stated that

DALEY DECLARATION ISO WFB'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1  the card holder was in the hospital. *Id*, Notes tab, 1152. The customer provided the number in

2  question on his account application, *Id*, Application Data, line 418, and Verkhovskaya included

3  this phone number on her Class List.

4         74.     On other occasions the person answering the call claimed that the customer was out

5  of the country but offered to get a message to the customer. See phone numbers ████████ (*Id*,

6  Notes tab, line 63318, "3p stated ch is [going] to be out of country until dec") and ████████

7  (*Id*, Notes tab, line 6626, "sd she [customer] is out of the country right now but can get msg to

8  her").

9         75.     Similarly, phone number ████████ was marked with a "wrong number" code

10  after an August 25, 2015 call by Wells Fargo was answered by a person identifying herself as the

11  customer's daughter and stating that "ch has passed away [____] wanted [____] to remove this

12  number from the calling list." *Id,* Notes tab, line 4112.

13         76.     For other phone numbers, the account notes indicate that the person answering the

14  phone stated they were not the customer, but do not identify the third party. Nevertheless, these

15  notes indicate that the person answering the call knew the customer, giving rise to an inference

16  that the customer had or may have had authorization to provide Wells Fargo with consent to call

17  the number. For example, the person answering Wells Fargo's May 18, 2017 call to phone number

18  ████████ stated "bad number to reach ch" and "suggested [a different number] is the best."

19  WF_Pieterson 3416, Notes tab, line 41273. Similarly, Wells Fargo's June 18, 2015 call to phone

20  number ████████ was answered by a person claiming that the customer was "no longer at this

21  #." *Id.* Notes tab, line 7144.

22         77.     For all of the examples set forth in paragraphs 65 through 76 above, the available

23  evidence in the sample data produced suggests that the call may have been received by a non-

24  customer who is a member of the class. (It is also possible that the customer answered the call but

25  falsely claimed to be someone else.) However, the evidence also indicates that the persons

26  answering these calls were relatives of the customer or that some circumstance had occurred

27  which meant simply that the phone number was no longer a good (or "the best") method for Wells

28  Fargo to contact the customer. To determine whether Wells Fargo in fact had consent to call a

1  particular number at a particular time, one would have to analyze how Wells Fargo obtained the

2  phone number and whether the customer who gave it the number had authorization to provide

3  Wells Fargo with consent to dial the number. In many cases in the sample data, the available

4  evidence (e.g., account applications or account notes) suggests that Wells Fargo did have consent.

5  At a minimum, individual evidence and analysis would be required to determine consent.

6      78.    Based on this evidence contained in the sample data that I reviewed, it is clear that

7  individual analysis of consent would be necessary even for calls that were answered by non-

8  customers. One cannot conclude, based on the mere fact that a phone call was answered by a non-

9  customer, that Wells Fargo had no consent to dial the number. Whether Wells Fargo had consent

10 to dial the number provided will depend upon whether Wells Fargo's customer was a subscriber or

11 user of the phone number, or otherwise had authority to provide consent for Wells Fargo to call

12 that number. Verkhovskaya has conducted no analysis of the consent issue, and has offered no

13 methodology for determining consent other than by individual analysis of each phone number and

14 call.

15     I declare under penalty of perjury under the laws of the United States of America that the

16 foregoing is true and correct and was executed on this 17th day of December, 2018, at Chicago,

17 Illinois.

18

19                                         Margaret Daley

20

21

22

23

24

25

26

27

28

07685.1850/13626585.1                          27                          3:17-cv-02306-EDL

DALEY DECLARATION ISO WFB'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION