# Exhibit 3

# REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

# Daley Declaration

# Exhibit B

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| ALBERT PIETERSON, on behalf of himself and all others similarly situated, | |
| Plaintiff, | |
| v. | Case No. 3:17-cv-02306 - EDL |
| WELLS FARGO BANK, N.A., | |
| Defendant. | |
| JOHN HASTINGS, on behalf of himself and all others similarly situated, | |
| Plaintiff, | |
| v. | Case No. 3:17-cv-03633 - EDL |
| WELLS FARGO BANK, N.A., | |
| Defendant. | |

# EXPERT REPORT OF MARGARET DALEY

I.   SUMMARY OF OPINIONS ................................................................................ 3

II.   QUALIFICATIONS ........................................................................................... 4

III.   FACTUAL BACKGROUND ............................................................................. 6

   Wells Fargo Card Services Division Places Calls Using A Dialer ........................... 6

   Wells Fargo Only Places Dialer Calls To Cellular Numbers With Consent.............. 6

   Agents Record Notes On Interactions With Customers In The ECaR Database ....... 8

   The Problem Of Reassigned Numbers ...................................................................... 8

   Non-Customer Contact And "Wrong Number" Designations .................................. 10

   The Sample Data Produced For Analysis .................................................................. 14

IV.   ANALYSIS AND CONCLUSIONS ................................................................. 15

   It Is Not Possible To Distinguish Calls To Non-Customers From Calls To Account Holders Using The "Wrong Number" Designations ................................................. 15

   It Is Not Possible To Use Public Records Databases To Distinguish Calls Received By Non-Customers From Calls Received By Account Holders ........................................... 20

   It Is Not Possible To Automatically Determine The Status Of Consent For Each Call, As This Requires Individualized Investigation Of Account Records ................................... 34

## I.  SUMMARY OF OPINIONS

1.  It is not possible to distinguish calls made to non-customers from calls made to Wells Fargo account holders using the "wrong number" designations available in the Wells Fargo dialer and account records. The dialer designations of ███████████ in Castel Connects, and ████████████████████████ in Aspect do not reliably identify genuine non-customers, and therefore cannot be used to determine which calls placed by Wells Fargo's dialers were received by "persons who were not Wells Fargo credit card account holders at the time of the calls" from those received by customers.

2.  There is no automated way to determine which "wrong number" codes correspond to a non-customer receiving a call. My analysis required manual review of the Account Notes, including careful correlation of the timing of customer interactions with respect to when a "Wrong Number" designation had been applied. This analysis drew on multiple data sets derived from different databases and information repositories, and could not be queried from a single resource. This was a laborious, multi-stage process. To conduct this analysis across the entire proposed class would require individualized review of each record.

3.  It is not possible to distinguish calls received by non-customers from calls received by account holders using public records databases. Wells Fargo's business records do not record the identities of the persons who answer the calls placed by Wells Fargo in its efforts to reach its customers. If a call is answered by a non-customer, Wells Fargo neither creates nor maintains business records with identifying information for the non-customer's name, date of birth, social security number or address. The only information that is available is the cellular number, the date it was called and the date it was marked as a wrong number. This

CONFIDENTIAL

information alone is insufficient to identify the person that answered the call from Wells Fargo. Further individualized investigation is required.

4. It is not possible to automatically determine the status of consent for each call, as this requires individualized investigation of account records.

## II.     QUALIFICATIONS

5. I am a Managing Director at Berkeley Research Group ("BRG") and a leader in its Global Investigations + Strategic Intelligence practice group. BRG is a leading global strategic advisory and expert services firm that provides independent expert testimony, litigation and regulatory support, authoritative studies, strategic advice, and data analytics to major law firms, Fortune 500 corporations, government agencies, and regulatory bodies around the world. I joined BRG in 2015.

6. Prior to joining BRG, I was Co-Chair of the Forensic Technology & Analytics practice at Duff & Phelps, an international consulting firm. I was also Vice President and General Counsel at an international consulting and investigations firm. I have an undergraduate degree from the University of Michigan and I received by Juris Doctor cum laude from Boston University School of Law.

7. I am an Illinois licensed attorney and a licensed private detective in the state of Illinois and Michigan. I was appointed by the Director of the Illinois Department of Professional Regulation to serve a member of state of Illinois board regulates private detectives and other licensed security and investigative professionals. I also serve as Chairman of the Cook County Board of Ethics.

8. I specialize in leading forensic technology investigative teams that work on complex databases housing sophisticated financial, transactional, and compliance related data.

9. I am a Certified Information Privacy Professional ("CIPP"), a Certified Fraud Examiner ("CFE") and a Certified Anti-Money Laundering Specialist ("CAMS").

10. My investigations team was named "Best of Chicago for Global Risk and Investigations" by the National Law Journal. I have been named every year since 2014 by Who's Who Legal as one of a limited group of nationally recognized Forensic Investigation experts. In 2017 and 2018 I was named by Who's Who as one of five U.S. based "Thought Leaders" in the field of Digital Forensics. In 2018 I was named as one of 40 U.S. Thought Leaders in Investigations. I have served on the American Institute of Certified Public Accountants task force on Forensic Technology and the American Bar Association's task for on Corporate Monitors. I have authored numerous articles on topics of data analysis, data security and data privacy. In 2017 I was appointed to the Sedona Conference Working Group W11 on Data Security and Privacy Liability.

11. I have been an expert witness in numerous state and federal cases throughout the United States testifying as an investigative and data analytics expert.[1]

12. I have been retained by counsel for Wells Fargo Bank, NA. I am being compensated at the hourly rate of $600.

13. My understanding of the factual matters at issue in the litigation is based on my review of the pleadings, written discovery responses, deposition testimony and exhibits and document productions.[2] I personally conducted or supervised all of the research and analysis which is set forth in this report and therefore I have personal knowledge of the matters described herein.[3] I understand that additional information relevant to my opinions may be disclosed

---

[1] My Curriculum Vitae is set forth as Exhibit 1.
[2] A list of the documents I received is set forth as Exhibit 2.
[3] Throughout this declaration, when I use the first-person to describe my analysis, I am referring to work conducted by me or by my staff under my direction.

in subsequent reports, document productions, and depositions. Accordingly, I reserve the right to amend my findings based upon such additional information.

## III.    FACTUAL BACKGROUND

### *Wells Fargo Card Services Division Places Calls Using A Dialer*

14. Wells Fargo's Card Services division places calls to Wells Fargo credit card account holders to collect past due accounts.

15. I understand that from the period September 18, 2014 forward, Wells Fargo's Card Services division used dialer equipment to place some calls to customers regarding past due credit card accounts. Until mid-November 2016, Wells Fargo placed calls using a Castel Connects Campaign Generator versions 4.0 and 4.2 dialer system. From mid-October 2016 forward Wells Fargo placed these calls using systems and equipment supplied by Aspect Software Inc., specifically Unified IP Advanced List Management version 7.3.[4] Some of these calls were connected to live customer service agents, and some use an Instant Message Delivery ("IMD") function to allow the person who answers the call to interact with pre-recorded message prompts by pressing keys on the phone pad.[5]

### *Wells Fargo Only Places Dialer Calls To Cellular Numbers With Consent*

16. It is the policy of Wells Fargo not to use its dialer system to dial account holders' cellular telephone numbers unless they have provided express prior consent.[6] Mike Nunn and Jacob

---

[4] Declaration of Jacob Mou in Support of Defendant Wells Fargo Bank, N.A.'s Motion to Stay, p. 2 and Deposition of Jacob Mou, p. 52.

[5] Deposition of Jacob Mou, pp. 92-93.

[6] See WF Pieterson 000024: "Team members are required to obtain express consent prior to contacting an account holder, or his or her authorized account representative, on his or her cell phone on the automated communication system (dialer)."

Mou each testified that the Wells Fargo dialers are programmed to only dial telephone numbers for which the customer consented to receive calls.[7]

17. Wells Fargo obtains the customer's consent at the time the telephone number is submitted with a credit card application, as well as during subsequent communications with the account holder. Consent may also be supplied by the customer through the Wells Fargo website online, or during an ATM transaction.[8]

18. In the sample data which I analyzed, as discussed later in this report, 83.62% of the telephone numbers called were provided by the account holders to Wells Fargo as part of their original account application.[9] Of the 16.38% of CORE numbers not identified in the Application Data, many were identified in the Notes Data as having a "Cell Consent date… the same as the date the credit card account opened."[10] This points to additional sources of consent, other than the Application Data, such as direct customer interactions at or after the time the account was opened.

19. In addition to granting consent, customers may also revoke consent. It is Wells Fargo's policy that "[p]rior express consent can be revoked by the customer at any time and any way."[11] Revocation of consent is different from the issue of non-customer contact addressed in this report.

---

[7] Deposition of Mike Nunn at 112:14-20; 113:18-114:6; Deposition of Jacob Mou at 124:13-18. See also WF_Pieterson 000023-WF_Pieterson 000025.
[8] Wells Fargo's Responses to Plaintiff's First Set of Interrogatories, Response to Interrogatory Number 5 at pp. 9-10.
[9] The phone numbers were identified in one or more of the "EmployerPhone," "StudentPhone," "HomePhone," and "CellPhoneNumber" fields of the Application Dataset. This analysis is attached as Exhibit 3.
[10] This analysis is attached as Exhibit 4.
[11] See WF_Pieterson 001344.

CONFIDENTIAL

*Agents Record Notes On Interactions With Customers In The ECaR Database*

20. During the course of their collection activities Wells Fargo customer service agents enter notes into the account records with pertinent information obtained during an interaction with an account holder or other party who answered a call.[12] These notes document the history of the account and are used as reference by persons working on the account at a later date. Examples of information captured in the notes include best times to contact the account holder, payment arrangements and updates to consent.[13]

21. Wells Fargo's Card Services Division uses the Enterprise Collections and Recovery ("ECaR") database as its system of record for communications with account holders.[14] Agents are trained to document their communications with customers as free-text notes in ECaR. These free-text notes are manually entered and often involve abbreviations and other forms of shorthand.[15]


*The Problem Of Reassigned Numbers*

22. Sometimes, a Wells Fargo credit card account holder discontinues their service on a cellular telephone to which they had previously subscribed, and the number is then reassigned to a new user.

23. The FCC noted in 2017 that approximately 35,000,000 telephone numbers are disconnected each year, and 100,000 numbers are reassigned by wireless carriers every day.[16]  In 2016, the annual industry-wide rate of telephone number reassignment or "churn" was 26.3%. Services

---

[12] Deposition of Jacob Mou at 21:13-23.
[13] Deposition of Mike Nunn, p. 152.
[14] Deposition of Mike Nunn, p. 75.
[15] Deposition of Mike Nunn, pp. 119-120, see also example of account notes attached as Exhibit 6 to the Deposition of Mike Nunn.
[16] FCC-17-90A1_Rcd., at 6009, attached as Exhibit 5.

CONFIDENTIAL

to prepaid accounts (which are often anonymous) experienced an annual industry-wide reassignment rate of 57.5%.[17]

24. This reassignment rate is even higher when cellular number owners are experiencing financial distress. A 2015 Pew Research Center found that 23% of smartphone owners cancelled or suspended their service due to financial constraints. For smartphone owners with an annual income of $30,000 or less, the figure jumps to almost 50%.[18]

25. The problem of reassigned numbers is vexing for businesses like Wells Fargo that attempt to maintain communications with customers. Unless the account holder takes steps to alert Wells Fargo that their telephone number has been discontinued or changed, there is no consistent or reliable mechanism by which to learn that the number has been reassigned prior to placing more calls. In fact, the FCC has recently sought comment on its proposal to create a database of reassigned numbers to help businesses comply with the TCPA in the face of a substantial rate of number reassignment.[19]

26. Wells Fargo operates a compliance scrubbing process called Enterprise Privacy Scrub Service (EPSS) to flag and remove phone numbers for individuals and businesses that have some sort of restriction in place prior to placing calls.[20] The EPSS was designed to provide consistent approaches to legal requirements (both federal and state laws), Wells Fargo company policies, and contractual restrictions. The EPSS system removes phone numbers from the list of numbers eligible to receive dialer calls for a number of reasons, including, but not limited to, if they:

---

[17] FCC-17-126A1, p. 17 attached as Exhibit 6.
[18] "U.S. Smartphone Use in 2015," p. 14, PewResearchCenter (April 1, 2015), attached as Exhibit 7.
[19] See FCC Proposes Action, Seeks Input to Address Robocalls to Reassigned Phone Numbers (March 22, 2018); accessed at https://www.fcc.gov/document/fcc-seeks-address-robocalls-reassigned-phone-numbers-0, attached as Exhibit 8.
[20] Deposition of Mike Nunn, p. 111.

a)  Requested a privacy or solicitation preference with Wells Fargo;

b)  Added their solicitation preference to an external list (such as DNC);

c)  Have a cell phone number that matches one of the external cell phone lists;

d)  Have an area code where a State of Emergency has been declared;

e)  Are to be excluded due to contractual or policy agreements.[21]

The EPSS system also removes some reassigned numbers[22], but due to the lack of a central database or repository of reassigned numbers, no system can comprehensively exclude all reassigned numbers without the participation of and notice from the owners of the telephone numbers.

### *Non-Customer Contact And "Wrong Number" Designations*

27. Sometimes a call from Wells Fargo is answered by a person who tells the customer service agent that they are not the account holder. In such instances of apparent non-customer contact, Wells Fargo's customer service agents are trained to make a note in the account records.[23] This note is a free-text comment entered manually by the agent, and stored in ECaR. The agents are trained to accept this representation uncritically, and no additional investigation is performed to verify if the person is in fact a non-customer.

28. The software interface that connects the customer service representative to ███████████ ████████████████████████████████████████████████ ████████████████████ The terminology used within Wells Fargo for such a designation is a "Wrong Number" disposition or code. ████████████████████

---

[21] EPSS User Guide (WF_Pieterson 003559-3560). See also EPSS flowchart on WF_Pieterson 003415.
[22] Wells Fargo Bank, N.A.'s Responses to Plaintiff's First Set of Interrogatories, Response to Interrogatories numbers 13, 15, and 17. See also Deposition of Jacob Mou, pp. 153-154 and 164.
[23] Deposition of Mike Nunn, p. 132.

CONFIDENTIAL

29. Wells Fargo agents use the "Wrong Number" flag in a variety of situations, including where:

The person claims to be an ex-spouse or a family member of the account holder;

The person, without necessarily commenting on whether they claim to be a customer or non-customer, says this is not the best number at which to reach the account holder;

The person asks not to be called; or

The person answering the call claims to be a non-customer or third party.

30. Numerous examples of such situations appear in the sample account data. Persons identifying themselves as the customer's mother, father, grandmother, spouse, or other family member answered calls from Wells Fargo, and provided information about alternative methods to contact the customer, or agreed to convey a message to customer. For example, at line 25601 of the "Notes" tab of the sample data (WF_Pieterson 003416), the person answering the phone identified as "chs [card holder's] mother [who] does not want to keep getting these calls on her phone for her son." The phone number was then flagged as "Wrong Number," without further inquiry about the son's access to the phone or his authorization to use that telephone number to contact him. Similarly, at lines 29660 and 35751 of the Notes file, other persons identifying themselves as customers' mothers gave alternate contact numbers for the customers, and the original numbers were then flagged "Wrong Number," despite the call recipients' acknowledgement of a familial connection to the customer. Similarly, at line 24578, a person "indicated that she was [the] spouse of the ch [cardholder], but this was not

---

[24] Deposition of Mike Nunn at p.149:1-11.

CONFIDENTIAL

a good number to reach him at."  The number was flagged "Wrong Number," without further inquiry.

31. The same assertion and resulting "Wrong Number" code can occur when a person identifying herself as a mother or other family member calls in and asks that a number be removed from their family member's account. An example of this is at line 34824 of the Notes data.[25]

32. Likewise, there are examples in the Notes data of numbers flagged as a "Wrong Number" after a call recipient merely suggested that another number was a better contact number. At line 41273, a person answered and stated the number was a "bad number to reach ch [card holder]," and then "suggested [a different number] is best." At line 5556, the customer's father called in to say a number was "no longer a good number to reach ch [customer] at," and provided "a good number to reach ch [card holder] at." The father's number—though previously supplied as a "good number"—was then flagged "Wrong Number."

33. Other examples include numbers flagged "Wrong Number" after a person said the customer was "no longer at this # [number]," and refused to provide alternative contact information for the customer (line 7144).

34. I observe that some of these scenarios which result in "Wrong Number" designations are not instances in which non-customers are contacted, but instead are instances of revoked consent, updating contact information, and/or communications with third parties on telephone numbers the account holder may have provided as a point of contact. Other scenarios suggest that the person answering the call may not have been the customer but was a relative of the

---

[25] Separate instances of customers providing authorization to their relatives to act on their behalf with respect to accounts also exist in the data, supporting the proposition that some percentage of customers who provided family members' numbers as valid contact numbers for their accounts had express authorization from the family member to do so. For example, at line 25403 of the Notes tab, a cardholder "authorized his mother . . . to speak on his behalf," and she then made a payment on the customer's account.

CONFIDENTIAL

customer; neither the account notes describing the conversation nor the "Wrong Number" disposition itself shed any light on the question of whether the customer had authorization to provide the cell number to Wells Fargo as a means of contacting the customer.

35. Manually-entered notes in ECaR may in some cases contain information contemporaneously provided by the customer service agent during the phone conversation that may illuminate the circumstances behind a designation of "Wrong Number," but are often inconclusive.

36. In addition to the ███████████ codes manually entered by agents in response to interaction with called parties, there is also a second type of "Wrong Number" designation in the Wells Fargo dialer system. The Instant Message Delivery ("IMD") function within the Castel Connect and Aspect dialers allow customers to interact with a pre-recorded message by entering numbers on the phone keypad.[26] One of the prompts in the IMD sequence tells

███████████████████████████████████████████

number, designating it as a "Wrong Number."

37 ███████████████████████████████████████████

additional record in ECaR to consult for context about the circumstances surrounding the designation of the telephone number as a "Wrong Number," unless the person remains on

███████████████████████████████████

---

[26] Deposition of Jacob Mou at 92:13-93:9.
[27] WF_Pieterson 003408 ████████████████████████████████

CONFIDENTIAL

***The Sample Data Produced For Analysis***

38. It is my understanding that Wells Fargo queried its records to identify a randomized sample of 1,000 cellular telephone numbers that had at some point been designated with either an ██████████ code indicating a "Wrong Number" disposition.[28] Wells Fargo then identified the Account IDs associated with those numbers, and pulled the ECaR account notes, dialer data, and application data that corresponded with them. This data was provided to me for analysis.

39. I understand that a second sample of 1,000 cellular telephone numbers has been pulled, however this data was not available to analyze for this report. I reserve the right to supplement my findings with additional conclusions drawn from this second sample of data.

40. It is also my understanding that Wells Fargo identified additional data related to the sampled Account IDs in the form of Dialer Data, Account Notes and Credit Card Application Data (the "Application Data"). BRG received the following datasets:

| Data Source | Description |
|---|---|
| WF_Pieterson 004008 - HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.xlsx; "Aspect" Tab | Dialer Data from the Aspect Dialer, relating to the CORE numbers ("Aspect Data") |
| WF_Pieterson 004008 - HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.xlsx; "Castel" Tab | Dialer Data from the Castel Dialer, relating to the CORE numbers ("Castel Data") |
| WF Pieterson 003416 - WND Sampling Call Data (7.27.18)  HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.XLSX; "Notes" Tab | Account Note Data from the ECaR System, relating to the CORE numbers ("Notes Data") |
| WF_Pieterson 004007 - HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY.xlsx | Data from Original Account Application, relating to the CORE numbers ("Application Data") |

---

[28] Deposition of Ravi Abraham at 92:10-21.

CONFIDENTIAL

41. As it happened, some of the Account IDs had multiple cellular telephone numbers for which an ███████ code had been applied, such that the sample data that I received contained information for 1,038 unique cellular telephone numbers. Additional name and address account information relating to these Account IDs and phone numbers was provided to BRG in an excel spreadsheet which I will refer to as "Account Data" for the remainder of this report.[29] I will be referring to the 1,038 telephone numbers in this Account Data as "CORE Numbers" throughout the remainder of my report.

42. I used these datasets to identify which CORE numbers appeared in Account Application Data. I also conducted a variety of analyses set forth below to determine the reliability of the "Wrong Number" disposition codes in identifying calls placed to cellular telephone numbers which may have been answered by non-customers.

## IV.    ANALYSIS AND CONCLUSIONS

### It Is Not Possible To Distinguish Calls To Non-Customers From Calls To Account Holders Using The "Wrong Number" Designations

43. The "Wrong Number" designations of ███████ do not reliably identify genuine non-customers, and therefore cannot be used to determine which calls placed by Wells Fargo's dialers were received by customers, and which were received by persons "who were not Wells Fargo credit account holders at the time of the calls," and are therefore members of the proposed class in this case.[30]

44. An ███ code only indicates that a customer service agent made a decision to designate a telephone number as a "Wrong Number" as a result of an interaction with the recipient. The

---

[29] WF Pieterson 003416 - WND Sampling Call Data (7.27.18)    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY.XLSX; "Account_Data" Tab.
[30] See proposed class definition, Amended Complaint, p. 4.

code is an ambiguous marker applied as the result of human discretion. The presence of the

████ code provides no specifics about what statements were made by the recipient, or that

the agent heard and responded to those statements appropriately. For instances in which the

recipient did claim to be a non-customer, there is no guarantee such a claim was truthful.

45. A ████ code only indicates that the recipient pressed "9" on their keypad. The application

of the "████ code provides no guarantee that recipient intended to assert that they were a

non-customer, or that this claim was truthful.[31]

46. Wells Fargo's Analytics Manager Jacob Mou's declaration states that Wells Fargo customer

service agents may designate a telephone number a "Wrong Number" for a variety of reasons

other than it being a wrong number:

> Wrong number dispositions or codes are notated for a wide variety of
> reasons, depending upon the circumstances surrounding the particular
> account or call. For example, the person answering the phone may
> identify herself as the customer but state that she does not want to receive
> further calls or ask Wells Fargo to call a different number that is on file
> for that customer. Or the person answering a call may blurt out something
> that sounds like "wrong" or "Wrong Number" and hang up without
> explaining the comment or indicating whether or not the person
> answering the call was a Wells Fargo customer. Or the Wells Fargo
> employee may enter a wrong number code based on his or her
> interpretation of what was said in the conversation, out of an abundance

---

[31] An example from the "Notes" data at line 45213 illustrates that people sometimes misrepresent themselves in calls with Wells Fargo. In that call, the "mother ████ was initially posing as ch [card holder] and was receiving information from someone in background during authentication. Asked who was speaking in background and she stated it was her friend. When I asked for additional pieces of authentication, she handed phone to person in background who identified herself as the ch [card holder] and the person I had been speaking to as her mother. I [advised] that for the security of her acct she [should] be the one who calls in the future and can give us permission to speak to someone else [about] acct." Likewise, at line 49861, another person "stated that she will attempt to make the payment on 09/20/2017 and then stated that she was the mother of our account owner and then stated once again she was our customer."

CONFIDENTIAL

of caution, in order to code the account so that further research can be conducted before the resumption of calls to that number.[32]

47. Consistent with these statements, my analysis of the data produced by Wells Fargo identified instances in which the "Wrong Number" codes had been applied for reasons other than a non-customer contact. Examples are discussed below.

### *Right Party Contact Misidentified As "Wrong Numbers"*

48. Jacob Mou stated that "Wells Fargo very often determines that a number in its records with a wrong number code in fact belongs to its customer."[33] To investigate this possibility, I conducted an analysis of the dialer records and account data provided by Wells Fargo. I identified numerous instances in which Wells Fargo's agents received promises to pay and other apparent direct communication with the account holder during conversations on a cellular telephone number that had previously been designated as a "wrong number."

49. For example, I identified 35 such instances in the sample of CORE Numbers. The account notes for these calls indicated that the call was received by a Wells Fargo account holder, even though the phone number had previously been given a wrong number designation of either ██████[34] I note that these 35 instances are only anecdotal examples and do not represent a total count of all such instances in the sample, nor can any statistical inferences about the frequency of this occurrence be drawn. Further investigation, including but not necessarily limited to direct interviews with the users of the cellular numbers in question,

---

[32] Declaration of Jacob Mou Regarding Plaintiff's Request for Production No. 44, p. 2 par. 5.
[33] Declaration of Jacob Mou Regarding Plaintiff's Request for Production No. 44, p. 3 par. 7.
[34] See BRG Right Party Contact Analysis, attached as Exhibit 9.

CONFIDENTIAL

would be required to reliably ascertain which of the other "Wrong Number" designations were applied to cellular telephone numbers belonging to actual account holders.

50. As an illustration of this issue, consider cell number ████████ associated with the account ████████ in the data produced by Wells Fargo. This number was marked with an ███ code on August 20, 2017, and the agent's notes describe the conversation as follows: "3rd/p stated he not taking anymore calls from Wells Fargo, and if we want to communicate with him we should do it in writing." I understand this to indicate that the person who answered the phone simply did not want to communicate with Wells Fargo by telephone, not that the number in question was not associated with the account holder. On November 30, 2017, the wrong number designation on that phone number was reversed when Wells Fargo communicated with the account holder, on the same cell number stated above, and according to the agent's notes at the time, "ch stt the number its callable," indicating the card holder stated the number was in fact a callable point of contact for that customer.

51. Set forth below are further examples of other "Wrong Number" designations found in my analysis of the CORE numbers which do not appear to correspond to non-customer contacts. In each of the examples below, a cellular telephone number was dialed using the Aspect dialer, was coded with a ████████ indicating that the ███████████████ they were not the account holder, and then *during the same phone call* the recipient made a promise to pay.[35]

---

[35] See BRG 740 Code Right Party Contact Analysis, attached as Exhibit 10.

CONFIDENTIAL

| seqnum | phone_num | time_of_contact | response_status | dial_mode | ACCT_ID | name |
|---|---|---|---|---|---|---|
| | | 1/22/2018 22:00 | DPV PTP | IMD | | Positive Voice Promise to Pay |
| | | 4/14/2017 23:05 | DPV PTP | IMD | | Positive Voice Promise to Pay |
| | | 7/25/2017 16:23 | DPV PTP | AGENT/OP | | Positive Voice Promise to Pay |
| | | 2/19/2018 19:12 | DPV PTP | AGENT/OP | | Positive Voice Promise to Pay |
| | | 3/5/2018 20:58 | DPV PTP | IMD | | Positive Voice Promise to Pay |
| | | 8/22/2017 20:29 | DPV PTP | IMD | | Positive Voice Promise to Pay |
| | | 12/13/2016 22:13 | DPV PTP | PREDICTIVE | | Positive Voice Promise to Pay |

### _There Is No Automated Way To Analyze The Validity Of "Wrong Number" Codes_

52. The analysis described above required manual review of the Account Notes, including careful correlation of the timing of customer interactions with respect to when a "Wrong Number" ██████████████████████████ had been applied. This analysis drew on multiple data sets derived from different databases and information repositories, and could not be queried from a single resource. Additionally, this review could not be automated because of the abbreviations and non-standardized language used by the agents in their notes.

CONFIDENTIAL

53. Multiple data analysts working at my direction assisted with this analysis to carefully evaluate each set of Account and Notes data and to verify findings. This was a laborious, multi-stage process. In my opinion as an expert in data analytics, there is no effective way to automate this analysis across the entire proposed class. Instead, that analysis would require individualized review of each record and the results of those analyses may be inconclusive or disputed.

54. My analysis also identified that in the vast majority of instances, Wells Fargo placed no subsequent dialer calls to a telephone number after a "Wrong Number" designation was applied. Of the 1038 CORE numbers analyzed, only 99 telephone numbers (less than 10%) received a dialer call after a "Wrong Number" designation was noted in either the dialer records or the agent's notes. As to the numbers that did receive subsequent calls, additional manual analysis of account notes and other documentation would be required to identify whether information subsequently came to Wells Fargo's attention that would establish consent to call those numbers. More than 80% had no subsequent communication of any kind after a "Wrong Number" designation was noted.[36]

### *It Is Not Possible To Use Public Records Databases To Distinguish Calls Received By Non-Customers From Calls Received By Account Holders*

55. Nor is it possible to distinguish calls received by non-customers from calls received by account holders using public records databases. Wells Fargo's business records do not contain the identities of the persons who answer the calls placed by Wells Fargo in its efforts to reach its customers. When calls are answered by non-customers, Wells Fargo neither creates nor maintains business records with identifying information for the non-customer's

---

[36] See Exhibit 11.

name, date of birth, social security number or address. The only information that is available is the cellular number, the date it was called and the date it was marked as a wrong number. This information alone, however, is insufficient to identify the person that answered the call from Wells Fargo.

56. A foundational question, then, in attempting to identify a class of non-customers, is whether there is a reliable forensic method to determine the identity of the subscriber or user of a cellular telephone number, and whether there is a reliable forensic method to determine the identity of the person who received the call.

### *Subscribers vs. Customary Users*

57. For any given telephone number, there are several types of individuals who can be associated with that number in some way. Each of these different types of associated individuals are distinguishable from one another and have unique challenges with respect to identification.

58. A *subscriber* to a cellular telephone number is the party responsible for paying the wireless carrier for that service. There is no master database of cellular subscribers from which to identify the subscriber of any given cellular number or numbers. Each individual wireless carrier maintains its own set of records, but even these are necessarily incomplete. In the case of "prepaid" wireless accounts, the telecommunications provider may not have any record of the subscriber's name, because the account is not billed in a traditional fashion. Instead, the prepaid subscriber deposits funds into their account to obtain a certain amount of service, and as long as the account is funded, the telephone number can be used. The wireless provider need not and does not maintain any records of the subscriber's identity because no bill is ever sent. So-called "burner phones" are a subset of prepaid accounts, in which a certain

amount of wireless service comes preloaded in the phone at the time of purchase and no

direct contact ever exists between the user and the telecommunications provider.[37]

59. A *customary user* of a cellular telephone is a term used to describe the person who most

frequently has possession of a particular mobile device and uses it to make and receive calls.

There is no master database of customary users from which to identify the actual user of any

given cellular number or numbers. Many cellular phone users are members of group or

family plans, where a single subscriber maintains an account with the telecommunications

provider on behalf of their family or employees. In these instances, a single individual may

be the primary or even exclusive user of a cellular telephone number, but because the account

is held and paid for by another person or organization, that primary or exclusive user is

unknown to the telecommunications provider and is not identified in any formal

documentation.

60. A third category of associated users are the actual individuals who pick up the phone and

answer any particular call. Identification of these call recipients is beyond the reach of any

database.

### *Public Records Data Vendors*

61. Despite the lack of any national directory of cellular telephone owners, subscribers, or

customary users, there are Data Vendors that compile databases by aggregating information

from a variety of third-party sources, such as credit card applications and other sources where

---

[37] The anonymous nature of pre-paid plans cause concern among legislators and security experts due to their use by terrorists and other criminals. For example, Congress considered a proposed bill, dubbed the "Closing the Pre-Paid Mobile Device Security Gap Act of 2016," or HR 4886, which proposed to ban anonymous pre-paid cellular phones. *See* https://www.govtrack.us/congress/bills/114/hr4886/summary, attached as Exhibit 12.

a consumer self-reports a cellular number. None of these Data Vendors purport to offer a database of cellular subscribers, or a database of cellular users. Instead, these databases are represented to consist of aggregated information indicating a wide array of associations between phone numbers and people that can be used by investigators as a starting point for further investigation.

62. Although public records Data Vendors compile and offer many types of reliable, authoritative information, such as real estate ownership and business records, the difference is that these types of records are sourced from reliable and verifiable public records such as recorded deeds and secretary of state records. By contrast, cellular telephone usage is not published in publically accessible records. Data Vendors draw from any available association between a person's name and a telephone number that may appear in one of their sources. The accuracy and currency of these sources is variable.

63. The telephone data sold by the Data Vendors makes no effort to distinguish *subscribers* from *customary users* from *ancillary parties* who at some point and in some way were associated with a telephone number. The Data Vendors draw these associations from a variety of source documents in which individuals have provided a phone number as a point of contact. A person may provide a phone number for a wide variety of reasons. The number may indeed be the number for which they are a subscriber, or the customary user. Sometimes a person may provide a telephone number because they had the permission of the subscriber or customary user to use that number. Sometimes a person may provide a number that is not their own because they are trying to avoid disclosing their own number for some reason. Sometimes the number is either written down or transcribed from a document in error, such

as a so-called "fat finger" mistake. Sometimes a database error or data corruption can mistakenly connect a number and a person's name.

64. I have conducted analyses in prior TCPA cases involving instances in which people who did not have cellular phones of their own used the cellular telephone number(s) of a friend or a family member. I have observed such associations ending up in Data Vendor records. As a result, the Data Vendors report these third party names as associated with the cellular numbers, even though the names do not and never did reflect an actual subscriber or customary user.

65. The use of group or family plans makes it particularly difficult to associate a cellphone number with a unique user. In the case of cellular numbers that are part of family or group subscriptions, the name of the account holder, such as a parent or spouse, is often reported rather than the actual user of the cellular number, or vice versa. Nor can the Data Vendors identify whether a number is part of a group or family plan in the first place. Thus, there is no way to determine whether that particular individual is the account holder, the actual user of the number, or another family member who uses a different number on the same plan.

66. Even where a number is not part of a family plan, multiple family members can become associated with the same number. For example, if spouses or other family members have joint credit cards or bank accounts, their names often become associated with each other's phone numbers even if they are neither the account holder nor the user of that number. It is also possible that spouses will sign up for various commercial services using the other spouse's contact information. This could also cause one spouse to become "associated with" the other spouse's phone number in public databases.

67. Many Data Vendors do not offer records of historical cellular telephone usage, only records the Vendor construes as representing current usage. Because they cannot obtain the actual service dates from the telecommunication carriers, what Data Vendors report as "first" and "last seen" dates are merely the dates of the source records obtained from their third-party sources. The reliability of those sources cannot be assessed, as LexisNexis and other Data Vendors typically refuse to identify them as they are considered "confidential, proprietary info."[38] In contrast, other data sold by Data Vendors, such as real estate ownership and business records, are sourced from reliable and verifiable public records, such as recorded deeds and secretary of state records with clearly identified dates when their various contractual relationships or other obligations occurred.

68. As a consequence of these well-known problems, professional investigators do not rely upon reverse historical lookups to identify the user of a cellular number in the past. Instead this information is considered only a lead, one of many possible inputs for subsequent investigative work. An additional investigation that can evaluate the accuracy of the lead could include a review of the reported data for obvious errors, a search of public records, media sources and the internet, or even direct contact to the subject.

### *Data Vendors Acknowledge Their Unreliable Results In Their Pricing And In Their Warranties.*

69. LexisNexis provides the following disclaimer with respect to the accuracy of its telephone lookup services:

> Important: The Public Records and commercially available data sources
> used on reports have errors. Data is sometimes entered poorly,

---

[38] Email from Leslie Sherman at LexisNexis.com, April 14, 2016, attached as Exhibit 13.

processed incorrectly and is generally not free from defect. ***This system should not be relied upon as definitively accurate.*** Before relying on any data this system supplies, it should be independently verified. [39]

(Emphasis added)

70. TLO issues a similar warning regarding the accuracy and completeness of its reported data.[40]

71. As further acknowledgement of the unreliability of its lookup data, LexisNexis bases its pricing on the assumption that the majority of searches will not return any result at all. In response to a 2016 request by BRG for reverse cellular phone lookup pricing, LexisNexis explained that it only charges a fee when the search returns a result. LexisNexis then provided a tiered price quote with charges that presumed a low accuracy rate.[41] BRG subsequently confirmed with LexisNexis that as of the end of 2017 its low accuracy rate had not improved.[42]

72. Based upon my twenty years as a professional investigator and on the extensive testing that I have conducted on the data at issue in this and other cases, it is my opinion, to a reasonable degree of scientific certainty, that historical reverse cellular lookup services are highly unreliable and unable to accurately identify the recipients of the calls at issue in this case absent a complex individualized investigation. Historic cellular lookups are notoriously unreliable and their data cannot be used alone to determine who was using a cellular number at the time of a particular call. In addition, given the substantial differences in the information

---

[39] LexisNexis Disclaimer, attached as Exhibit 14.
[40] "The TRADS Services are provided "as-is", with no warranties of any kind, whether express, implied in fact or by operation of law, or statutory, including without limitation, those as to quality, non-infringement, accuracy, completeness, timeliness, or currentness, and those warranties that might be implied from a course of performance or dealing or trade usage and warranties of merchantability and fitness for a particular purpose." See https://www.tlo.com/terms-conditions, p.7, attached as Exhibit 15.
[41] LexisNexis pricing email, attached as Exhibit 16.
[42] Affidavit of Rachel Robinson, attached as Exhibit 17.

reported by Data Vendors, choosing which of the persons identified by reverse lookup process is a class member and which would be left uncompensated in the event of a recovery by the proposed class would be a purely arbitrary method without additional investigation.

### *Data Analysis Of CORE Numbers Demonstrates The Unreliable Information Provided By The Data Vendors*

73. At the time I prepared this report, plaintiffs have not disclosed their expert witness(es) nor have they articulated the methodology by which they propose to identify the non-customers they claim are members of the proposed class, or a methodology which would establish that Wells Fargo lacked consent to place any particular call. At such time that plaintiffs do put forth such a methodology or identify the persons they contend are class members, I intend to comment on the efficacy and appropriateness of that proposal.

74. In the absence of a specific proposal from plaintiffs to review, I have conducted a preliminary analysis of the CORE numbers with respect to proposed methods for class member identification that I have encountered in prior engagements.

75. Despite the unreliable and inconsistent data reported by the Data Vendors' cellular telephone reverse lookup services, I have served as a consulting and/or testifying expert in several TCPA lawsuits involving allegations of non-customer contact and reassigned telephone numbers in which plaintiffs' experts proposed the use of public record data vendors such as LexisNexis and TLO as a way to determine who received a call to a particular cellular telephone number.

76. To demonstrate the unreliability of using Data Vendors to identify potential class members, I conducted preliminary searches on each of the CORE numbers in the database of historic cellular telephone name associations provided by LexisNexis. In addition to researching the

CORE numbers in LexisNexis, I have also conducted certain additional testing as detailed below, including searches in the database of cellular telephone information provided by TLO.

77. I selected LexisNexis and TLO because they are proprietary public records databases which are both well-established and frequently used in the investigative industry. I have extensive professional experience with both databases and am familiar with their strengths and weaknesses. LexisNexis and TLO also are among the only Data Vendors that claim to provide *historical* reverse lookup data for cellular numbers. Most Data Vendors only purport to identify the current user or owner of the cellular number.

78. For each of these Data Vendors, BRG's licensed private detective agency, BRG Investigatory Services LLC, has subscribed to the highest level of cellular data information available, and these subscriptions entail access to information that is only available to organizations that pass the data protection and compliance verification processes of the respective Data Vendors. The results of each search was documented and saved as individual PDF copies in my workpapers. My testing demonstrates that using public records Data Vendors to conduct "reverse cellular lookup" of telephone numbers produces unreliable results for several key reasons, as summarized below.

### *Failure To Return Any Name For The Subscriber Or User*

79. If a subscriber or customary user of a cellular telephone number never discloses their number to one of the data sources used by the Data Vendor to aggregate its records, then that user's name will not be available to the Data Vendor and will not be associated with their own phone number.

80. This scenario is evident in the case of plaintiff Albert Pieterson's telephone number. I conducted a reverse lookup on the cellular number that plaintiff Albert Pieterson claims received calls from Wells Fargo. I understand from Plaintiff's Responses and Objections to Defendant's Second Set of Interrogatories that Mr. Pieterson claims to have been the subscriber to this number from 2012 forward and its exclusive user since at least September 18, 2014 forward.[43] I found that the neither LexisNexis or TLO associate Mr. Pieterson with the cellular number ██████-7599. In fact, both Data Vendors return no name at all for this number.[44]

*Failure To Return The Correct Name Of The Subscriber Or User*

81. If a person other than the subscriber or customary user of a cellular telephone number does disclose that number to one of the data sources used by the Data Vendor to aggregate its records, either in error or for some reason believing themselves to be an authorized user of that number, then that user's name will be associated with a phone number that is not their own.

82. This scenario is evident in the case of plaintiff John Hastings' telephone number. I understand from the complaint that Mr. Hastings claims to have received calls from Wells Fargo that were intended for Wells Fargo account holder ███████.[45] I conducted a reverse lookup on the cellular number at issue and found that neither LexisNexis nor TLO associate Mr. Hastings with the cellular number █████ 0525. LexisNexis only reports the name ██████████ the name of the account holder that Wells Fargo was trying to

---

[43] Plaintiff's Responses and Objections to Defendant's Second Set of Interrogatories, p. 3-4.
[44] The reverse lookups for ██████ 7599 are attached as Exhibit 18.
[45] Hastings v. Wells Fargo Bank, *et al*., Complaint, p. 4 par. 12-15.

reach. TLO also identifies ███████████ with the number, but as a secondary result, whereas the database gives the highest confidence ranking to the name ████████████████ who is said to be associated with the number from April 2007 to May 2018. This time frame overlaps with the time period during which Mr. Hastings contends he was using that phone number and received the phone call from Wells Fargo that is in dispute.[46]

83. Mr. Pieterson and Mr. Hastings have stepped forward to identify themselves as the users of cellular telephone numbers they assert were called in error. Strikingly, neither plaintiff would be identified as a potential class member if the Data Vendors reverse lookup service were used.

*Returning Conflicting And Inconsistent Results*

84. As an additional source of complication and lack of reliability, because Data Vendors rely on their own sources of input and then run their own proprietary algorithms to identify a name association on a prior date, they report results that are substantially different from one another. If plaintiffs were to rely on one Data Processor, they might end up with one set of names for proposed class members, while the choice to rely on a different Data Processor could result in a substantially different list. For example, the search for Mr. Hasting's phone number, discussed above, returned the name of Wells Fargo account holder ████████ ██████████ from LexisNexis, but the same search conducted in TLO returned records identifying a " ██████████ as the more likely user. Not only is neither result correct, the two results are incorrect in different ways. This results in an arbitrarily and non-objective selection of potential class members.

---

[46] The reverse lookups for ████████0525 are attached as Exhibit 19.

CONFIDENTIAL

*Results From The Analysis Of The CORE Numbers In LexisNexis*

85. My analysis of the 1038 CORE cellular numbers illustrates these problems. After searching each of the 1038 telephone numbers in the database of historic cellular telephone name associations provided by LexisNexis for the time frames appropriate for each call, I found that LexisNexis failed to return any name at all for 69.85% of the numbers.[47]

86. LexisNexis returned multiple different name associations for 5.97% of the telephone numbers, for the same time frame, with no clarity on which one might be the putative class member who actually received the call.

87. LexisNexis only returned a single name for 24.18% of the numbers searched—but in 27% of those results the name returned by LexisNexis was the same as the account holder that Wells Fargo was attempting to contact.

88. LexisNexis was only able to provide a single name identifying an alleged non-customer in 17.6% of the calls.

89. Furthermore, the return of any name from this search provides no guarantee that the name is in fact an accurate identification of the subscriber, or user, of the phone who actually received the call in question.

*Issues That Arise When Using Multiple Data Vendors*

90. As noted, plaintiffs have yet to disclose a methodology for identifying potential class members, but I have previously worked on expert engagements in TCPA cases in which plaintiff's experts have proposed the use of multiple Data Vendors such as LexisNexis, TLO, and others in tandem to identify names associated with cellular numbers. In those cases, the

---

[47] The results of the LexisNexis reverse lookup analysis are attached as Exhibit 20.

CONFIDENTIAL

use of multiple Data Vendors was proposed as a way to "fill in" gaps where one Data Vendor failed to return a name.

91. To date, I have only conducted this historical cellular telephone reverse lookup analysis for the CORE numbers in LexisNexis, but I know from other TCPA expert engagements that searching a set of telephone numbers in two or more Data Vendors' records introduces conflicts and contradictions. In similar engagements in which I have conducted this analysis, I have found that LexisNexis and TLO rarely return the same, single name of a person associated with a phone number; in my experience this occurs between 7-14% of the time depending on the characteristics of the population of consumers at issue.

92. When Data Vendors disagree on the individual associated with a phone number at a moment in time, are unable to provide any name at all, or provide multiple competing names, there is no objective, data-based method by which to identify a potential class member without resorting to additional individualized investigation.

93. This is true even when a positive identification from one Data Vendor is not directly contradicted by a contrary positive identification from another Data Vendor. In my experience, the absence of records in the other Data Vendor indicates a general lack of extensive documentary support for that association. This means that the positive association could have been based on single unsubstantiated (and potentially inaccurate) source.

## *Returning The Names Of Wells Fargo Account Holders*

94. All 1038 of the CORE Numbers were called because at some point they were submitted to Wells Fargo as being the cellular numbers for account holders. All of these numbers were included in the sample because at some later point in time the numbers were designated as being "Wrong Numbers" for those account holders. I searched these numbers in TLO's

CONFIDENTIAL

database of current cellular telephone name associations, and 39.4% of the numbers return the name of the Wells Fargo account holder.[48] If the phone number was correctly submitted to Wells Fargo as a contact point for that account holder, and the Data Vendors' records correctly identify the current subscriber or user, then this would mean the number was incorrectly flagged as a "Wrong Number."

95. One of the well-publicized sources of data relied on by Data Vendors to associate names with cellular telephone numbers is credit card applications. Therefore, the account holder's credit card application to Wells Fargo is in some cases the same source by which the Data Vendor associates the telephone number with a name. It is therefore not surprising that the Data Vendors report the same names of Wells Fargo account holders, even for numbers that in Wells Fargo's dialer were marked as "Wrong Numbers."

### *The Names Returned By Data Vendors Are Often Incorrect*

96. The results I observed in the CORE Numbers are consistent with my past experience using cellular telephone lookup services. In 2016, I conducted testing of the reliability of LexisNexis' reverse lookup service using a list of 167 cellular telephone numbers for which I already knew the correct current user's name. These numbers encompassed a range of service plans including individually owned single user plans, family plans, and employer-

---

[48] See analysis of TLO current name associations attached as Exhibit 21. 39.4% of the cellular numbers are associated with a name that matches both the first <u>and</u> last name of the account holder. 51.25% of the numbers match to the account holder's first <u>and/or</u> last name. First and last names differences are valid to consider as potential matches to account holder names for a number of reasons. First, family telephone plans often cause multiple names to be associated with a single phone number by data vendors. The cellular number may well be used by the account holder but the cellular number is part of a family plan where a different family member is the actual subscriber to the cellular plan. Second, a first name match that does not include a last name match may also be the same person and thus the account holder due to last name changes which occur as a result of marriage. Further investigation would need to be conducted to determine the prevalence of this situation in this dataset.

CONFIDENTIAL

owned plans.[49] Only 67 of these test numbers returned the correct name of the known user, representing an accuracy rate of just 40.12%. Furthermore, of these 67 instances where a match was found to the known user, only 16 of the numbers (23.88%) returned the correct user's name as a single result, from both TLO and LexisNexis. The other numbers returned the name of the known user, but also identified one or more other persons as being associated with the number, with no indication of which of the names was the correct one.

### *It Is Not Possible To Automatically Determine The Status Of Consent For Each Call, As This Requires Individualized Investigation Of Account Records*

97. It is my understanding that Plaintiffs' seek to certify the following class:

> All persons within the United States who, between September 18, 2014 and the present, (1) received a non-emergency call to their cellular telephone numbers; (2) through the use of an automatic telephone-dialing system or an artificial or prerecorded voice; (3) from Defendant; (4) regarding the collection of alleged debts in connection with Wells Fargo credit card accounts; and (5) who were not Wells Fargo credit account holders at the time of the calls.[50]

98. Due to the difficulties in identifying proposed class members discussed above, it is unclear how plaintiffs propose to determine which calls were received by non-customers, and in my opinion it is not possible to do so. Even if such a determination were possible, however, it does not address the separate question of whether there was consent for Wells Fargo to place a particular call.

---

[49] I do not know if any pre-paid plans were included in the data set, but I did not take any steps to exclude them, and assume that pre-paid plans were included in some percentage. The results of this testing is attached as Exhibit 22.

[50] Amended Complaint, p. 3.

CONFIDENTIAL

99. It is my understanding that either the subscriber or the customary user of a cellular telephone number may consent to receive calls under the TCPA. As discussed above, subscribers and customary users are often distinct individuals. A call received by a non-customer subscriber might have been properly consented to by the customary user; conversely, a call received by a non-customer customary user might have been properly consented to by the subscriber. Additionally, third parties can also give consent, allowing account holders to receive calls on phones owned or operated by non-customers.

100. My analysis of the sample CORE numbers identified many instances of cellular numbers that had been designated in the Wells Fargo systems as a "Wrong Number" but where the agent's notes indicate the call reached a third party connected with the account holder, as set forth above.[51] Individualized investigation is necessary to establish whether any of these phone numbers for associated third-parties were submitted by the customer, and if so whether valid consent was provided at that time.

101. For example, phone number ████ 4241 was marked with an ████ code on November 29, 2014, and the agent's notes describe the conversation as follows: "3rd prty sttd not good nmbr to reach ch at left message with 3rd prty to have ch reach us." Accounting for the agent's shorthanded abbreviations, I understand this to say that a third party stated that the number called was not a good number to reach the card holder, and took a message to have the card holder contact Wells Fargo. In other words, the person who received the call was in contact with the card holder and advised this was not an efficient or preferred point of contact to that person. Understanding the meaning of this note would require research regarding the

---

[51] See Exhibit 23.

CONFIDENTIAL

circumstances of the customer initially providing the number for Wells Fargo to contact and whether the person had authorization to do so.

102. Phone number ████████0096 was marked with the ████ code on January 6, 2017 and the agent's notes describe the conversation as follows: ████████0518. number provided by mta-added to file. removed from ACDB and dialer." Accounting for the agent's shorthanded abbreviations, I understand this to say that the person answering the phone provided an alternate phone number which was then substituted into the account in place of the number dialed here. Understanding the meaning of this note would likewise require individualized inquiry regarding how the original number was obtained, and whether the person was a customer who was merely updating contact information, rather than a person asserting that the number was a "wrong number" or not the customer's number.

103. As set forth above in paragraphs 30 to 33, there are numerous examples where a person answering a call from Wells Fargo, or calling in to Wells Fargo, identifies as a family member or other person with a connection to Wells Fargo's customer.[52] Such telephone numbers can receive a designation of "Wrong Number," without information regarding whether the customer actually is a subscriber or customary user of the phone number. Sometimes the numbers are flagged "Wrong Number" even if they may still be associated with the customer, but a family member asserts the number "[is] not a good number to reach [their spouse, etc.] at."[53] Other examples include numbers flagged "Wrong Number" because another number was the better or "best" number for the customer.[54]

---

[52] See WF_Pieterson 003416, Notes, lines 25601, 29660, 34824, 35751.
[53] See WF_Pieterson 003416, Notes, line 24578.
[54] See WF_Pieterson 003416, Notes, lines 5556 and 41273.

CONFIDENTIAL

104. These notes are by no means determinative that the number was a non-customer's. Determining the meaning of these notes would require individualized inquiry regarding how the original number was obtained, and whether the person was a customer or family member who was merely updating contact information, rather than a person asserting that the number was a "wrong number" or not the customer's number.

Respectfully submitted,

_____

Margaret A. Daley

CONFIDENTIAL